
Gianetti v. Blue Cross and Blue Shield of Connecticut, Inc.
D.Conn.,2008.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
Charles D. GIANETTI, M.D., Plaintiff,
v.
BLUE CROSS AND BLUE SHIELD OF CONNECTICUT, INC., et al., Defendants.
No. 3:07cv01561 (PCD).

May 6, 2008.

Charles D. Gianetti, Bridgeport, CT, pro se.
Matthew H. Geelan, Michael G. Durham, Donahue, Durham & Noonan, P.C., Guilford, CT, for Defendants.

### *RULING ON MOTION TO DISMISS*

PETER C. DORSEY, District Judge.

*1 Plaintiff Charles D. Gianetti, M.D. brought this action against Defendants Blue Cross and Blue Shield of Connecticut, Inc., Anthem Health Plans, Inc., Anthem Insurance Companies, Inc., (collectively, "Defendant Anthem" or "Anthem"), as well as Defendants Samaris Rose ("Rose") and Cynthia Bellamy ("Bellamy"), in Bridgeport Superior Court for state law claims of breach of contract, quantum meruit, unjust enrichment, fraud and misrepresentation, and violations of Connecticut Unfair Trade Practices Act ("CUTPA"). Defendant Anthem removed the action to this Court on the grounds that Plaintiff's claims are preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* (2000) ("ERISA") and the claims raise substantial federal questions. Defendant Anthem filed a Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated herein, the Motion to Dismiss [Doc. No. 9] is **granted** as to all claims and all Defendants.

## I. BACKGROUND

For purposes of deciding this motion, the following factual allegations are assumed to be true. *See Mirree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). Plaintiff's explanation of the facts is less than clear, but the Court gathers the following. On March 10, 1999, Plaintiff, a physician in the State of Connecticut, performed reconstructive plastic surgery and other services on Rose, a minor child at the time of the surgery, who was named as a defendant in Plaintiff's state law complaint. (Compl. Count 1 ¶¶ 1, 5.) Bellamy, also so named, is the mother of Rose. (Compl. Count 1 ¶¶ 3, 4.) As of the date of these medical procedures, Bellamy and Rose were covered by an employer sponsored health benefit plan operated by Anthem and governed by ERISA.[FN1] According to Plaintiff, Bellamy and Rose signed a statement acknowledging their responsibility for payment of all fees regardless of insurance, and agreed that Plaintiff would not send them a statement of charges until Defendant Anthem paid Plaintiff and completed its review process. (Compl. Count 2 ¶¶ 11, 15.)

> FN1. Defendant Anthem states that the plan in question is an employer sponsored health benefit plan governed by ERISA. (Aff. of Linda Brink ¶¶ 4, 5.) Plaintiff does not dispute this assertion, and the Court accepts it as true for the purposes of this ruling.

Plaintiff subsequently sent Defendant Anthem: (1) a statement of charges for services performed on Rose, in the amount of $7,695; and (2) the patient's assignment of benefits to Plaintiff. (Compl. Count 1 ¶ 6.) Defendant Anthem remitted a payment of $3,019.50 to Plaintiff, stated that it had erroneously remitted a payment to Rose and/or Bellamy, and denied part of Plaintiff's charges as not covered. (Compl. Count 1 ¶¶ 7, 8, 9.) According to the Plaintiff, Defendant Anthem maintains that it made payments to Bellamy and Rose, but Plaintiff states

that Bellamy and Rose have denied receiving such payments. (Compl. Count 5 ¶¶ 24, 26, 27.) Furthermore, Plaintiff asserts that a September 8, 2000 statement does not reflect Defendant Anthem's payment to Bellamy and Rose or to Plaintiff. (Compl. Count 4 ¶¶ 24, 25.)

Plaintiff made numerous requests to Anthem for the remaining charges, and sent a statement of amount due to Bellamy and Rose. (Compl. Count 1 ¶¶ 10, 11; Compl. Count 2 ¶ 14.) Plaintiff reports that Bellamy and Rose have refused to pay the amount due to Plaintiff. (Compl Count 2 ¶ 16.) Despite having stated that Rose's records had been purged from its files, Defendant Anthem's employee subsequently submitted a listing of the claim's disposition. (Compl. Count 5 ¶¶ 30, 31.)

*2 On September 17, 2007, Plaintiff brought this action in Bridgeport Superior Court against Anthem, Rose, and Bellamy. The complaint alleges breach of contract, quantum meruit, and unjust enrichment against all Defendants, and fraud and misrepresentation and violation of CUTPA against Defendant Anthem. Plaintiff prays for monetary damages, costs, interest, and punitive damages.

On October 24, 2007, Defendant Anthem removed the action to this Court stating that removal was appropriate on the grounds that Plaintiff's claims are preempted by ERISA and the claims raise substantial federal questions.[FN2] (Def. Anthem's Pet. for Removal ¶ 2.) On November 27, 2007, Plaintiff was granted leave for extension of time to respond to the notice of removal, though he did not subsequently file a response. On January 24, 2008, Defendant Anthem filed a motion to dismiss on the grounds that Plaintiff's state law claims are preempted by ERISA. Plaintiff requested and was granted an extension of time until March 14, 2008 to file an objection. On March 17, 2008, without leave from the court, Plaintiff filed a late objection to the motion to dismiss. In deference to Plaintiff's *pro se* status,[FN3] the Court has considered the arguments therein, notwithstanding the late filing.

FN2. Bellamy and Rose never joined Defendant Anthem's Notice of Removal. Defendant Anthem informed the Court that Bellamy and Rose were contacted by Defendant Anthem regarding the Notice of Removal and they took no position on removal. (Def. Anthem's Removal Statement ¶ 5.) Remand to State court is not appropriate on this ground because Bellamy and Rose have waived any objection to removal by their failure to respond. *See Allstate Ins. Co. v. Zhigun,* No. 03 Civ. 10302, 2004 WL 187147, at *3 n. 2 (S.D.N.Y. Jan. 30.2004) (citing *Loftis v. United Parcel Service, Inc.,* 342 F.3d 509, 516-517 (6th Cir.2003); *Parrino v. FHP,* 146 F.3d 699, 703 (9th Cir.1998)) ("Failure to comply with the rule of unanimity in a notice of removal, is, unlike lack of subject matter jurisdiction, a procedural defect that is waived thirty days after the notice of removal is filed.").

FN3. While *pro se,* Plaintiff is in fact an experienced litigator, as he has filed almost 200 cases similar to this one. *See Gianetti v. Siglinger,* No. CV980349830, 2004 WL 1098443, at *4 (Conn.Super.Ct. Apr.26, 2004). The State of Connecticut has also brought suit against Plaintiff for violations of CUTPA, alleging balance billing of clients in situations similar to those involved here. Complaint, *State of Connecticut v. Gianetti,* No. CV-04-4033348-S (Conn.Super.Ct. Jul. 21, 2004).

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) must be decided on "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999). In deciding a motion to dismiss, well-pleaded facts must be accepted as true and

considered in the light most favorable to the Plaintiff.*Patane v. Clark,* 508 F.3d 106, 111 (2d Cir.2007). The issue in deciding a motion to dismiss is "not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims."*Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995). The factual allegations made in the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."*Bell Atlantic Corp. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1959, 167 L.Ed.2d 929 (2007). This requires the complaint to contain "enough fact to raise a reasonable expectation that discovery will reveal evidence" of the Plaintiff's claim. *Id.*

## II. DISCUSSION

### A. Jurisdiction

A defendant may only remove an action to district court if the plaintiff could have brought the action in the district court in the first instance. *See*28 U.S.C. § 1441(a) (2002) ("[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant ... to the district court of the United States."). Among the cases over which federal courts have original jurisdiction are those cases "arising under" federal law. 28 U.S.C. § 1331 (1980)."It is long settled law that a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law."*Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (citing *Gully v. First Nat'l Bank,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936)). Generally, the plaintiff is "master" of the complaint and the defendant's federal defense to a state law complaint does not provide grounds for removal to district court. *The Fair v. Kohler Die & Specialty Co.,* 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913); *Gully,* 299 U.S. at 116. A major exception to the well-pleaded complaint rule is that "Congress may

so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character."*Metropolitan Life Ins. Co.,* 481 U.S. at 63-64. ERISA is one such area. A cause of action within the scope of the civil enforcement provisions of ERISA § 502(a) [29 U.S.C. § 1132(a) ] is "necessarily federal in character by virtue of the clearly manifested intent of Congress" and is removable to federal court.*Metropolitan Life Ins. Co.,* 481 U.S. at 66-67. Despite the absence of any federal issue on the face of Plaintiff's complaint, this case falls within the scope of ERISA's civil enforcement provisions and, therefore, was properly removed to this Court. This Court, as a result, has jurisdiction over this case.

### B. ERISA Preemption of State Law Claims Brought by the Assignee of Benefits

\*3 It is uncontested that Plaintiff is a health benefit plan beneficiary by way of Bellamy and Rose's assignment of rights to Plaintiff. (Def. Mot to Dismiss 10 n. 2; Pl. Obj. to Mot. to Dismiss 6.) Plaintiff contends, however, that as a third-party healthcare provider, as opposed to a plan participant, his state law claims cannot be preempted by ERISA because his claims do not relate to the plan's administration. (Pl.'s Mot. to Dismiss 5.) Plaintiff argues that as a third-party health care provider, he may bring claims in his capacity as an assignee and in his own right, concurrently. (*Id.* at 6.)

A participant or beneficiary is empowered under ERISA's civil enforcement scheme to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."29 U.S.C. § 1132(a)(1)(B) (2006). Accordingly, the Second Circuit has held that third-party health care providers, as assignees of beneficiaries, have standing to bring suit under ERISA claiming their assigned benefits. *I.V. Servs. of Am., Inc. v. Trs. of Am. Consulting Eng'rs Council Ins. Trust Fund,* 136 F.3d 114, 117 n. 2 (2d Cir.1998) ("[T]he assignees of beneficiar-

ies to an ERISA-governed insurance plan have standing to sue under ERISA.")." Given that Plaintiff had standing to bring suit under ERISA, Plaintiff's state law claims are subject to ERISA preemption, if appropriate. *See, e.g., Weisenthal v. United Health Care Ins. Co. of N. Y.,* Nos. 07 Civ. 1175, 07 Civ. 0945, 2007 WL 4292039, at *4 (S.D.N.Y. Nov.29, 2007) (holding that ERISA preempted the plaintiff heath care provider's state law claims after finding the plaintiff had standing to sue).

### C. The Preemption Clause

In enacting ERISA,

"Congress sought principally to address concerns that lack of uniformity and the administrative and financial burdens of compliance with conflicting state laws might work to the detriment of plan beneficiaries, and reduce the willingness of employers to adopt such plans, or lead to a reduction in the level of benefits furnished."

*Plumbing Indus. Bd. v. Howell Co.,* 126 F.3d 61, 66 (2d Cir.1997) (citing *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990)). Thus, Congress's principle goal was to "protect ... the interests of participants in employee benefit plans and their beneficiaries."*Aetna Health Inc. v. Davila,* 542 U.S. 200, 208, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004) (quoting 29 U.S.C. § 1001(b)). To ensure the uniformity of benefits law, ERISA contains an express preemption clause, providing, with some exceptions, that ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a) (2006).*See also Howell,* 126 F.3d at 66.

To find ERISA preemption, however, the moving party must defeat the presumption that Congress did not intend to supersede state law. *Howell,* 126 F.3d at 66-67. In considering whether Congress intended preemption, the Supreme Court noted that

"if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), [29 U.S.C. § 1132(a)(1)(B),] and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)."*Davila,* 542 U.S. at 210. The Court must determine, therefore, "whether plaintiff 'at some point in time, could have brought [his] claim under ERISA § 502(a)(1)(B)' and if so, whether any 'independent legal duty is implicated by [defendants'] actions."*Curcio v. Hartford Fin. Servs. Group,* 469 F.Supp.2d 18, 22 (D.Conn.2007) (quoting *Davila,* 542 U.S. at 210). Further, "[i]f the alleged liability is derived from or dependent upon the existence and administration of an ERISA-regulated benefit plan, then the state-law claims are not 'entirely independent of the federally regulated contract itself,' and are therefore preempted."*Id.* (quotation omitted). State laws are not independent of the ERISA plan if the interpretation of the terms of the benefits "forms an essential part of" the plaintiff's claims and the defendant's alleged liability. *Davila,* 542 U.S. at 213.

### D. Counts One, Three, and Four: Breach of Contract, Quantum Meruit, and Unjust Enrichment as to Defendant Anthem

*4 Defendant Anthem contends that all of Plaintiff's claims are preempted by ERISA because of courts' "expansive construction of ERISA's preemption clause," because the claims relate to the ERISA plan, and because precluding preemption would undermine ERISA's comprehensive civil enforcement scheme. (Def.'s Mot. to Dismiss 3, 10.) In reply, Plaintiff argues that his breach of contract claim is not preempted by ERISA because ERISA's civil enforcement provisions authorize him to bring such a claim. (Pl.'s Obj. to Mot. to Dismiss 2.)

According to the Supreme Court's decision in *Davila,*"if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independ-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)." *Davila,* 542 U.S. at 210. Plaintiff's breach of contract, quantum meruit, and unjust enrichment state law claims are all interrelated for purposes of the *Davila* analysis. For these state law claims, the first *Davila* factor for preemption is satisfied because, as previously discussed, Plaintiff could have brought his claim under ERISA. As a plan beneficiary, pursuant to his assigned rights, Plaintiff had standing to recover benefits under ERISA. *Curcio v. Hartford Fin. Servs. Group,* 469 F.Supp.2d 18, 23 (D.Conn.2007).

The second *Davila* factor is whether defendant's actions implicate any legal duty independent of the ERISA plan. Plaintiff's breach of contract, quantum meruit, and unjust enrichment claims are "derived from or dependent upon the existence and administration of" the ERISA plan. *Curcio,* 469 F.Supp.2d at 23 (quotation omitted). Plaintiff alleges that Defendants have received the value of his services and have failed to pay the amount due for the services. (Compl. Count 3 ¶¶ 29, 30.) Recovery of benefits under the ERISA plan requires an initial determination of the nature and extent of Plaintiff's benefits under the plan. Plaintiff's benefits under the ERISA-regulated plan dictate both the value of the services and, as a result, the amount due for those services. *Curcio,* 469 F.Supp.2d at 23. "[I]nterpretation of the terms of [plaintiff's] benefit plan[ ] forms an essential part of [his state law claim], and ... liability would exist here only because of [defendant's] administration of ERISA-regulated benefits plans. [Defendant's] potential liability under [state law] in [this case], then, derives entirely from the particular rights and obligations established by the benefit plans." *Davila,* 542 U.S. at 213. Plaintiff's breach of contract, quantum meruit, and unjust enrichment claims, thus, are "not entirely independent of the federally regulated contract itself." *See Curcio,* 469 F.Supp.2d at 23 (citing *Davila,* 542 U.S. at 210). Rather, Plaintiff brings suit to recover payments he alleges were promised

or due to him under the ERISA plan.

**\*5** In *Weisenthal v. United Health Care Insurance Co. of New York,* the Southern District of New York decided a similar case in which the plaintiff brought various state law claims seeking damages for the defendant's decision not to cover certain medical procedures under its ERISA-regulated healthcare insurance plans. 2007 WL 4292039, at \*1, 6 (S.D.N.Y. Nov.29, 2007). The Southern District of New York explained that all of the claims were grounded in the ERISA-regulated plan and thus the defendant's actions did not implicate an independent legal duty.

> "Plaintiffs allege fraud insofar as Defendants [refused to provide] reimbursement for procedures that should have been reimbursed. By failing to reimburse patients for procedures that should have been reimbursed, Plaintiffs allege that Defendants were unjustly enriched, and that Plaintiffs are now entitled to the reasonable value of the services rendered in quantum meruit. By refusing to reimburse patients, Plaintiffs allege that Defendants infringed on the contractual relationship established in the Agreements.... The conduct of which Plaintiffs complain, however, is nothing more than the manner by which Defendants decided not to reimburse patients. Such was the same situation confronted by the *Davila* Court, and the same result obtains here: Plaintiffs' common law claims seek 'only to rectify a wrongful denial of benefits promised under ERISA-regulated plans and do not attempt to remedy any violation of a legal duty independent of ERISA.'"

*Id.* at \*6 (quoting *Davila,* 542 U.S. at 213) (internal citations omitted).*See also Berry v. MVP Health Plan, Inc.,* No. 1:06-CV-120, 2006 WL 4401478, at \*8 (N.D.N.Y. Sept. 30, 2006) (holding that ERISA preempted the plaintiff's unjust enrichment claim because "[c]onsideration of this claim necessarily entails an examination of the [ERISA] plan which governs each of plaintiffs' claims, as assignees, for benefits.").

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

For the reasons stated herein, Plaintiff's claims of breach of contract, quantum meruit, and unjust enrichment as to Defendant Anthem are **dismissed**.

**E. Counts Five and Six: Fraud, Misrepresentation, and Connecticut Unfair Trade Practices Act (CUTPA) Violation as to Defendant Anthem**

Defendant Anthem contends that ERISA preempts Plaintiff's fraud and misrepresentation claims. (Def.'s Mot. to Dismiss 1; Def's Reply in Supp. of Mot. to Dismiss 1-6.) Plaintiff argues that ERISA does not preempt claims when the "deception only incidentally concerned" the benefits, or because fraud is of special interest to the state. (Pl.'s Obj. to Mot. to Dismiss 3-4.) Plaintiff also suggests that because the misrepresentation claim would exist regardless of ERISA coverage, it is not preempted. (*Id.* at 6.)

The Second Circuit has held that "ERISA preempts state common law claims of fraudulent or negligent misrepresentation when the false representations concern the existence or extent of benefits under an employee benefit plan."*DaPonte v. Manfredi,* 157 Fed. Appx. 328, 330 (2d Cir.2005) (quotation omitted). In *DaPonte,* the Second Circuit held that ERISA did not completely preempt plaintiffs' state law claims of negligent and fraudulent misrepresentation when the defendant promised medical coverage upon a certain date and subsequently failed to provide the coverage, but made no "misrepresentations regarding the existence or extent of benefits *under an employee benefit plan.*" *Id.* at 330-31 (internal quotation omitted) (emphasis in original). The Second Circuit distinguished *Cicio v. Does 1-8,* 321 F.3d 83, 92-93 (2d Cir.2003), in which ERISA preempted a claim for state law malpractice when a Defendant misrepresented "crucial terms in the plan ... which materially affected the extent of plaintiff's coverage under the plan."*DaPonte,* 157 Fed. Appx. at 330.

*6 In *Geller v. County Line Auto Sales, Inc.,* on which Plaintiff relies, the Second Circuit held that ERISA did not preempt a state law fraud claim. 86 F.3d 18, 22-23 (2d Cir.1996). There, the plaintiffs alleged that the defendants fraudulently misrepresented the employment status of an individual and, in reliance on the misrepresentation, the plaintiffs paid benefits on her behalf. *Id.* at 19-20.Unlike in this case, the claim in *Geller* did not "rely on the [ ] plan's operation or management."*Id.* at 22-23.Instead, "[t]he plan [in *Geller]* was only the context in which this garden variety fraud occurred."*Id.* Plaintiff alleges that Defendant Anthem fraudulently concealed and misrepresented payments and its denial of review of claims made under the ERISA plan. (Compl. Count 5 ¶ 32.) Assuming the facts alleged in the complaint, Anthem's fraud and misrepresentation concern both the existence and extent of benefits under the plan and involve the plan's management. The denial of charges, the alleged lack of timely review of the denial of charges, and the alleged purging of the patient's records from Anthem's files (Compl. Count 5 ¶¶ 28-32) are all closely related to the manner in which Anthem manages the plan and have substantial impact on Plaintiff's benefits under the plan. These are not akin to the garden variety fraud in *Geller.*ERISA, therefore, preempts Plaintiff's fraud and misrepresentation claims, and these claims are **dismissed** as to Defendant Anthem.

Plaintiff's Connecticut Unfair Trade Practices Act (CUTPA) claim is similarly preempted by ERISA. Plaintiff alleges that the acts of fraud and misrepresentation constitute violations of CUTPA. (Compl. Count 6 ¶ 34.) Under controlling precedent, ERISA preempts CUTPA claims. *See, e.g., Levine v. Hartford Life Ins. Co.,* No. Civ. A. 302CV81, 2002 WL 1608330, at *2 (D. Conn. June 28, 2002); *Krass v. Connecticare, Inc.,* No. Civ. 3:96CV2565, 1998 WL 26409, at *5 (D.Conn. Jan.14, 1998). The reasoning supporting ERISA preemption of fraud and misrepresentation claims extends to CUTPA claims. The alleged unfair and deceptive acts are closely related to the operation of the plan and have a substantial impact on the existence of and the extent to which Defendant Anthem

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

owes payments to Plaintiff under the plan. Therefore, Plaintiff's CUTPA claims as to Defendant Anthem are also **dismissed.**

**F. The "Savings Clause"**

Plaintiff does not argue that his state law claims fall within ERISA's "savings clause," and the Court agrees with Defendant Anthem's contention that the claims do not fall within the savings clause. ERISA does not preempt state laws falling within its "savings clause," 29 U.S.C. § 1144(b)(2)(B). The savings clause provides that ERISA plans are not exempt from state laws "regulat[ing] insurance companies, insurance contracts, banks, trust companies, or investment companies."29 U.S.C. § 1144(b)(2)(B) (2006).

*7 The Supreme Court held that a court should consider two factors in determining whether a state law regulates insurance within the meaning of the savings clause. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 50, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). First, the court must "consider the 'common-sense view' of the term 'regulates insurance' which suggests that 'in order to regulate insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry.'"*Howard v. Gleason Corp.,* 901 F.2d 1154, 1158 (2d Cir.1990) (emphasis omitted) (quoting *Pilot Life,* 481 U.S. at 50). Second, in interpreting the savings clause, the court should be guided by judicial interpretation of "the business of insurance" under the McCarran-Ferguson Act, 15 U.S.C. § 1011, *et seq.Pilot Life,* 481 U.S. at 48. Under the McCarran-Ferguson Act, courts determine, "[f]irst, whether the [state law] has the effect of transferring or spreading a policyholder's risk; second, whether the [state law] is an integral part of the policy relationship between the insurer and the insured; and third, whether the [state law] is limited to entities within the insurance industry."*Id.* at 48-49 (emphasis omitted).

Under the first consideration, Plaintiff's state law claims of breach of contract, quantum meruit, unjust enrichment, fraud, misrepresentation and violations of CUTPA are not directed specifically at the insurance industry, but rather are laws of general application. *See, e.g., UNUM Life Ins. Co. of Am. v. Ward,* 526 U.S. 358, 377 n. 7, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) (noting that a common law cause of action for bad-faith breach of contract was not "specifically directed to the insurance industry and therefore not saved from ERISA preemption"); *see also Bailey-Gates v. Aetna Life Ins. Co.,* 890 F.Supp. 73, 79 (D.Conn.1994) ("[I]t is well-established in this district that ERISA's savings clause does not except [ ] CUTPA ... claims from preemption.").

Similarly, Plaintiff's state law claims do not satisfy the McCarren-Ferguson Act criteria, and are thus not saved by the savings clause. None of the state law claims presented here transfer or spread policyholder's risk, constitute an integral part of the policy relationship between the insurer and the insured, nor are the laws limited to entities within the insurance industry.

**G. Supplemental Jurisdiction Over Claims Against Bellamy and Rose**

Plaintiff contends that his state law breach of contract, quantum meruit, and unjust enrichment claims against Bellamy and Rose are not preempted by ERISA. (Obj. to Mot. to Dismiss 1.) Indeed, Plaintiff's state law claims against Bellamy and Rose are not preempted by ERISA because they improper defendants to an ERISA suit. The Second Circuit has held that "in a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable."*Crocco v. Xerox Corp.,* 137 F.3d 105, 107 (2d Cir.1998) (quoting *Leonelli v. Pennwalt Corp.,* 887 F.2d 1195 (2d Cir.1989)). Plaintiff does not suggest that Bellamy and Rose are administrators nor trustees of the plan, and therefore, as plan participants, Bellamy and Rose are improper defendants to this ERISA suit.

*8 This Court has supplemental jurisdiction over Plaintiff's state law claims against Bellamy and Rose. "In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."28 U.S.C. § 1367(a) (1990). Accordingly, "28 U.S.C. § 1367(a)... makes pendent party jurisdiction possible where the claim in question arises out of the same set of facts that give rise to an anchoring federal question claim against another party."*Kirschner v. Klemons*, 225 F.3d 227, 239 (2d Cir.2000); *see also City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (holding state law claims form part of the same case if they and the federal claims "derive from a common nucleus of operative fact").

Plaintiff's claims against Defendants Anthem, Bellamy and Rose arise from the same operative facts. Plaintiff could not have a claim against Anthem without the assignment of Bellamy and Rose's ERISA-governed rights and benefits to Plaintiff, nor could he have a claim against Bellamy and Rose without Anthem's denial of charges. Plaintiff's claims against Anthem, Bellamy, and Rose all arise out of their alleged failure to compensate Plaintiff for the services performed on March 10, 1999. (Compl. Count 1 ¶¶ 5, 11; Compl. Count 2 ¶ 16.) Since Plaintiff's state law claims against Bellamy and Rose derive from the same set of facts as his federal claims against Anthem, the Court has supplemental jurisdiction over Plaintiff's state law claims against Bellamy and Rose.

**H. Count Two, Three, and Four: Breach of Contract, Quantum Meruit, and Unjust Enrichment as to Bellamy and Rose**

Plaintiff alleges that minor child Rose and her mother, Bellamy, had signed a contract with Plaintiff stating that they were "responsible for the payment of all fees [in connection to the March 10, 1999 medical care] regardless of insurance."He further alleges that they breached the contract by failing to remit payment for the services he performed after Anthem denied payment and completed its review process. (Compl. Count 2 ¶¶ 12-17.) Plaintiff also makes claims against Bellamy and Rose for quantum meruit and unjust enrichment.

Bellamy and Rose are not liable under this contract. Connecticut General Statutes § 20-7f(b) provides: "It shall be an unfair trade practice in violation of Chapter 735a [Conn. Gen.Stat. § 42-110a, *et seq.]* for any health care provider to request payment from an enrollee, other than a co-payment or deductible, for medical services covered under a managed care plan."Furthermore, Plaintiff has been instructed by Connecticut state courts that "he cannot engage in balance billing for covered services."*Gianetti v. Siglinger*, No. CV980349830, 2004 WL 1098443, at *4 (Conn.Super.Ct. Apr.26, 2004); *see also Gianetti v. Siglinger*, 279 Conn. 130, 900 A.2d 520, 524 (Conn.2006) ("[P]laintiff was well aware that the practice [of balancing billing] was prohibited through court decisions and statutes."). Therefore, with respect to his claims against Bellamy and Rose, Plaintiff has failed to state a cause of action upon which relief can be granted. Plaintiff's claims against Bellamy and Rose may also be time-barred, given that the medical procedures took place in March 1999 and Plaintiff did not file his complaint until September 2007.[FN4] For the reasons stated herein, Plaintiff's claims against Defendants Bellamy and Rose are **dismissed** pursuant to Federal Rule of Civil Procedure 12(b)(6).

> FN4. The applicable Connecticut statute of limitations for breach of contract, quantum meruit, and unjust enrichment is six years. Conn. Gen.Stat. § 52-576(a). While Plaintiff's Complaint fails to state the date of the alleged contract, it seems reasonable to assume that it was signed on or about

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the date of the procedures to which it relates.

## I. Plaintiff's Request to Amend the Complaint

*9 Plaintiff requests that the Court consider his claims as if they had been made under ERISA or, in the alternative, grant him leave to amend his complaint. (Pl.'s Obj. to Mot. to Dismiss 3.) Defendant Anthem objects to this request. (Def.'s Reply in Supp. of Mot. to Dismiss 7 n. 1.) The Court declines to grant Plaintiff leave to amend his complaint, nor will the Court consider ERISA claims that Plaintiff has not pled. When, as is the case here, a party cannot amend the complaint as a matter of course, the party "may amend its pleading only with the opposing party's written consent or the court's leave."Fed.R.Civ.P. 15(a)(2). The Court's discretion is properly exercised to deny leave to amend in the presence of an "apparent or declared reason," including "undue delay, bad faith ... on the part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The Court finds that such factors are present here.

As noted previously, Plaintiff has filed numerous unsuccessful suits against insurers and former patients, raising claims similar to those in this suit. *See Gianetti v. Siglinger,* 279 Conn. 130, 900 A.2d 520, 524 (Conn.2006) ( "[T]he trial court noted other litigation arising out of the plaintiff's practice of balance billing and concluded that the plaintiff was well aware that the practice was prohibited through court decisions and statutes.").*See also Gianetti v. Greater Bridgeport Individual Practice Ass'n,* 2005 WL 2078546, n. 15 (Conn.Super. July 21, 2005) ("[T]he plaintiff's tactics in filing multitudinous lawsuits, most of which have proven to have no merit, overburden the public courts to further the plaintiff's selfish interests and amount to an abuse of the judicial process."). The appearance of bad faith on the part of Plaintiff in the filing of this suit makes the Court disinclined to permit him to amend

his Complaint. Furthermore, the incidents underlying Plaintiff's allegations against Anthem took place between 1999 and 2001, and thus it appears that Plaintiff's claims against Anthem, raised in 2007, are likely time-barred, which would render amendment futile.[FN5] Plaintiff's request for leave to amend his Complaint is denied.

> FN5. "As ERISA does not prescribe a limitations period for actions under § 1132, the controlling limitations period is that specified in the most nearly analogous state limitations statute."*Miles v. N.Y. State Teamsters Conference Pension & Ret. Plan,* 698 F.2d 593, 598 (2d Cir.1983). Here, the applicable statute of limitations are those under Connecticut state law. *See Cole v. Travelers Ins. Co.,* 208 F.Supp.2d 248, 252 & n. 2 (D.Conn.2002). The applicable Connecticut statutes of limitations are six years for breach of contract, quantum meruit, and unjust enrichment, Conn. Gen.Stat. § 52-576(a); three years for fraud and misrepresentation, Conn. Gen.Stat. § 52-577; and three years for CUTPA violations, Conn. Gen.Stat. § 42-110g(f).

For the reasons stated herein, the Motion to Dismiss [Doc. No. 9] is **granted** as to all parties and claims. The Clerk shall close the case.

SO ORDERED.

D.Conn.,2008.
Gianetti v. Blue Cross and Blue Shield of Connecticut, Inc.
Slip Copy, 2008 WL 1994895 (D.Conn.), 44 Employee Benefits Cas. 1552

**END OF DOCUMENT**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



In re Payment Card Interchange Fee and Merchant
Discount Antitrust Litigation
E.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
In re PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION.
**No. 05-MD-1720 (JG)(JO).**

Jan. 8, 2008.

*ORDER*

JOHN GLEESON, District Judge.
*1 Having reviewed the objections to Magistrate
Judge Orenstein's September 7, 2007 Report and
Recommendation granting the defendants' motion
to dismiss the class plaintiffs' claims for damages
incurred prior to January 1, 2004 and having found
them to be without merit, I hereby adopt Magistrate
Judge Orenstein's Report and Recommendation.

So ordered.

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

This Document Relates To:

CV 05-3800 CV 05-4728 CV 05-5072 CV 05-5077
CV 05-5803 CV 05-5869 CV 05-5880 CV 06-1829
CV 05-3924 CV 05-4974 CV 05-5073 CV 05-5080
CV 05-5153 CV 05-5870 CV 05-5881 CV 06-1830
CV 05-4194 CV 05-5069 CV 05-5074 CV 05-5081
CV 05-5207 CV 05-5871 CV 05-5882 CV 06-1831
CV 05-4520 CV 05-5070 CV 05-5075 CV 05-5082
CV 05-5866 CV 05-5878 CV 05-5883 CV 06-1832
CV 05-4521 CV 05-5071 CV 05-5076 CV 05-5868
CV 05-5879 CV 05-5885

**REPORT AND RECOMMENDATION**

JAMES ORENSTEIN, United States Magistrate
Judge.
A putative class including millions of retailers
across the country has sued the Visa and Master-
Card payment card networks, as well as many of
the banks that are members of those networks and
issue their cards, alleging a variety of violations of
the antitrust laws. Their claims have certain things
in common with claims settled in an earlier case
known as *In re Visa Check/MasterMoney Antitrust
Litigation,* docket no. CV 96-5238 (E.D.N.Y.) (the
"*Visa Check*" litigation). It is the relationship
between that earlier case and this one that is now
before the court: specifically, along with the bank
defendants, the payment card network defendants in
this case who previously settled the *Visa Check* lit-
igation seek an order that either dismisses or strikes
from the relevant pleadings all of the class
plaintiffs' claims for damages incurred prior to
January 1, 2004. Docket Entry ("DE") 387. Upon a
referral from the Honorable John Gleeson, United
States District Judge, I now make my report and,
for the reasons that follow, respectfully recommend
that the court grant the motion.

*I. Background*

The first complaint in this consolidated litigation
was filed by plaintiff Photos, Etc. Corp. in June
2005; several others followed over the next months
and on October 20, 2005, the Judicial Panel on
Multidistrict Litigation consolidated those actions
for pretrial purposes and transferred them to this
district. DE 1. In the almost two years since that
time, cases have continued to be transferred for
consolidation and there are currently over fifty
cases associated with this action. Several of the
consolidated cases were pleaded as putative class
actions; the remaining plaintiffs (the "Individual
Plaintiffs") eschewed collective action and sued
only on their own behalf. The plaintiffs in the putat-
ive class actions (the "Class Plaintiffs"), who have
coordinated their actions under the leadership of a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

group of attorneys serving as co-lead counsel,[FN1] filed their First Consolidated Amended Class Complaint ("Complaint") on April 24, 2006. DE 317. The motion I address here concerns only the claims contained in the latter pleading; it has no bearing on the Individual Plaintiffs' several complaints.

> FN1.*See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 2006 WL 2038650 (E.D.N.Y. Feb.24, 2006) (appointing co-lead counsel).

**\*2** The Complaint defines two putative classes, both of which seek relief for harms allegedly arising out of the defendants' purported collaboration to inflate "interchange" fees. The latter term refers to the fee charged to merchants by the banks that issue payment cards; it is the largest component of the total fee that banks charge for processing transactions using those cards. Complaint ¶ 8. The two classes differ in only two respects: one class seeks monetary damages and is defined as "[a]ll persons, business, and other entities that have accepted Visa and/or MasterCard Credit and/or Debit Cards in the United States at any time from and after January 1, 2004[;]" the second seeks equitable relief and is defined exactly the same as the first class, only without the temporal restriction. Complaint ¶ 97a. The Complaint acknowledges that a class "virtually identical to" the aggregate of the two putative classes was previously certified in the *Visa Check* litigation. Complaint ¶ 106 (citing *In re Visa Check/MasterMoney Antitrust Litig.* (*"Visa Check I"* ), 192 F.R.D. 68 (E.D.N.Y.2000), *aff'd,*280 F.3d 124 (2d Cir.2001)). A brief discussion of that earlier litigation will help place the instant dispute in context.

### A. *The Visa Check Litigation*

#### 1. *The Claims*

On February 22, 2000, this court certified a class consisting of "all persons and business entities who have accepted Visa and/or MasterCard credit cards

and therefore have been required to accept Visa Check and/or MasterMoney debit cards under the challenged tying arrangements during the fullest period permitted by the statute of limitations."*Visa Check I*, 192 F.R.D. at 90. The *Visa Check* class alleged, among other things, that unlawful collusion between Visa and MasterCard resulted in artificially inflated interchange fees, which in turn caused harm to the class and for which it sought damages and equitable relief. The class asserted that Visa and MasterCard were effectively controlled and operated by their member banks by virtue of the banks' positions on the boards of directors of Visa and MasterCard; it further alleged that the simultaneous membership of certain banks on the boards of both Visa and MasterCard facilitated collusion between the two networks. *See* DE 387-6 (*"Visa Check* Complaint") ¶¶ 43-46. The *Visa Check* class further contended that Visa and MasterCard shared overwhelming dominance in the credit card market and implemented anticompetitive rules to preserve that dominance. *See, e.g., Visa Check* Complaint ¶¶ 50, 66. For example, the class alleged, when a competitor entered the credit card market, Visa required its members to boycott the competitor's credit cards by refusing to issue cards or process transactions using them. *Visa Check* Complaint ¶ 54.

#### 2. *The Notice Of Pendency*

In June 2002, the court ordered the leaders of the plaintiff class in *Visa Check* to notify class members that the action was pending. The plan of notification required the class to mail a seven-page Notice of Pendency ("Notice") directly to absent class members and to publish a summary version in a variety of media over a month-long period. DE 455-7 (*Visa Check* Consent Order For Providing Notice To Members Of The Certified Class dated June 21, 2002) (*"Visa Check* Notice Order") ¶¶ 12-16. The order provided the parties with full opportunities to object both to the execution of the notice plan and to the sufficiency of the Notice itself, on due process grounds or otherwise. *See id.* ¶¶ 11,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

19.

*3 The Notice sent pursuant to the order was addressed to "all persons and business entities in the United States who, at any time since October 25, 1992, have accepted Visa and/or MasterCard credit cards for payment and have therefore been required to accept Visa and/or MasterCard-branded debit cards (also known as *Visa Check, MasterMoney* or *MasterDebit* cards)."*Visa Check* Notice Order Ex. G (Notice of Pendency of Class Action) (boldface highlighting and capitalization removed). It contained information about the history of the litigation, provided notice of the class members' right to opt out of the action and consequences of remaining in it, and directed class members to sources of further information. *Id.* The Notice described the claims at issue as follows:

The allegations against Visa and MasterCard are set forth in the Second Amended Consolidated Class Action Complaint filed with the Court on May 26, 1999. Plaintiffs claim that Visa and MasterCard, individually, and in conspiracy with each other and with their member banks, have violated the federal antitrust laws by forcing merchants who accept Visa and/or MasterCard-branded credit cards for payment also to accept Visa and/or MasterCard-branded debit cards for payment, and by conspiring and attempting to monopolize a market for general purpose point of sale debit cards. Plaintiffs claim that Defendants' actions have caused merchants to pay excessive fees on Visa and MasterCard credit and debit transactions, have caused merchants to pay excessive fees on on-line PIN based debit transactions (which allegedly have been inflated as part of Defendants' alleged conduct), and have injured competition, merchants and consumers. Plaintiffs seek: (1) an injunction prohibiting the Defendants from engaging in the alleged violations of the federal antitrust laws (including the elimination of the alleged forced acceptance of the Visa and/or MasterCard-branded debit cards for payment by merchants who accept Visa and/or MasterCard-branded credit cards for payment), and (2) the re-

covery of damages for the alleged excess portion of fees paid on Visa and MasterCard credit and debit transactions, and on online PIN-based debit transactions, as well as costs and attorneys' fees.

*Visa Check* Notice of Pendency ¶ 3.[FN2]

> FN2. The summary version-which was published in eight separate publications, over the PR Newswire twice, in relevant trade association publications, and on the Internet from September 9, 2002 through October 14, 2002-included the following warning: "If you or your company have accepted MasterCard and/or Visa cards for payment at any time since October 1992, this Notice may affect your rights."*Visa Check* Notice Order Ex. H (boldface highlighting and capitalization removed).

### 3. *The Settlement*

After seven years of hard-fought litigation and on the cusp of trial, the parties to the *Visa Check* litigation agreed in principle to settle the case. As part of that settlement, the plaintiff class gave Visa and MasterCard a broad release of claims, the precise contours of which are at the heart of the dispute now before the court. Part of that release, the meaning of which is now in dispute, referred to "conduct prior to January 1, 2004"-a date that was still several months in the future both at the time the agreement was signed and when the court approved it. In full, the release provided as follows:

[MasterCard and Visa] shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action against the Released Parties [MasterCard and Visa], whether class, individual, or otherwise in nature, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that any Releasing Party [Class Member] ever had, now has, or hereafter can, shall or may have, relating in any way to any conduct

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

prior to January 1, 2004 concerning any claims alleged in the Complaint or any of the complaints consolidated therein, including, without limitation, claims which have been asserted or could have been asserted in this litigation which arise under or relate to any federal or state antitrust, unfair competition, unfair practices, or other law or regulation, or common law, including, without limitation, the Sherman Act, 15 U.S.C. § 1 et seq. Each Class Member hereby covenants and agrees that it shall not, hereafter, seek to establish liability against any of the Released Parties based, in whole or in part, upon any of the Released Claims.

*4 DE 387-4 ("Settlement") ¶ 28.[FN3] The injunctive relief included modifications to the defendants' marketing and labelling of their debit products, alterations to the defendants' membership rules, and the reduction of interchange fees for transactions involving debit cards between August 1, 2003 and December 31, 2003. Settlement ¶¶ 4-8. The defendants agreed to make regular instalment payments that will ultimately exceed $3.05 billion, $350 million of which was to be paid by December 22, 2003. Settlement ¶ 3.

> FN3. The *Visa Check* class entered into substantially identical settlement agreements with each network. *See* DE 387 (reprinting each). For ease of reference, I refer to them collectively as the "Settlement" and cite exclusively to the agreement executed by Visa.

Of particular relevance to the dispute now before the court is the fact that the Settlement did not become binding on the parties when executed, or even when approved by the court. Instead, the parties agreed that the Settlement would take effect only when three events had occurred: (1) court approval of the Settlement; (2) dismissal of the action with prejudice; and (3) expiration of the time to appeal from the court's approval of the Settlement, or if appealed, affirmance of the court's approval with no possibility of further review. Settlement ¶ 25.

The Settlement was negotiated in the Spring of 2003, and the final agreement documents were signed in June of that year. Over the next two months, the parties notified the roughly five million class members about the terms of the proposed settlement and solicited any objections they might have to its fairness. The notice included "the releases, verbatim, as set forth in the proposed Settlement" as well as instructions about how to get additional information, contact the claims administrator or the plaintiffs' lead counsel, and lodge an objection. *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F.Supp.2d 503, 509 n. 5 (E.D.N.Y.2003) (*"Visa Check II"* ). Only 18 class members lodged any objection to the proposal. *Id.* at 509 & n. 6.

The district court held a fairness hearing on September 25, 2003, at which it heard argument on all objections to the Settlement. *Id.* at 508.The court found the Settlement to be procedurally and substantively fair, and approved its terms as reasonable under all of the circumstances. *Id.* at 509-11.The United States Court of Appeals for the Second Circuit affirmed that ruling, and the Settlement accordingly took effect in early 2005. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir.), *cert. denied,*544 U.S. 1044, 125 S.Ct. 2277, 161 L.Ed.2d 1080 (2005).

**B. *The Instant Litigation: The Class Plaintiffs' Claims***

The instant Complaint, the allegations of which I deem to be true for present purposes, names as defendants Visa U.S.A., Inc. and Visa International Service Association (collectively, "Visa"); MasterCard International Incorporated and MasterCard Incorporated (collectively, "MasterCard"); and several banks. The Complaint alleges that all defendants engaged in a course of concerted activity to inflate interchange fees in violation of various antitrust laws.

Visa and MasterCard are membership corporations comprised of thousands of banks worldwide; the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

banks named as defendants in this action are members of both MasterCard and Visa. Complaint ¶¶ 52-54. Several banks are represented on the Board of Directors of each network, and some are represented on both boards. Complaint ¶¶ 88, 177-92. In addition to their governance roles, the banks, as network members, participate in consumer payment card transactions involving the Visa or MasterCard transaction processing system, assuming the role in any given transaction of an "Issuing Bank" or an "Acquiring Bank." An Issuing Bank issues payment cards bearing the Visa or MasterCard imprimatur to consumers who wish to use them as forms of payment in transactions with merchants in the putative plaintiff class. An Acquiring Bank receives payment transactions from such merchants, and coordinates between and among the relevant Issuing Bank, the merchant, and the Visa or MasterCard network, as appropriate, to facilitate the transaction's processing. Issuing Banks assess interchange fees, purportedly as compensation for their role in the payment card transaction. Those fees are a subset of the overall fee a merchant must pay every time it accepts a Visa or MasterCard payment card as payment for a sale. Complaint ¶ 8.

*5 To illustrate, when a consumer uses a Visa card to make a purchase from a merchant, the latter contacts an Acquiring Bank to seek authorization, and the Acquiring Bank then submits the transaction to the Visa network for transmission to the Issuing Bank. If the Issuing Bank determines that the consumer has sufficient credit or funds to make the proposed purchase, it approves the transaction. Upon such approval, the Issuing Bank transfers the payment price to the Acquiring Bank, minus the interchange fee, which the Issuing Bank keeps for itself. The Acquiring Bank then transfers the purchase price to the merchant, minus the interchange fee (which the Issuing Bank kept) as well as other deductions, including the Acquiring Bank's fee, and other service and processing fees.[FN4] The total difference between the purchase price paid by the consumer and the smaller amount that the merchant eventually receives is known as the "merchant dis-

count fee." Complaint ¶ 8.

> FN4. In some circumstances, a single bank can act as both the Issuing Bank and the Acquiring Bank for the same transaction; the interchange fee is nevertheless charged in such transactions.

Each network promulgates membership rules, which govern the terms of the banks' participation in transactions using either network's card, and sets the level of the interchange fee charged to merchants. By virtue of their positions on the Boards of Directors of MasterCard and Visa, the banks control the amount charged as interchange fees for each network. Further, because so many banks are members of both Boards, they jointly establish the level of interchange fees for Visa and MasterCard and ensure that each network's interchange fees increase regularly in coordination with each other, rather than decreasing as they would in response to competition. Complaint ¶¶ 131-35.

The membership rules insulate Visa and MasterCard from competition in other ways, and the rules imposed on merchants forbid them to encourage customers to use payment cards with a lower interchange fee or to pass the cost of the interchange fee along to customers using Visa or MasterCard payment cards. The Class Plaintiffs contend that all of this conduct, by itself, violates federal and state antitrust laws. Additionally, among other anticompetitive effects that they say show violations of the antitrust laws, the Class Plaintiffs claim that they have been coerced into paying interchange fees that are far higher than unrestrained competition would produce. Complaint ¶¶ 153-60, 227-33.

Throughout the Complaint, the Class Plaintiffs refer to the *Visa Check* litigation. *See* Complaint ¶¶ 106, 121, 141, 198-99, 204, 312-13, 318. They also define the amount of damages at issue with reference to the Settlement: specifically, they seek monetary damages "for the fullest time period permitted by the applicable statutes of limitations and the purported settlement and release in [*Visa Check* ], in an

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

amount to be proved at trial ....” Complaint Prayer for Relief ¶ D. Accordingly, the Complaint's terms mandate clear definition of the temporal scope of the Settlement as a precondition for establishing the amount of damages at issue.

### C. *The Defendants' Motion to Dismiss*

*6 On June 9, 2006, the defendants moved to dismiss the Class Plaintiffs' claims for damages to the extent such damages were incurred before January 1, 2004. DE 387. The defendants argued that the Settlement's release provision excused Visa and MasterCard from liability of the type the Class Plaintiffs seek to impose until January 1, 2004, and that the latter date therefore marks the start of the time period for which the Class Plaintiffs may seek monetary damages. The Class Plaintiffs disagree and, to put the dispute in clear relief, they point to an increase in the networks' interchange fees for credit card transactions [FN5] that took effect in August 2003 (the “2003 fee increase”)-after the Settlement was signed, but before this court approved it in December 2003 and before it took effect in 2005. The Class Plaintiffs contend that that fee increase caused billions of dollars in damages in 2003 alone, and effectively wiped out the monetary value of the Settlement. *See* DE 738 (Transcript of Oral Argument, Nov. 21, 2006) (“Tr.”) 51-52, 56, 61. They therefore assert that it can appropriately form part of the basis of their instant claims against the defendants. The defendants argue that they have been released from any liability for such damages because the 2003 fee increase was conduct included within the Settlement's release provision.

> FN5. The Settlement provided for a five-month decrease in the interchange fee for debit transactions using Visa and Master-Card products, but said nothing about interchange fees for credit transactions. Thus the dispute here centers on whether the latter fact was contemplated by all parties, or was an oversight by the class plaintiffs' erstwhile counsel that left room for the de-

fendants to take an action that was arguably entirely inconsistent with the Settlement's spirit.

Notwithstanding the Class Plaintiffs' assertion that the amount at stake in this motion is potentially billions of dollars, the relief that the defendants now seek is in one sense quite limited: as they made clear at the oral argument before me, they do *not* now seek to bar the Class Plaintiffs from seeking the much greater amount of damages-an amount that the Class Plaintiffs' counsel characterized as “a lot more than” five to eight billion dollars, Tr. 61-62-that was incurred in or after 2004 as a result of the 2003 fee increase or any other pre-2004 conduct. Although they have not disavowed seeking such relief later, they have explicitly limited the instant motion to seeking the dismissal of claims for damages that assert harms both caused and suffered prior to January 1, 2004. *See* Tr. 26, 32-37.

The Class Plaintiffs oppose the defendants' motion on two grounds. First, they advance a construction of the Settlement's release provision that would cover only the defendants' allegedly anticompetitive conduct through May 26, 1999 (the date of the last amended complaint in *Visa Check* ), leaving them free in this litigation to seek damages for later conduct, including the 2003 fee increase. Second, they assert that even if the Settlement did purport to release the portion of their claim for damages that is predicated on the effects prior to January 1, 2004 of the 2003 fee increase, that part of the release is ineffective because the notice sent to *Visa Check* class members was constitutionally inadequate to protect their rights to opt out of the Settlement. *See* DE 453 (“Opp'n Memo.”).

*7 I heard oral argument on the motion on November 21, 2006. In light of the fact that the Class Plaintiffs had challenged the adequacy of the notice provided to the *Visa Check* plaintiff class, I asked their counsel to explain if he was seeking rescission of the Settlement or some other remedy. He was unable to provide an answer at the time, and I therefore permitted him an opportunity to submit supple-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

mental briefing on the Class Plaintiffs' position in the event that the court agreed that the notice was inadequate. In that later submission, the Class Plaintiffs explained that they believe that any constitutional inadequacy of the Notice of Pendency would not void the Settlement but would restrict the enforceable scope of its release provision. DE 562.

## II. *Discussion*

### A. *Applicable Legal Standard*

A complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a). That rule is not always simple to satisfy; it can oblige a plaintiff "to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."*Iqbal v. Hasty,* 490 F.3d 143, 148-49 (2d Cir.2007) (emphasis in original) (quotation marks omitted). A claimed violation of the antitrust laws is a paradigmatic example of the need for such amplification because-as this case has demonstrated-discovery of such claims often proves expensive, laborious and time-consuming; and that reality can unfairly pressure "cost-conscious defendants to settle even anemic cases" as the least prohibitive alternative. *Bell Atl. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1967, 167 L.Ed.2d 929 (2007); *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 2007 WL 2471805, *2 & nn. 3-4 (2d Cir. Sept.4, 2007) (noting that despite uncertainty about the application of the flexible plausibility standard in other kinds of cases, it plainly applies in antitrust cases in part due to discovery burdens). The "plausibility standard" does not heighten the pleading requirements of Rule 8(a), but rather clarifies that a plaintiff has given fair notice of the nature of the claims and the grounds on which they rest only if it specifies enough factual detail to show that the plaintiff is entitled to relief. *Id.* at 1965 n. 3.[FN6] Accordingly, to survive a motion to dismiss, the Complaint must include "enough fact to raise a reasonable expectation that discovery will reveal evidence" of the

claim at hand. *Id.* at 1965.Of course, the court must accept the allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir.2006).

> FN6. The instant motion was briefed and argued before *Twombly* was decided. No party has suggested that either the latter decision or the cases in this Circuit interpreting it, such as *Iqbal* and *In re Elevator Antitrust Litigation,* alter the analysis or the outcome that should obtain here.

Although the defendants seek relief under Rule 12, the Class Plaintiffs urge the court to decide it instead pursuant to Rule 56 for two reasons. First, they argue that the defendants have presented materials external to the pleadings and have thus forced the conversion of their motion to one for summary judgment. Second, they argue that the defendants' reliance on the Settlement's release provision is an affirmative defense that the Complaint merely anticipates, and is therefore an inappropriate basis for relief under Rule 12, even if substantially similar relief might be available under Rule 56. Opp'n at 8-9 & n. 8. Neither proffered reason justifies treating the defendants' motion to dismiss as a motion for summary judgment.

*8 In evaluating a motion to dismiss, the court may consider the complaint, any documents incorporated into the complaint by reference, and public records. *Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004). Further, if plaintiffs have actually relied on the terms and effect of a relevant document in drafting their complaint, and if the authenticity and accuracy of the document is undisputed, the document is "integral to the complaint," although outside the pleadings, and the court may consider it in deciding a motion to dismiss.*Faulkner v. Beer,* 463 F.2d 130, 134 & n.l (2d Cir.2006); *see also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (plaintiff's actual notice of information contained in defend-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ant's motion papers dissipates necessity of converting motion to dismiss into motion for summary judgment). Indeed, the court may consider such a document even if the plaintiff's complaint does not include or incorporate it. *Holowecki v. Fed. Express Corp.,* 440 F.3d 558, 565-66 (2d Cir.2006). In addition, the court may, without converting a dismissal motion into a motion for summary judgment, consider materials of which judicial notice may be taken, such as a settlement agreement. *See In re Drexel Burnham Lambert Group,* 960 F.2d 285, 289 (2d Cir.1992); *Kramer v. Time Warner,* 937 F.2d 767, 773 (2d Cir.1991). Finally, it is not a party's presentation of extrinsic materials that triggers the conversion; rather, it is the court's consideration of them in determining the motion that is critical. *Fonte v. Bd. of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988).

The defendants' submission consists of two declarations from counsel, a copy of each of the *Visa Check* Settlement Agreements, and a copy of the *Visa Check* Second Amended Consolidated Class Action Complaint. DE 387. The latter three fall well within the range of materials that a court may consider on a motion to dismiss. Each was filed on the public docket of the *Visa Check* litigation, and each is therefore cognizable information on a motion to dismiss.[FN7] Further, as set out below, the Class Plaintiffs relied on all of those documents in detailing their claims for relief and they are accordingly cognizable as "integral to the complaint." Finally, the court could take judicial notice of the Settlement Agreements under Rule 201 of the Federal Rules of Evidence. *In re Drexel Burnham Lambert Group,* 960 F.2d at 289. Under any of these rationales, the Settlement Agreements and the *Visa Check* complaint are properly considered on this motion.

> FN7. The relevant items in the docket of that litigation, CV 96-5238, were the following: DE 1 (Complaint); DE 24 (First Amended Consolidated Class Action Com-

plaint); DE 25 (Second Amended Consolidated Class Action Complaint); DE 164 (Third Amended Consolidated Class Action Complaint); DE 811 (Settlement Agreement as to MasterCard); DE 812 (Settlement Agreement as to Visa).

The remaining two documents on which the Class Plaintiffs rely in urging a conversion to a Rule 56 motion-the declarations of counsel-do unquestionably contain facts outside the pleadings, but the mere fact of their presentation does not require the court to convert this motion to a motion for summary judgment. If "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment."Fed.R.Civ.P. 12(b). Under the circumstances, I need not and do not consider the declarations at issue, and I recommend that the court do likewise: one declaration merely lists the exhibits annexed to it and the other sets forth allegations regarding communication between the Class Plaintiffs' counsel and the declarant. *See* DE 387. Neither is helpful to my analysis of the defendants' motion and accordingly I do not consider them. As a result, there is no basis for converting the defendants' motion into one for summary judgment. Further, to the extent that the Class Plaintiffs have submitted factual evidence outside the pleadings, I do not consider it, and it would not affect my analysis in any event.[FN8]

> FN8. The Class Plaintiffs have submitted a declaration that sets forth allegations and discusses the exhibits annexed to it, which include: discovery materials from this litigation, an article published on the "American Banker Online" web site, and assorted documents previously publicly filed on the *Visa Check* docket. DE 454.

\*9 The Class Plaintiffs' second argument in favor of conversion fares no better. A defendant may raise an affirmative defense on a motion filed pursuant to Rule 12(b)(6), and need not employ the procedure available under Rule 56, "if the facts supporting the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

defense appear on the face of the complaint."*United States v. Space Hunters, Inc.,* 429 F.3d 416, 426 (2d Cir.2005) (citing *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004)). The Complaint is rife with references to the *Visa Check* litigation. It defines the class as "virtually identical" to the class certified in the *Visa Check* litigation,[FN9] Complaint ¶ 106, refers to the market definition and market power findings in the *Visa Check* litigation, Complaint ¶¶ 141, 198-99, 204, 312-13, and relies on findings of fact in that litigation. Complaint ¶¶ 121, 318. More significantly for present purposes, the Complaint explicitly defines its prayer for relief by reference to the release provision on which the defendants rely for their affirmative defense: specifically, the Class Plaintiffs seek "monetary damages ... for the fullest time period permitted by ... the purported settlement and release in [*Visa Check.*]" Complaint Prayer for Relief ¶ D. In other words, the Class Plaintiffs acknowledge that the amount of their recovery is limited by the scope of the claims released by the Settlement.

> FN9. The exception, of course, is those members of the plaintiff class here who opted out of the *Visa Check* litigation and thus are not bound by the Settlement; their claims for damages incurred prior to 2004 are not affected by this motion.

The parties plainly disagree about the scope of damages that might be available in light of the Settlement, and that disagreement may or may not raise an obstacle to disposition at this stage of the proceedings-a matter I discuss below. But there can be no dispute that the Class Plaintiffs themselves have pleaded that the scope of the release in the Settlement is dispositive of the limits of the damages they may seek if they prove the claims asserted in the Complaint. Accordingly, the defendants may properly raise their affirmative defense of release as a basis for seeking dismissal under Rule 12. *See Steinmetz v. Toyota Motor Credit Corp.,* 963 F.Supp. 1294 (E.D.N.Y.1997) (determining preclusive effect of class action settlement under

Rule 12(b)(6)).

## B. *Analysis*

The Class Plaintiffs make several arguments in support of the viability of the claims at issue, but all of them fall into two broad categories. First, they argue that, for a variety of reasons, the claims in the current Complaint seeking damages for conduct that occurred in late 2003 are viable because they do not fall within the scope of the *Visa Check* Settlement's release provision. Second, they contend that even if the claims at issue here are properly considered to be within the scope of the Settlement, the release provision is unenforceable either because it is the result of a fraud or due to insufficient notice to the class members whose rights were at stake. I consider-and reject-each category of arguments in turn below.

### 1. *The Claims Are Within The Scope Of The Release*

**\*10** The Class Plaintiffs argue that the Settlement did not effect a release of the current Complaint's claims related to conduct occurring after the time of settlement, such as the 2003 fee increase, because that conduct could not be considered as "concerning any claims alleged in the [*Visa Check* ] Complaint."*Id.* In other words, the Class Plaintiffs urge the court to first examine the current Complaint to identify the conduct out of which its claims arise, compare that conduct with the conduct at issue in the *Visa Check* complaint, and only bar claims in the current Complaint to the extent the conduct at issue in the two cases is identical.

The defendants construe the language of the release provisions differently: they argue that the Settlement released any claim "relating in any way to any conduct prior to January 1, 2004 as long as that conduct related to claims alleged in the [*Visa Check* ] Complaint."DE 490-1 ("Reply") at 5 (quotation marks omitted). Using their approach, the court would first assess whether the current Complaint's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

claims relate to conduct prior to January 1, 2004, then evaluate whether that conduct has a connection with claims asserted in *Visa Check* and if so, bar any such claims.

a. *The Release Is Not Ambiguous*

The parties' disagreement must be considered against the backdrop of substantive New York law, which the parties to the *Visa Check* Settlement agreed would govern. Settlement ¶ 38. That law defines ambiguity, as applicable here, as language that is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the integrated agreement."*Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir.2002) (citing *Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998)). Absent any disagreement as to whether the Settlement is a fully integrated contract, *see* Settlement ¶ 35, the question thus becomes whether the disputed release provision is objectively susceptible to multiple meanings. Even if it is, if the overall intent of the parties is clear from the face of a contract, the court should "choose that construction which will carry out the plain purpose and object of the [agreement]."*Kass*, 91 N.Y.2d at 567, 673 N.Y.S.2d 350, 696 N.E.2d 174 (internal citation and quotation marks omitted) (alteration in original). The applicable substantive law thus contemplates consideration of the precise clause in dispute and the overall context of the agreement in which that clause appears.

Taken as a whole, the Settlement reflects a bargain that is both carefully calibrated in its details and intentionally broad in scope: in return for relief that marked the Settlement as "the largest in the history of antitrust law,"*Wal-Mart Stores, Inc.*, 396 F.3d at 101, the *Visa Check* plaintiff class released Visa and MasterCard from liability for all conduct up through the end of the year in which the agreement was reached. The breadth of that release was underscored by the comprehensive and open-ended wording upon which the parties agreed. For example, the

Agreements refer to "claims, demands, actions, suits, causes of action ... whether class, individual, or otherwise in nature" and to "liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or in equity ...." Settlement ¶ 28. Moreover, in delineating the claims released, the Settlement uses the clause *"relating in any way* to any conduct prior to January 1, 2004 concerning any claims alleged in the Complaint[.]"*Id.*(emphasis added). The Settlement made explicit that the plaintiffs were releasing all "claims which have been asserted or could have been asserted in this litigation[,]" but it was equally explicit in stating that the release included such claims but was not limited to them.*Id.* ("including without limitation" the claims that were or could have been raised in the *Visa Check* complaint). The plain language of the release provision thus extinguishes any claim that could be asserted by a *Visa Check* class member against Visa and MasterCard if that claim related to the *Visa Check* claims, regardless of whether such claims were actually asserted in the complaint-and also regardless of whether such claims *could* have been so asserted under applicable pleading rules and case law.

**\*11** Every court to consider the scope of the Settlement has similarly concluded that it released all claims arising out of conduct occurring before January 1, 2004 related to the claims at issue in the *Visa Check* litigation. *See Visa Check*, 297 F.Supp.2d at 514 (the Settlement released "all claims based on the mix of facts that produced anticompetitive interchange rates"); *Wal-Mart*, 396 F.3d at 104 (the Settlement "precludes actions for conduct occurring prior to January 1, 2004 that was or could have been alleged in the complaint"); *Reyn's Pasta Bella LLC v. Visa U.S.A., Inc.*, 442 F.3d 741, 745 (9th Cir.2006) (the Settlement released "all antitrust liability arising out of conduct, prior to January 1, 2004, that is related to the claims asserted in the [*Visa Check* ] class action"). In so ruling, those courts have construed the Settlement's release provision as extinguishing a universe

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of potential claims that is necessarily larger than those supported by the factual allegations in the complaint filed in the *Visa Check* litigation.

For example, this court held in *Visa Check II* that the Settlement released claims asserted in a separate action pending in the Southern District of New York. The claims in that case, *In re Visa/MasterCard Membership Rules Antitrust Litig.*, docket no. CV 01-10027 (S.D.N.Y.), arose out of allegedly inflated interchange fees for credit card transactions supported by exclusionary rules pertaining to the Visa and MasterCard credit card networks. Notwithstanding the different legal theory underlying the claims at issue in that action, and the different facts that might be relevant, the exclusionary rules were "an integral part of the factual predicate" in *Visa Check* and thus, claims arising out of them were also extinguished. *Visa Check II*, 297 F.Supp.2d at 515;*aff'dWal-Mart*, 396 F.3d at 108. Likewise, this court held that the release provisions were broad enough to extinguish claims against banks who are members of the Visa and Master-Card networks even though the banks were not parties to *Visa Check* and claims accordingly could not have been asserted against them in that litigation. *Visa Check II*, 297 F.Supp.2d at 513-15;*see Reyn's Pasta Bella LLC v. Visa U.S.A., Inc.*, 259 F.Supp.2d 992 (N.D.Cal.2003) (adopting reasoning), *aff'd*442 F.3d 741 (9th Cir.2006).

The Class Plaintiffs seek damages for harms they allegedly suffered due to concerted activity among the defendants that violated federal antitrust law. They complain about the agreements into which the defendants entered, the exclusionary rules they implemented, and the supracompetitive interchange fees they charged. Complaint ¶¶ 228, 273, 289. The factual allegations on which those complaints are predicated plainly relate to the factual predicate of the *Visa Check* litigation, which included the nature and extent of defendants' collaboration, the effect of any such collaboration on competition and interchange fees, and the resulting harm to merchants in the plaintiff class.*Visa Check II*, 297 F.Supp.2d at

513-14. To the extent they seek to prove that the defendants are liable as a result of the implementation of the 2003 fee increase, the Class Plaintiffs will have to establish, among other things, that the fee increase was an artificial result of the defendants' illegal concerted activity and that the fee increase had anticompetitive effects-elements that are "virtual clone[s] of the centerpiece" of *Visa Check.Visa Check II*, 297 F.Supp.2d at 513. Accordingly, I conclude that under any fair reading of the relevant pleadings and the Settlement, the claims at issue here fall within the scope of the Settlement's release of claims "relating in any way to any conduct prior to January 1, 2004 concerning any claims alleged in the [*Visa Check* ] Complaint."Settlement ¶ 28.

*b. The Claims At Issue "Could Have Been Asserted"*

**\*12** The broad scope of the language of the release makes inapposite the Class Plaintiffs' attempt to show that the claims now at issue in this motion-claims for damages incurred in the last five months of 2003 as a result of the 2003 fee increase-could not have been asserted in the *Visa Check* litigation. Even if that were the relevant inquiry, however, I would not find the plaintiffs' argument convincing because I do not agree that the allegations in the final version of the class complaint filed in *Visa Check* prior to the Settlement sets the boundary of the claims that "could have been asserted" in that litigation.

As a general matter, when a plaintiff attacks a defendant's continuous anticompetitive course of conduct, the plaintiff may not recover damages incurred after the date the complaint is filed. *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 398 (2d Cir.1980). In some circumstances, however, the court may allow the plaintiff to supplement the complaint "to allow for recovery of damages up to the time of trial."*Id.* The scope of a plaintiff s recovery is therefore dependent on the contents of the complaint, but those contents are subject to amend-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ment at the discretion of the trial court. As a result, I disagree with the Class Plaintiffs that the universe of claims that "could have been asserted" in the *Visa Check* case-and that were accordingly released pursuant to the Settlement-is limited to the claims actually pleaded in any of the various iterations of the complaint filed by the plaintiff class in the earlier litigation.

I also disagree with the Class Plaintiffs for a more practical reason. Even if the *Visa Check* plaintiffs did not and could not foresee the 2003 fee increase when they first agreed to the Settlement, that increase had already occurred by the time the fairness of the proposed agreement was before the court for approval. At that time-when nobody was in the dark about the defendants' intention to raise the interchange fee for credit transactions-the Settlement was still executory, and it remained so for over a year after that, until the affirmance of this court's approval of the Settlement finally made the agreement binding on all parties. As counsel on both sides appeared to agree during the oral argument on the instant motion, if the *Visa Check* plaintiffs believed that the 2003 fee increase was unlawful and deprived them of the anticipated benefit of their bargain, they could have simply withdrawn from the Settlement before or after the fairness hearing and sought leave to add new claims based on the defendants' conduct in August 2003. *See* Tr. 21, 28, 50-51. Thus, even if I agreed that the "could have been asserted" language served to limit the scope of the Settlement's release provision, I would not agree that such a reading would advance the Class Plaintiffs' cause here.

### 2. The Release Is Enforceable

The Class Plaintiffs contend that even if their current claims based on the 2003 fee increase can properly be considered within the scope of the Settlement's release provision, they should nonetheless be free to pursue such claims here both because the release was fraudulently induced and because the class was given insufficient notice to support such a

broad release of its claims. I find neither argument persuasive.

### a. There Was No Fraud In The Inducement

*13 Pursuant to the parties' explicit agreement, Visa and MasterCard lowered interchange fees for debit transactions on August 1, 2003. *See* Settlement ¶ 8. The Class Plaintiffs now complain, however, that what the defendants gave the merchants with one hand, they took away with the other: on the same day, both networks increased the interchange fees they charged for credit transactions. The Class Plaintiffs theorize that Visa and MasterCard secretly agreed to fix the level of those fees in violation of antitrust laws. Opp'n at 5. They also contend that such a secret plan to make the Settlement worth less to the merchants than they anticipated would amount to fraudulent inducement and render the resulting Settlement-and in particular, its release provision-unenforceable. Opp'n at 16.[FN10]

> FN10. As a technical matter, the court could simply disregard this aspect of the Class Plaintiffs' argument because it relies on factual assertions outside the Complaint. I nevertheless urge the court to dispose of the argument on the merits to avoid the piecemeal litigation that might otherwise result. Under the liberal amendment regime of Fed.R.Civ.P. 15(a), the only reason the Class Plaintiffs would be denied leave to amend their Complaint to add allegations supporting a theory of fraudulent inducement would be a finding that the amendment would be futile (I offer no view as to whether such allegations would be likely to satisfy the flexible plausibility standard required under *Twombly* ). Such a futility inquiry would merely replicate the analysis I present here. I therefore conclude that the interest of judicial economy is served by addressing the issue now.

A release, like any other contract, may be avoided

if it has been fraudulently induced, even if the release was produced after extensive negotiations by represented parties. *Lobel v. Maimonides Med. Ctr.,* 39 A.D.3d 275, 835 N.Y.S.2d 28, 29 (N.Y.App.Div.2007) (citing *Blue Chip Emerald v. Allied Partners,* 299 A.D.2d 278, 750 N.Y.S.2d 291 (N.Y.App.Div.2002)); *City of Amsterdam v. Daniel Goldreyer, Ltd.,* 882 F.Supp. 1273, 1280 (E.D.N.Y.1995) (citations omitted). Further, an omission of material fact constitutes fraud if it violates a duty of disclosure; such a duty exists, among other things, when one party has "superior knowledge, not readily available to the other, and knows that other is acting on the basis of mistaken knowledge."*Frontier-Kemper Constructors, Inc. v. Am. Rock Salt Co.,* 224 F.Supp.2d 520, 529 (W.D.N.Y.2002) (citations omitted).

In essence, the Class Plaintiffs' fraudulent inducement theory requires an assumption that the *Visa Check* defendants had superior information about, and therefore a duty to disclose, their plans to institute the 2003 fee increase before the parties entered into the Settlement in June 2003. Such an assumption is untenable for several reasons. First, the defendants may have had superior advance knowledge of the 2003 fee increase, but the *Visa Check* class plaintiffs had good reason to anticipate the possibility of that increase even if they did not know for a certainty to expect it. *See Visa Check I,* 192 F.R.D. at 75 (discussing, in February 2000, the defendants' prediction that that credit card interchange fees would increase in response to a decrease in debit card interchange fees).

Second, even if the class was unaware of the 2003 fee increase until after they entered into the Settlement, they had ample opportunity to act on their presumed dismay over the increase before being bound by the release to which they had agreed. The fee increase had taken effect almost two months before the fairness hearing on September 25, 2003, and over five months before this court approved the agreement. Any of the 18 objectors to the Settlement could have cited the fee increase as a new de-velopment that rendered the agreement unfair, but none did so. More fundamentally, the class itself could have simply withdrawn from the Settlement, without the need to persuade the court that it was unfair, if it believed that the fee increase deprived it of the anticipated benefit of its bargain-but it did not do so.

**\*14** It would hardly have been unreasonable for the *Visa Check* class plaintiffs to decide that the concrete benefits of the Settlement-including a fund of billions of dollars, and a guaranteed (albeit temporary) decrease in interchange fees for debit transactions-made the risks attendant to the agreement worthwhile. Assuming they viewed an increase in credit card interchange fees as possible, or even likely, they also had to know that, like the anticipated decrease of debit card fees for which they had bargained, the change need not be permanent. A card network's decision to charge a higher (or lower) interchange fee must to some extent be ratified with each new transaction-it is always, at least in theory, subject to renegotiation absent an exercise of bargaining power, licit or otherwise, that artificially keeps the subject off the table. Accordingly, it is entirely plausible that the attorneys representing the *Visa Check* class plaintiffs (who do not represent the current putative classes) concluded after a cost-benefit analysis that the worst-case scenario-a rise in credit transaction interchange fees that would wipe out much of the benefit to the class but would presumably be subject to renewed litigation starting in 2004 if continued in effect-was sufficiently unlikely to persuade them not to give up the certain benefits of the proposed Settlement.

The class plaintiffs and their counsel may or may not actually have engaged in such reasoning before deciding to press forward with the Settlement after the 2003 fee increase took effect. They may have come up with other reasons, or they may simply have failed to realize that they had a claim for damages that they were unintentionally waiving (though the latter possibility seems rather implausible). The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

matter is of course entirely speculative. What is not susceptible to any such speculation is the proposition that the defendants in *Visa Check* knew that their adversaries, in going forward with the Settlement even after the 2003 fee increase was announced, were "acting on the basis of mistaken knowledge."Whatever the defendants' motives in waiting until after the Settlement was signed to announce the fee increase, they simply could not unilaterally foist that increase on the plaintiffs without taking a risk that they would thereby jeopardize settlement and incur the continued burdens of litigation.

b. *The Notice Was Sufficient*

In seeking to preserve their ability to pursue damages incurred in 2003 as a result of the 2003 increase, the Class Plaintiffs step gingerly around some potential legal land mines. Most obvious in that context is their disavowal of any intention to seek rescission of the Settlement based on their argument that the notice to the *Visa Check* class plaintiffs was unconstitutionally deficient. Instead, they would seek only to limit the scope of the Settlement's release provision so as to negate its coverage of "the claims as to which the [*Visa Check* ] notice of pendency was constitutionally inadequate."DE 562 at 1. The proposal is, not surprisingly, quite convenient for the Class Plaintiffs: it would recast the bargain they struck in 2003 in a way that, in their view, would allow them to keep the billions of dollars paid under the Settlement as well as the benefit of the five-month decrease in debit card interchange fees, and would also give them the opportunity to seek billions of dollars more in damages associated with the increase in credit card interchange fees incurred in late 2003. Whether the *defendants* would have entered into such a bargain is not something the Class Plaintiffs address. But that question is inescapable because the court would only reach this prong of the Class Plaintiffs' argument if it concludes that the Settlement's release does otherwise bar the claims at issue in this motion. Viewed in that light, the ques-

tion answers itself: the defendants having bought a very expensive peace for their conduct through the end of 2003, the remedy the Class Plaintiffs propose as an alternative to rescission would unfairly deprive them of a significant part of the benefit of their bargain. Thus even if I agreed that the notice in *Visa Check* was defective, I would disagree that the claim they wish to pursue as a result could be resuscitated through any means other than a complete rescission of the Settlement-a result that even the Class Plaintiffs affirmatively seek to avoid.

*15 The Class Plaintiffs are similarly careful in identifying the notice that they say was insufficient. Given the fact that it is the Settlement, and in particular its release provision, that is the obstacle they now face, they might naturally be expected to challenge the sufficiency of the notice to the *Visa Check* class about the proposed Settlement itself. That course, however, is plainly foreclosed by two facts. First, although several class members lodged objections to the Settlement at the fairness hearing on September 25, 2003, and continued to press them on appeal, no participant in the *Visa Check* litigation objected at that stage that the notice of that Settlement was itself inadequate. Second, in reviewing this court's approval of the Settlement, the appellate court explicitly held that the latter notice, coupled with the *Visa Check* complaint and the Notice of Pendency, sufficiently advised class members that their potential claims against banks-and not only their potential claims against named defendants Visa and MasterCard-were at issue in the litigation. *Wal-Mart,* 396 F.3d at 114-15.

Accordingly, the Class Plaintiffs restrict their argument to an attack on the Notice of Pendency disseminated to absent *Visa Check* class members long before the parties agreed to the Settlement. In essence, the Class Plaintiffs contend that because there was insufficient notice of the claims being litigated, any Settlement that purported to release not only those claims but others that *could* have been litigated as well would result in a denial of due process if enforced against absent class members.

Due process requires that absent class members receive the best practicable notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."*Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314-15, 70 S.Ct. 652, 94 L.Ed. 865 (1950). It also requires that such parties be afforded the opportunity to remove themselves from the class.*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *see*Fed.R.Civ.P. 23. Thus, to be constitutionally adequate, notice to absent class members must:

(1) describe succinctly and simply the substance of the action and the positions of the parties; (2) identify the opposing parties, class representatives, and counsel; (3) indicate the relief sought; (4) explain any special risks of being a class member, such as being bound by the judgment; (5) describe clearly the procedures and deadlines for opting out; and (6) note the right of any class member to appear in the action through counsel.

*Robinson v. Metro-North Commuter R.R. Co.,* 267 F.3d 147, 167 n. 11 (2001).

The Notice of Pendency plainly warned absent *Visa Check* class members that their potential claims for damages arising out of artificially inflated interchange fees were at issue in that action. The third sentence in its description of the litigation said that the *Visa Check* class claimed "that Defendants' actions have caused merchants to pay excessive fees on Visa and MasterCard credit and debit transactions ..."*Visa Check* Notice ¶ 3. That warning plainly sufficed to put absent class members on notice of the possibility that their rights with respect to the defendants' practices in setting and collecting interchange fees might be determined in the class action.[FN11] As a result there is nothing about enforcement of the Settlement's release provision in this case that offends due process.

> FN11. In attacking the Notice as under-inclusive, the Class Plaintiffs take issue

with the sentence that immediately precedes the one just quoted (a sentence that describes the *Visa Check* complaint's allegation of an unlawful tying arrangement) but elides any reference to the allegations about excessive fees. Opp'n at 21; *Visa Check* Notice ¶ 3. The omission is troubling, but has no bearing on my analysis, which takes into account the record rather than merely the parties' selections from it.

III. *Recommendation*

**\*16** For the reasons set forth above, I respectfully recommend that the court grant in full the defendants' motion to dismiss the Class Plaintiffs' claims for damages to the extent that those damages were incurred prior to January 1, 2004.

IV. *Objections*

This Report and Recommendation has been electronically filed on the court's ECF system and is therefore deemed served on all parties as of today's date. Any objection must be filed with the Clerk of the Court must be filed by September 24, 2007. Failure to file objections within this period, absent the entry of an order extending that deadline pursuant to Federal Rule of Civil Procedure 6(b)(1), waives the right to appeal the district court's order. *See*28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Beverly v. Walker,* 118 F.3d 900, (2d Cir.1997); *Savoie v. Merchs. Bank,*84 F.2d 52, 60 (2d Cir.1996).

**SO ORDERED.**

E.D.N.Y.,2008.
In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation
Slip Copy, 2008 WL 115104 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.


Johnson v. Sears Roebuck & Co.
D.Conn.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
Vivian JOHNSON, Plaintiff
v.
SEARS ROEBUCK & CO., Defendant.
**Civil Action No. 3:05-CV-139(JCH).**

Aug. 29, 2007.

Vivian E. Johnson, Farmington, CT, pro se.
Erica Weyer Todd, Joseph F. Trotta, Trotta, Trotta
& Trotta, New Haven, CT, Paul Guggina, Tyler
Cooper & Alcorn, Hartford, CT, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. NO. 127]

JANET C. HALL, United States District Judge.

### I. INTRODUCTION

*1 Vivian Johnson, a pro se plaintiff, brings this action against the defendant, Sears Roebuck & Co ("Sears"), for damages she sustained from a furnace that Sears allegedly installed improperly in her home.

Sears has filed a Motion for Summary Judgment [Doc. No. 127] as to all of Johnson's claims, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### II. STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir.2000). Once the moving

party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial,"*Anderson,* 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought.*Anderson,* 477 U.S. at 255;*Graham,* 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."*Carlton,* 202 F.3d at 134."When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. *Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000).

### III. FACTUAL BACKGROUND[FN1]

> FN1. For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiff, where there is evidence to support her allegations.

On or about August 31, 1999, Johnson purchased a Kenmore oil furnace from Sears, which was installed in September. *See* Def.'s Loc. R. Civ. P. 56(a)1 Statement ("Def.'s Stat.") at Ex. H, Plf.'s More Definite Statement Revised November 10, 2005 ("Revised Statement") at ¶ 4 [Doc. No. 127]. At the time of purchase, Johnson and Sears entered into a Master Protection Agreement ("MPA") for an additional three years of coverage on her furnace. *Id.* at Ex. 3, Master Protection Plan ("MPA").

On September 15, 1999, Johnson complained that the furnace was leaking water and making noise,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and a Sears technician came to her home to invest-igate.*Id.* at Ex. H, Plf.'s Revised Statement at ¶ 4. The technician told Johnson that the problem was not the furnace, because an oil furnace does not have water in it. *Id.* at Ex. A, Johnson's Dep. at 184. Johnson claims the technician told her it was the water heater that was leaking,[FN2] and he fixed it at no expense to Johnson; however, Johnson made numerous calls thereafter to Sears complaining that the problem still existed. *Id .* at 181.According to Johnson, a Sears representative came in September 2003 and told her that it was a pre-existing humidifier that was leaking water. Johnson believed the humidifier was part of the furnace, because when the furnace was installed Sears representatives detached and reattached it without asking for her permission. *See* Plf.'s Memorandum in Opposition ("Mem. in Opp.") at 3 [Doc. No. 130].

> FN2. In its Memorandum in Support of Summary Judgment ("Mem. in Supp."), at 2, Sears claims that the technician told Johnson that the water was coming from the humidifier and a condensate pipe from the central air conditioner that was located above the furnace. However, Sears has failed to attach page 219 of Johnson's deposition testimony in which she allegedly testified to this; thus, the court cannot rely on this information.

*2 Johnson filed this lawsuit on January 25, 2005, alleging that Sears violated her human rights; violated her Fourteenth Amendment right to due process; breached a contract; breached a warranty; violated the Lemon Law; and was negligent.

## IV. DISCUSSION

### A. Jurisdictional Amount

Sears argues that Johnson cannot prove the requisite minimum amount in controversy, which is $75,000. *See* Def.'s Mem. in Supp. at 13. Under the law of this Circuit, "[a] party invoking the jurisdic-tion of the federal court has the burden of proving that it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount."*Tongkook Am., Inc. v. Shipton Sportswear Co.,* 14 F.3d 781, 784 (2d Cir.1994). In determining whether a plaintiff satisfies this amount in controversy requirement, the court looks only to the damages that the plaintiff claims were caused by the defendant, not to whether the plaintiff can show that the defendant caused those damages. *See United Food & Commercial Workers Union, Local 919 v. Centermark Properties of Meriden Square,* 30 F.3d 298, 305-06 (2d Cir.1994)."It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."*Tongkook,* 14 F.3d at 784.

Johnson has claimed damages for time lost from work, aggravation, medical complications, legal expense, damage to sentimental items, increased oil expenses, and violation of her human rights. *See* Def.'s Stat. at Ex. A, Johnson Dep. at 268. While at least the last of this list of damages is uncertain, nonetheless "the doubt should be resolved in favor of the plaintiff's pleadings."*Tongkook,* 14 F.3d at 785. Moreover, while the court has serious questions with respect to whether Johnson has incurred damages over $75,000, the court cannot say to a legal certainty that, if Johnson prevailed on her claims the damages would be less than $75,000.

### B. Due Process

Sears asserts that Johnson's claim that her Fourteenth Amendment right to due process of law has been violated was withdrawn by Johnson at her deposition. *See* Def.'s Mem. in Supp. at 13. The court agrees. In her sworn deposition testimony, Johnson testified that she wanted to litigate her case in federal court rather than through arbitration, and that her Fourteenth Amendment claim had been premised on her belief that she would have to arbit-rate this matter in a state other than Connecticut, which would be difficult for her. *See* Def.'s Stat. at Ex. A, Johnson Dep. at 163. Because that was no

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

longer an issue, Johnson admitted that her Fourteenth Amendment claim was withdrawn.[FN3] Thus, Johnson cannot now create an issue of fact by contradicting her prior sworn deposition testimony. *C.f. Perma Research & Dev. Co. v. Singer Co .,* 410 F.2d 572, 578 (2d Cir.1969) ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). In fact, Johnson has presented no evidence, other than her argument in her Memorandum in Opposition, *see* Mem. in Opp. at 27, that would support her assertion that she has not given up her Fourteenth Amendment claim. A memorandum of law is not evidence, *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995) (" '[Mere conclusory allegations or denials' in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist.") (citations omitted). Therefore, Johnson's Fourteenth Amendment due process claim will be considered withdrawn by the court.[FN4]

> FN3. The following exchange occurred between Johnson and counsel for Sears:
>
> *Defense counsel:* "So you're no longer pursuing that, your rights under the 14th Amendment?"
>
> *Johnson:* "Right."
>
> *Defense counsel:* "Okay. You're withdrawing that claim?"
>
> *Johnson:* "Yes."
>
> *Defense counsel:* "So Paragraph 2 of your More Definite Statement is withdrawn?"
>
> *Johnson:* "Yes."
>
> *Defense counsel:* "Okay."

> *Johnson:* "Thank you."

> FN4. Even if the court assumed Johnson had not withdrawn her Fourteenth Amendment claim, the court still would grant summary judgment to the defendants, because Johnson has provided no evidence that would create an issue of fact regarding this claim. Because she is currently proceeding in a court of law, it does not appear that Johnson's "rights to a fair trial that is judge [sic] by her peers, in a court of law," are being denied. *See* Plf.'s Stat. at ¶ 1.

## C. Breach of Contract

**\*3** To prove her breach of contract claim, Johnson must establish: "(1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the opposing party and (4) damages."*McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.,* 93 Conn.App. 486, 503-4 (Conn.App.Ct.2006). Moreover, "a plaintiff must prove that he or she sustained damages as a direct and proximate result of the defendant's breach."*Warning Lights and Scaffold Service, Inc. v. O and G Industries, Inc.,* 102 Conn.App. 267, 271 (Conn.App.Ct.2007). Indeed, "causation is an element-and a crucial one-of the plaintiff's prima facie case.'" *McCann,* 93 Conn.App. at 504 (citations omitted).

There is no dispute that Sears and Johnson entered into two agreements on or around August 31, 1999. *See* Def.'s Mem. in Supp. at 19. Johnson claims that Sears failed to honor the contracts because a technician never responded to her complaints. *See* Def.'s Stat. at Ex. H, Plf.'s Revised Statement at ¶ 5. However, in her sworn deposition testimony, Johnson admitted that approximately two weeks after the furnace was installed, a Sears technician told her that the furnace could not leak water and that it was her water heater or humidifier that was leaking water. *Id.* at Ex. A, Johnson Dep. at 184. These latter items are not covered by the agreements.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The Heating/Cooling Estimate and Proposal that Johnson signed on August 31, 1999, regarding her purchase of the furnace specifically states that, "Sears is not responsible for any existing code violations or pre-existing conditions of any ductwork, piping, electrical supplies or equipment not being replaced at this time. If additional work is required, it will be the customer's responsibility."*See* Def.'s Stat. at Ex. E. Furthermore, the MPA entered into on that same date only applies to "covered products" and limits liability on "telephone, water, gas, electrical or other lines, drains, or ductwork connecting to the equipment."*See* Def.'s Stat. at Ex. D, MPA at ¶¶ 1, 10(h). It also limits liability to Sears' agents, contractors, or licensees "for any incidental or consequential damages, including, but not limited to, property damage, lost time, loss of use of covered product(s) or any other damages resulting from the breakdown or failure of covered product(s) serviced under this MPA, delays in servicing or the inability to service any covered product(s)."*Id.* at ¶ 11.

These agreements show that, to the extent Sears technicians told Johnson it was the water heater or humidifier or air conditioner that was leaking water, these items were not covered by the MPA and thus Sears was not responsible for fixing them. Moreover, Sears argues that Johnson has failed to establish her breach of contract claim because there is no evidence that Sears breached the agreement and directly and proximately caused damages. *See* Mem. in Supp. at 19. Indeed, Johnson has pointed to no evidence that would indicate that it was the furnace, rather than these other items, that caused the leaking of the water in her basement; as a matter of fact, she was told by several people that the furnace does not contain water. For example, James Anderson of Viking Fuel Oil, whose technicians stopped the water leaking from the humidifier, told her as much in a telephone conversation with Johnson, in which he also told her that the humidifier is not part of the furnace and that a humidifier needs ongoing maintenance in order to stay free of problems. *See* Def.'s Stat. at Ex. F, Anderson Dep. at 21,

47-49. Timothy Kennedy of Kennedy Plumbing and Heating, whose technicians went to Johnson's home to inspect for leaks, testified that it was the condensate fitting of the air conditioner above the furnace, which was broken, that caused the leaking, not the furnace. *Id.* at Ex. G, Kennedy Dep. at 13.

*\*4* Because Johnson has provided no evidence, through expert testimony or otherwise, that would show that Sears breached the contract or that Sears' improper installation or maintenance of the furnace caused the water to leak in her basement, the court grants summary judgment to Sears on its breach of contract claim.

## D. Breach of Warranty

Sears argues that Johnson's breach of warranty claim must be brought under Connecticut's Product Liability Act ("CPLA") because her claim arises out of the installation of the furnace she purchased from Sears. *See* Def.'s Mem. in Supp. at 21. The court agrees, because Johnson's claim is premised on the "improper and defective installation" of the furnace. *See* Def.'s Stat. at Ex. H, Plf.'s Revised Statement at ¶ 5; *see also*Conn. Gen.Stat. § 52-572m(b).

The CPLA creates a consolidated cause of action for all product liability claims, which "shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."Conn. Gen.Stat. § 52-572n(a). However, although the CPLA creates the "exclusive remedy for claims falling within its scope,"*Winslow v. Lewis-Shepard, Inc.,* 212 Conn. 462, 471 (1989), it was "not meant to alter the substance of a plaintiff's rights or the facts that a plaintiff must prove in order to prevail."*LaMontagne v. E .I. Du Pont De Nemours & Co., Inc.,* 41 F.3d 846, 855 (2d Cir.1994)(*LaMontagne II* ). As such, it "retains the plaintiff's right to allege the traditional theories of recovery along with the statutory basis for recovery under one unified count denominated as a product liability

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

claim."[FN5] *LaMontagne v. E.I. Du Pont De Nemours & Co., Inc.,* 834 F.Supp. 576, 587 (D.Conn.1993) (*LaMontagne I*).

> FN5. The CPLA requires that a plaintiff bring a products liability claim within "three years from the date when the injury, death or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered."Conn. Gen.Stat. § 52-577a. However, Sears did not address the issue of the timeliness of Johnson's lawsuit, and thus any statute of limitations defense is deemed waived. *See Fisher v. Vassar College,* 70 F.3d 1420, 1452 (2d Cir.1995) ("[T]he statute of limitations is an affirmative defense and can be waived.").

Because the CPLA is silent as to the elements of this cause of action for breach of warranty, "there is another statutory source upon which the plaintiff [ ] may rely-the Connecticut Uniform Commercial Code, Title 42a of the Connecticut General Statutes ("CUCC")."*Id.* at 594.An express warranty is defined under Conn. Gen.Stat. § 42a-2-313(1) as:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the good shall conform to the sample or model.

Implied warranties are defined in two provisions. Conn. Gen.Stat. § 42a-2-314 provides: "[u]nless excluded or modified as provided by section 42a-2-316, a warranty that the goods shall be merchantable is implied in a contract with respect to goods of that kind."Furthermore, Conn. Gen.Stat. § 42a-2-315 provides: "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 42a-2-316 an implied warranty that the goods shall be fit for such purpose."Conn. Gen.Stat. § 42a-2-315. For both express and implied warranties, a plaintiff has the burden of proving causation. *See*Conn. Gen.Stat. § 52-572n(a) (setting forth product liability claims under CPLA "for harm *caused* by a product") (emphasis added); *Blockhead, Inc. v. Plastic Forming Co ., Inc.,* 402 F.Supp. 1017, 1024 (D.Conn.1975) ("In a breach of warranty action, a plaintiff may recover only after demonstrating that a warranty existed, that defendant breached the warranty, and that the breach was the proximate cause of the loss sustained.").

**\*5** The express warranty contained in the Heating/ Cooling Estimate & Proposal provides that, although Sears is not responsible for any pre-existing conditions of equipment not being installed or replaced at the time of installation, and although Sears only arranges for the installation, "should the workmanship of any Sears arranged installation prove faulty within one year, Sears will upon notice from you, cause such faults to be corrected at no additional cost to you."*See* Def.'s Stat. at Ex. E. Johnson also claims that it was implied that Sears would install a trouble-the Connecticut Uniform Commercial was told that the installation would be done by an expert installer. *See* Def.'s Stat. at Ex. C, Interrogatory # 15.

Notwithstanding these assertions, there is no basis on this record for Johnson's claim that Sears breached any express or implied warranties, or that any breach caused the water leaking in Johnson's basement. As noted above, *supra* at 7-8, Johnson has provided no expert testimony or other evidence

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that would support her claim that the furnace was malfunctioning and that it caused her basement to flood. Moreover, other items, such as the humidifier or air conditioner, were specifically excluded from the MPA, *supra* at 6-7.Thus, Johnson cannot claim that Sears breached any warranties as a result of those items leaking water. Additionally, Johnson admitted that Sears technicians came to her home to inspect the furnace soon after she complained about it, and that these technicians found that the furnace was working properly. *Supra* at 2-3, 6, 7;*see also* Def.'s Stat. at Ex. A, Johnson Dep. at 239. Without any evidence to the contrary, there is no material issue of fact. Thus, the court grants summary judgment to Sears on the breach of warranty claim.

## E. Lemon Law

Although Sears analyzes Johnson's "lemon law" claim as brought under Conn. Gen.Stat. § 42-179, which provides protection to consumers of motor vehicles, [FN6] *see* Def.'s Mem. in Supp. at 25-27, the court construes Johnson's "lemon law" claim as another breach of warranty or breach of contract claim based on the "Replacement and No Lemon Guarantee" clause in the MPA. *See* Plf.'s Mem. in Supp. at 31. Pursuant to that clause:

> FN6. According to the Connecticut Supreme Court, "[f]or consumer buyers of new motor vehicles, the act provides supplemental remedies of repair, replacement and refund to facilitate the enforcement of express warranties made by the manufacturers of such vehicles. These supplemental remedies come into play whenever a manufacturer or authorized dealer, after a reasonable number of repair attempts, is unable substantially to conform a new vehicle to the terms of the express warranty."*General Motors Corp. v. Dohmann,* 247 Conn. 274, 281 (1998). There is no motor vehicle involved in this case.

if we [Sears] determine that a covered product is

unrepairable due to unavailability or functional parts or technical information, you are entitled, at your option, to a comparable product replacement or we will cancel this MPA and refund the Total Price. We will, at your request, replace the product(s) covered by this MPA in the event of four (4) or more separate product failures, as determined by us, due to a defect in parts or workmanship within any continuous twelve (12) month period that the product(s) are covered. Product failures for these purposes must include replacement of a functional, non-expendable part, and do not include preventive maintenance, product diagnosis, customer instruction, accessory, cosmetic, or non-functional repair or replacement....

*6 See* Def.'s Stat. at Ex. D, MPA at ¶ 6.

This claim must also fail for the same reasons as stated above. *See supra* at 7-8, 10-11.When the technician went to Johnson's home within two weeks of the purchase of the furnace, his investigation revealed that the problem was not the furnace, because an oil furnace does not have water in it. *Id.* at Ex. A, Johnson's Dep. at 184. That the water heater or the air conditioner may have been leaking water does not help Johnson, for the MPA specifies that it only covers the furnace and not anything connecting to the equipment. *Id.* at Ex. D, MPA at ¶ 10. Thus, the court grants summary judgment to Sears on this claim.

## F. Human Rights

In her Memorandum in Opposition to the Motion for Summary Judgment, Johnson claims that Sears violated her rights under the United Nation's Universal Declaration of Human Rights ("UDHR").*See* Plf.'s Mem. in Opp. at 32. Essentially, Johnson is arguing that, if Sears had fixed the furnace, pipes, and duct work, and if it had treated her with dignity and respect, "it would have prevented the pain and suffering the plaintiff has experience [sic] since August 1999."*Id.* at 33.

However, "the UDHR is not a treaty" and does not

have "the effect of domestic law." *Guaylupo-Moya v. Gonzales,* 423 F.3d 121, 133 (2d Cir.2005). It is a non-binding United Nations document, and "at the time of its adoption in 1948, it was the explicit position of the United States that the Declaration 'is not a treaty ... [or] an international agreement' and that '[i]t is not and does not purport to be a statement of law or of legal obligation.' " *Flores v. Southern Peru Copper Corp.,* 414 F.3d 233, 261 & n. 38 (2d Cir.2003). Moreover, it does not create a private right of action. *See Ciaprazi v. Goord,* 2005 WL 3531464, at *2 (N.D.N.Y.2005). Thus, Johnson's claims under the UDHR are dismissed.

## G. Negligence

To prove her claim for negligence,[FN7] Johnson must establish: (1) duty; (2) breach of that duty; (3) causation; and (4) actual injury. *Angiolillo v. Buckmiller,* 102 Conn.App. 697, 2007 WL 2051409, at *6 (Conn.App.Ct.2007)." 'If a plaintiff cannot prove all of those elements, the cause of action fails.' " *Id.* (citations omitted).

> FN7. To the extent Johnson's negligence claim involves Sears' installation of the furnace, it must be brought under the CPLA. *See* Conn. Gen.Stat. § 52-572m(b) (including as "product liability claims" negligence claims for injury or damage caused by the installation of a product). However, to the extent Johnson's claim involves allegations of negligence based on post-sale repairs (or lack of repairs) of the furnace, this claim is not encompassed by CPLA. *See Thomas v. Mazak Corp.,* 234 F.Supp.2d 135, 138 (D.Conn.2002) (citing cases). Thus, "even if a defendant is a 'product seller' within the CPLA for the purposes of one of the plaintiff's claims, it may still be a repairer, and hence not covered by the CPLA, for the purposes of other claims set forth in the complaint." *Id.* (citing *American Nat'l Fire Ins. Co. v. A .Secondino & Sons,* 832 F.Supp. 40, 42

(D.Conn.1993)).

"An essential element of any negligence action is the establishment of the defendant's conduct as a proximate cause of the plaintiff's injury.... 'The causal relation between the defendant's wrongful conduct and the plaintiff's injuries must be established in order for the plaintiff to recover damages.' " *Wu v. Town of Fairfield,* 204 Conn. 435, 438 (1987). The existence of the proximate cause "is determined by looking from the injury to the negligent act complained of for the necessary causal connection.... This causal connection must be based upon more than conjecture and surmise." *Paige v. Saint Andrew's Roman Catholic Church Corp.,* 250 Conn. 14, 26 (1999).

*7 Sears argues that Johnson has neither provided evidence of wrongful conduct by Sears nor has proved causation. *See* Def.'s Mem. in Supp. at 32-33. The court agrees, for the same reasons as stated above, *see supra* at 7-8, 10-11, 12, that Johnson has failed to prove that Sears' conduct caused any of the damages of which she complains.[FN8] Johnson has provided no expert testimony or other evidence that would support her claim that Sears was negligent by not acknowledging the furnace was leaking water and making loud noises and by not maintaining her furnace annually, or that any of Sears' actions caused the water to leak in her basement. *See* Def.'s Stat. at Ex. H, Plf.'s Revised Statement at ¶ 5. A Sears technician came to Johnson's home two weeks after she purchased the furnace to inspect it, and he told her that the problem was not the furnace, because an oil furnace does not have water in it. *Id.* at Ex. A, Johnson Dep. at 184. At that same visit, the technician fixed a non-Sears' product that was not covered by the MPA at no expense to Johnson. Additionally, Johnson admitted that no Sears technician who inspected the furnace told her the furnace was not functioning properly. *Supra* at 2-3, 6, 7; *see also* Def.'s Stat. at Ex. A, Johnson Dep. at 239. Because Johnson has failed to come forward with any evidence to support her claim of negligence by Sears in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

installing the furnace or inspecting it subsequent to purchase causing the water to leak in her basement, the court grants summary judgment to Sears on the negligence claim.

> FN8. Indeed, in her deposition testimony, Johnson admitted that her negligence claim is based on Sears' failure to perform the contract. *See* Def.'s Stat. at Ex. A, Johnson Dep. at 266-67.

## V. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment **[Doc. No. 127]** is GRANTED. The Clerk is ordered to close the case.

## SO ORDERED.

D.Conn.,2007.
Johnson v. Sears Roebuck & Co.
Slip Copy, 2007 WL 2491897 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

Page 1

Alstom Power, Inc. v. Schwing America, Inc.
D.Conn.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
ALSTOM POWER, INC., Plaintiff,
v.
SCHWING AMERICA, INC., Defendant.
Civil No. 3:04cv1311 (JBA).

Sept. 14, 2006.

Patrick M. Fryer, Steven Berglass, Seeley & Berglass, New Haven, CT, for Plaintiff.
Alan H. Maclin, Jeffrey F. Shaw, Briggs & Morgan, St. Paul, MN, Barry J. Waters, Murtha Cullina LLP, New Haven, CT, for Defendant.

Ruling on Motion for Summary Judgment [Doc. # 78]

JANET BOND ARTERTON, U.S.D.J.
**\*1** This diversity case arises out of a contract dispute between plaintiff Alstom Power, Inc. ("Alstom"), a Delaware corporation with its principal office in Windsor, Connecticut, and defendant Schwing America, Inc. ("Schwing"), a Minnesota corporation with its principal office in White Bear, Minnesota. Alstom brought a complaint alleging breach of contract (Count One), unjust enrichment (Count Two), negligent misrepresentation as to the goods/services to be provided under the contract (Count Three), declaratory judgment with respect to insurance coverage (Counts Four and Five), violation of the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § 42-110a*et seq.* and the Connecticut Unfair Insurance Practices Act, Conn. Gen.Stat. § 38a-816(b) (Count Six), and negligent misrepresentation as to insurance coverage (Count Seven). Am. Compl. [Doc. # 66]. Defendant now moves for summary judgment on all counts, which will be granted for the following reasons.

## I. Factual Background

In April 1999, ABB, a member of the Alstom Power Group,[FN1] was awarded a contract to construct a portion of a 150-megawatt power plant in Redbank, Australia. Def. L.R. 56(a)1 Stmt. [Doc. # 79] at ¶¶ 2, 4. The plant is near a coal mine and was designed to convert coal byproducts into energy. *Id.* at ¶¶ 5, 7; Pl. L.R. 56(a)2 Stmt. ¶ II.5. ABB was to provide steam generators and related equipment for the plant, a contract worth $130 million of the total $230 million (Australian dollars) Redbank budget. Def. L.R. 56(a)2 Stmt. ¶ 10.

> FN1. The record is unclear concerning the relationship between ABB and Alstom. Defendant characterizes ABB as a predecessor corporation to Alstom, and plaintiff denies this characterization but does not say what it believes the relationship to be. Regardless, both parties' briefs assume that Alstom is the proper party plaintiff to assert claims arising under ABB's contract.

The parties dispute the relationship between ABB and Schwing. ABB characterizes Schwing as a "supplier" who was to provide one component for its part of the Redbank project, a "material handling system used to store, mix and transport the coal slurry."*Id.* at ¶ 12.Schwing, by contrast, characterizes its role as a subcontractor responsible for "complete provision of a major portion of the Redbank power plant, not just for component parts, and plaintiff's bid included design, engineering, planning, specifications, services, on-site supervision, inspection and performance...." Pl. L.R. 56(a)2 Stmt. ¶ 12.

Schwing's response to the bid package, however, proffers a "price for the *material handling system* used to store, mix and transport the coal slurry."Def.App. Ex. 4 (9/21/99 letter from Thomas Lyons to R.T. Smuda) (emphasis added). The letter further states that Schwing has "included a parts

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

Page 2

only warranty in our base equipment offering; however, we offered a price adder to incur the cost of labor. Labor to service our equipment must be provided by either a Schwing employee or authorized agent, specifically Sulzer of Australia."*Id.*

Alstom responded to Schwing's package with a 29-page purchase order dated October 8, 1999, which requested four BDT [FN2] storage tanks, four storage tank sliding frame silo systems, four BDT paddle mixers, and four BDT transfer pumps. Def.App. Ex. 5. Included in the purchase order was one service trip for one Schwing employee to go to Australia for two weeks. *Id.* ABB also requested various inspection and test reports, contract drawings, and instruction manual specifications. *Id.*

> FN2. Although not fully explained in the record, BDT appears to be a type of coal byproduct that is processed in the Redbank plant.

*2 On October 29, 1999, Schwing responded to the purchase order with a letter acknowledging receipt of the order and assuring "successful and timely completion." Def.App. Ex. 6 at 1. The letter also requested a few modifications to the terms of the purchase order, including a limitation of warranties.*Id.* at 2. ABB never signed the letter to indicate its agreement to the changed terms. *Id.* at 6 (showing blank signature lines).

On June 23, 2000, ABB's Redbank Construction Manager confirmed the delivery at the Redbank site of the equipment that was ordered through the original purchase order, stating that the goods were received and "of good quality and condition." Def. L.R. 56(a)1 Stmt. ¶ 19; Pl. L.R. 56(a)2 Stmt. ¶ II.19; Def.App. Ex. 8. Schwing billed ABB approximately $1.8 million (U.S.Dollars), which was paid timely. Def. L.R. 56(a)1 Stmt. ¶ 20-21; Pl. L.R. 56(a)2 Stmt. ¶ II.20-21. [FN3]

> FN3. Plaintiff denies that this amount represented payment in full, given the subsequent dispute that arose between the

parties over costs of repairs in 2001-2002; however, plaintiff does not dispute that ABB paid Schwing's original invoice, representing the original equipment ordered.

On May 11, 2001, while the power plant was operating on BDT fuel, one of the "sliding frame power cylinder trunion arms broke," or, as plaintiff characterizes the accident, "exploded including but not limited to a cylinder flying through the system causing extensive and major damage."Def. L.R. 56(a)1 Stmt. ¶ 22; Pl. L.R. 56(a)2 Stmt. ¶ II.22. Schwing, through its contractor Parker Hannifin, replaced all eight cylinders at Redbank. Def. L.R. 56(a)1 Stmt. ¶ 27. However, plaintiff alleges that the replacement cylinders, which were due on June 30, were delayed until July 16, 2001, and then failed again in December 2001 and in 2002 and 2003. Pl. L.R. 56(a)2 Stmt. ¶ 27. Plaintiff seeks damages of approximately $700,000 for replacement material, commissioning, transportation, repair labor, and 15% overhead. Defendant argues that all of plaintiff's contract claims are barred by the statute of limitations. Defendant also argues that most of these costs are excluded by the parts-only warranty agreed by the parties or because the costs were not incurred by plaintiff.

## II. Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). Materiality is determined by the substantive law that governs the case.*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."*Id.*"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

Page 3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the nonmoving party's claim. *Celotex,* 477 U.S. at 322-23. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.' " *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 111 (2d Cir.2001) (quoting *Celotex,* 477 U.S. at 324);*see also Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-1224 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The nonmoving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson,* 477 U.S. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed.R.Civ.P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. *Matsushida,* 475 U.S. at 586 (citations omitted).

## III. Discussion

### A. Breach of Contract: Statute of Limitations

*3 Central to determination of this summary judg-

ment motion is the parties' dispute as to the applicable statute of limitations for this lawsuit filed August 6, 2004. The Uniform Commercial Code, governing sales of goods, establishes a four-year limitations period, *see*Conn. Gen.Stat. § 42a-2-725,[FN4] while construction and other general contract matters have a six-year limitations period, *see*Conn. Gen.Stat. § 52-576.[FN5]Thus, the critical issue is whether the parties' contract is a contract for the sale of goods, as Schwing argues, or a construction services contract, as Alstom argues.

> FN4."An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued."Conn. Gen.Stat. § 42a-2-725(1).

> FN5."No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues ..."Conn. Gen.Stat. § 52-576(a).

"To determine whether a contract ... is governed by the U.C.C., the court must determine whether the dominant factor or 'essence' of the transaction is the sale of the materials or the services."*Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 747 (2d Cir.1998) (quoting *Incomm, Inc. v. Thermo-Spa, Inc.,* 41 Conn. Supp. 566, 570, 595 A.2d 954, 956-57 (Conn.Super.Ct.1991)). This is a fact-specific determination that requires examination of "the main objective sought to be accomplished by the contracting parties."*Consol. Edison Co. of N .Y. v. Westinghouse Elec. Corp.,* 567 F.Supp. 358, 361 (S.D.N.Y.1983) (internal citation and quotation marks omitted) (denying motion to dismiss contract action relating to construction of nuclear power plant because factual development required to determine whether it was primarily a construction contract or contract for sale of goods).

The contract was formed pursuant to ABB's Bid Package requisitioning a "BDT Storage Tank (Sliding Frame Silo System)," Def. Ex. 3, by Schwing's acceptance of ABB's "Purchase Order,"

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

Page 4

which sets forth a list of "deliverable items," Def. Ex. 5 at 1, 6. The purchase order refers to the parties as "Seller" and "Purchaser." *Id.* at 2. The items were to be manufactured by Schwing either in the United States or Germany and shipped to Australia. *Id.* at 4. Schwing provided one of its employees to supervise installation in Australia for two weeks, *id.* at 4, but the purchase order did not include the full price of labor necessary for complete installation, which was undertaken by another firm. Alstom emphasizes the fact that Schwing was to engineer and quality-test the items provided and also supply instruction manuals. Under the U.C.C., however, " '[g]oods' means all things, *including specially manufactured goods, which are movable at the time of identification to the contract....*"Conn. Gen.Stat. § 42a-2-105 (emphasis supplied). Thus, the fact that the BDT storage tanks were specially manufactured items that required unique engineering, testing and instruction manuals for operation is not inconsistent with a finding that they are goods within the meaning of the U.C.C.

The cases plaintiff cites for the proposition that its contract is not subject to the U.C.C. are factually distinguishable. In *Insurance Company of North America v. ABB Power Generation, Inc.,* 925 F.Supp. 1053, 1056 (S.D.N.Y.1996), the defendant was retained to construct an entire power generation facility, including "design[ing] and construct[ing] the facility and procur[ing] necessary equipment."The contract, which "define[d][the] defendant's undertaking as 'services,' " " obligated the defendant-denominated as a "contractor"-to "provide [the owner] with a Project that functions...." *Id.* at 1061.Likewise, in *Niagara Mohawk Power Corporation v. Graver Tank & Manufacturing Company,* 470 F.Supp. 1308, 1324 (N.D.N.Y.1979), the contract obligated the "contractor" to "provide all the materials, equipment and apparatus, ... all the labor, tools, services and facilities ... [and] perform all the work and do all things necessary for the proper construction and erection and completion" of a "containment liner" in a nuclear power plant. Here, Schwing was oblig-

ated to provide certain component parts of the Redbank plant but not to install those parts. The contract did not require Schwing to provide "all the labor, tools, services and facilities," *compare id.,* but only obligated Schwing to provide one employee to oversee another subcontractor's work. Finally, the purchase order issued by ABB requests "deliverable items," not "services," and the bid package offered by Schwing is for the component parts of a "material handling *system,"* not for the construction services associated with that system. The fact that Schwing designed and engineered the system does not transmute the purchase order into a construction contract.

*4 For these reasons, the Court concludes that this contract is predominantly one for the sale of goods, governed by the U.C.C. Accordingly, a four-year statute of limitations is applicable.

Plaintiff's original complaint [Doc. # 1] was filed on August 6, 2004. Thus the question is whether any breach of contract is alleged to have occurred within four years of that date. Schwing contends that its performance of the contract was complete on June 23, 2000, when ABB's John King sent an email to Schwing confirming that the "BDT Bins and Support structures" were "received at [the Redbank] site and ... [are] of good quality and condition."Def.App. Ex. 8. Alstom, however, contends that performance was not complete in 2000, but "continu[ed] into 2001 and 2002" due to the "failure with the sliding frame cylinder arrangement," which was not fully repaired until July 16, 2001, and failed again in 2002. *See* Pl. L.R. 56(a)2 Stmt. ¶ 19.

Alstom conflates two different issues. Although Alstom contends that the 2001 sliding frame cylinder failure breached the contract, this is a separate question from when Schwing completed its original performance pursuant to the purchase order. Schwing's parts were delivered to Redbank on June 20, 2000, *see* Def.App. Ex. 8 ("All Items Report"), and there is no material dispute of fact that ABB certified Schwing's delivery complete and of ac-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

Page 5

ceptable quality as of June 23, 2000, *id.* at Ex. 8 (e-mail from John King to Keith Ireson). There is also no genuine dispute that the Redbank power plant was fully constructed and operating before Spring 2001, because the cylinder failure occurred during the firing of BDT fuel.

*See* Def. L.R. 56(a)1 Stmt. ¶ 22; Pl. L.R. 56(a)2 Stmt. ¶ 22. The real dispute between the parties thus is whether the cylinder failure is covered under the agreed warranty, not whether Schwing completed performance under the contract initially.[FN6]

> FN6. Although the Court finds that breach of warranty is the proper characterization of the parties' dispute, Alstom expressly disclaims a breach of warranty claim. Pl. Mem. in Opp. to Def. Summ. J. Mot. [Doc. # 96] at 1 ("Plaintiff's Amended Complaint dated November 3, 2005 (the operative complaint) alleges breach of contract, and does not allege breach of warranty.").

Under Conn. Gen.Stat. § 42-a-725(2), a "breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."The operative[FN7] warranty language in the Alstom-Schwing agreement, which is an amendment[FN8] to the purchase order, reads: "Schwing America, Inc. to include two (2) year parts only warranty or [sic] thru 9-30-02. This warranty does not obligate Schwing America Inc. to bear the cost of labor in replacement of defective parts or the cost of transportation of such parts."Def.App. Ex. 5 at 16.

> FN7. Schwing proposed additional language to the warranty ("This warranty is in lieu of any other warranty expressed or implied ...") in a letter sent to ABB on Oct. 29, 1999, *see* Def.App. Ex. 6, but ABB never agreed to the modification.

> FN8. Although ABB contends that their boilerplate warranty language on the following page of the purchase order applies, the purchase order explicitly sets forth the negotiated warranty as part of the "Commercial Requirements Amendments" modifying the boilerplate. *See* Def.App. Ex. 5 at 16-17.

This warranty is not an explicit guarantee of future performance, such as would be required under § 42a-2-725 to toll the statute of limitations until the time the defect is discovered. The parties' agreed language is a "parts only warranty" obliging Schwing to "replac[e] ... defective parts." It does not oblige Schwing to guarantee that its materials handling system will perform to a certain level over the warranty period. Accordingly, a breach of warranty "occurs when tender of delivery is made."Conn. Gen.Stat. § 42a-2-725(2).

*5 In *Flagg Energy Development Corp. v. General Motors Corp.,* 244 Conn. 126, 151, 709 A.2d 1075, 1087 (Conn.1998), a case with very similar facts, the Connecticut Supreme Court expressly "reject[ed] the ... contention that [a] repair or replacement clause in [a] purchase agreement tolls the running of the statute of limitations under § 42a-2-725."In *Flagg,* the parties contracted (via a purchase order) for gas turbine engines for a construction project. The engines malfunctioned approximately 1.5 years after acceptance by the plaintiff, and the plaintiff claimed that because the contract included a repair or replacement clause for defective materials or equipment, the statute of limitations started to run on the date of the malfunction. The Connecticut Supreme Court held that the repair/replacement clause in the contract was not a guarantee of the engines' future performance, *i .e.* an ongoing contractual commitment, but merely an additional remedy promised to the buyer in case of defect, and therefore the statute of limitations started to run on the date performance was tendered. *See Flagg,* 244 Conn. at 150. Likewise, the replacement-parts warranty agreed between Alstom and

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

Page 6

Schwing is not an explicit guarantee of future performance, and thus the statute of limitation began to run when delivery of the goods was tendered.FN9

> FN9.*Coakley & Williams, Inc. v. Shatterproof Glass Corp.,* 706 F .2d 456 (4th Cir.1983), on which plaintiff heavily relies, is distinguishable from this case and from *Flagg.*In *Coakley,* a contractor did replace the allegedly defective parts, and the Fourth Circuit held that the warranty on the replacement parts began to run when the replacements were installed. 706 F.2d at 462-63. In the present case, Alstom complains not that the replacement parts were defective, but that Schwing breached the contract because the original parts broke. Accordingly, the warranty period here begins to run upon tender of the original parts.

Because there is no genuine dispute of the material fact that ABB accepted Schwing's materials handling system as of June 23, 2000, Alstom's August 6, 2004 breach of contract claim was filed outside the four-year statute of limitations. Accordingly, defendant is entitled to summary judgment on Count One.

**B. Unjust Enrichment**

As an alternative to its breach of contract claim, Alstom alleges a quasi-contractual unjust enrichment claim. "Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.... Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment."*Gagne v. Vaccaro,* 255 Conn. 390, 401, 766 A .2d 416, 424 (Conn.2001). In other words, the remedy of unjust enrichment provides that "a plaintiff may recover the benefit conferred on a defendant in situations where no express con-

tract has been entered into by the parties."*Burns v. Koellmer,* 11 Conn.App. 375, 383, 527 A.2d 1210, 1215 (Conn.App.Ct.1987) (citing 5 *Williston on Contracts* § 1479 (3d ed.1970); *Restatement of Restitution* §§ 40, 41, 107). However, where an express contract exists, restitution for unjust enrichment, a quasi contractual remedy, is unavailable. *Lieberman v. Emigrant Mortg. Co.,* ---F.Supp.2d----, 2006 WL 1699515, at *6 (D. Conn. June 2, 2006) (Hall, J.) ("Parties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations. Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment.") (quoting *Polverari v. Peatt,* 29 Conn.App. 191, 199, 614 A.2d 484 (Conn.App.Ct.1992)).

**\*6** Here, there is no argument that the parties' express written contract is unenforceable, *e.g.,* for lack of consideration or lack of mutual agreement. *Cf. Restatement of Restitution* § 40(2). Plaintiff's action on the contract exists; it is simply barred by the statute of limitations. Therefore, due to the existence of a written contract, plaintiff cannot recover on an unjust enrichment theory, and defendant is entitled to summary judgment on Count Two.FN10

> FN10. Schwing argues that Alstom's unjust enrichment claim also should be barred by a four-year statute of limitations. The Court finds no Connecticut appellate authority concerning the applicable statute of limitations for unjust enrichment claims; some Superior Courts have applied a six-year period in contracts not involving the sale of goods. *See Bailey, Moore, Glazer, Schaefer & Proto, LLP v. Hippeau,* No. CV054007301S, 2006 WL 573888, at *2 (Conn.Super.Ct. Feb. 22, 2006) (six-year limitations period in quasi-contract action brought by accountant who was not paid for services rendered); *Gianetti v. Greater Bridgeport Indiv. Practice Assoc.,* No. (X02)CV4001686, 2005 WL 2078546, at

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

Page 7

*4 (Conn.Super.Ct. July 21, 2005) (six-year period applied to nonpayment of debt action). Defendant argues that a four-year period applies here because Connecticut courts apply the statute of limitations for analogous legal claims to equitable claims, *see Dowling v. Finley Assocs., Inc.,* 248 Conn. 364, 367-68 n. 7, 727 A.2d 1245, 1248 n. 7 (1999), but the Court need not resolve this unsettled issue of state law.

## C. Negligent Misrepresentation

Plaintiff's third count alleges that Schwing negligently misrepresented "certain services, materials, equipment, and products" it provided to plaintiff. Am. Compl., Third Claim, ¶ 16. Defendant moves for summary judgment on this count on the grounds that: it is barred by the statute of limitations; Alstom has proffered no evidence of reasonable reliance on Schwing's statements; and Alstom's breach of warranty claim from Count One cannot be combined with a negligent misrepresentation claim. Alstom has not addressed any of these arguments, and appears to have abandoned Count Three.

Even if plaintiff intended to pursue this claim, the Court agrees that it is barred by the applicable three-year statute of limitations. *See*Conn. Gen.Stat. § 52-577 (three-year statute of limitations applies to tort actions); *Krondes v. Norwalk Sav. Soc.,* 53 Conn.App. 102, 113-15, 728 A.2d 1103, 1110-11 (1999) (three-year statute of limitation applied to fraudulent misrepresentation claim). On the facts of plaintiff's complaint, any misrepresentation concerning the quality of the goods took place either when the contract was formed (Schwing's acceptance took place October 29, 1999), or, at the latest, when the goods were delivered to Redbank on June 20, 2000. Either point predates the filing of the August 2004 complaint by more than three years.

Moreover, the Connecticut Supreme Court held in *Flagg,* 244 Conn. at 153, that "commercial losses arising out of the defective performance of contracts for the sale of goods cannot be combined

with negligent misrepresentation."Thus, where the "factual underpinnings" of both claims are identical, a plaintiff is limited to a breach-of-contract claim. *Id.* at 155.Here, the allegations of plaintiff's negligent misrepresentation claim are identical to its breach of warranty claim, namely, that defendant's sliding frame and cylinder components were defective and malfunctioned in May 2001, causing damage to the Redbank plant. Accordingly, under *Flagg,* plaintiff cannot maintain this negligent misrepresentation claim.

For these reasons, defendant is entitled to summary judgment on Count Three.

## D. Insurance Coverage

Plaintiff's Fourth and Fifth Counts [FN11] relate to the insurance coverage provisions of the parties' agreement, which requires that "Seller will maintain general liability insurance on an occurrence basis, having limits of not less than $1,000,000 per occurrence ... and naming Purchaser as an additional insured with respect to any claim arising out of Seller's performance hereunder."Purchase Order, Pl.Ex. B at 18. It is undisputed that defendants breached this requirement because, although they obtained Commercial General Liability policies with limits of $2 million, ABB/Alstom was not a named insured on these policies. *See* Insurance policies, Def.App. Ex. 21 (only Schwing entities are named insureds); Def. L.R. 56(a)1 Stmt. ¶ 39 (claiming Schwing had CGL policies in effect but not alleging that the policies named ABB/Alstom). Schwing did put up a construction bond in ABB's favor of approximately $240,000, or 10% of the contract. *See* Def.App. Ex. 20. However, Schwing does not argue that this bond satisfied its insurance obligation under the agreement. Rather, Schwing argues that Alstom's insurance coverage claims fail because Alstom has not suffered or claimed any third-party losses for which it sought insurance coverage.

FN11. Count Five does not set forth a sep-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

Page 8

arate cause of action but claims costs and attorney fees relating to the insurance coverage claim in Count Four. Am. Compl. ¶ 29.

*7 The parties dispute whether Redbank's owners have filed a claim against Alstom. At the deposition of Clifton Stalph (Alstom's designated corporate representative knowledgeable about damages), Alstom's attorney stated that Redbank had sued Alstom, but refused to allow Stalph to divulge information about the lawsuit on the grounds of attorney-client privilege.[FN12] Stalph Depo., Pl. Surreply Ex. D, at 32-35. On this basis, plaintiff argues that it "informed" Schwing about the pending Redbank lawsuit, and that this lawsuit is the third-party claim that should be insured. Pl. Surreply Br. at 5. Plaintiff's Local Rule 56(a)2 Statement ¶ 40 alleges that Schwing was aware of Redbank's third-party claims "as the result of numerous meetings and communications with plaintiff throughout 2001, 2002, and 2003," but it also frames its cause of action as one for breach of contract for "defendant's failure to honor defendant's indemnity obligations," and acknowledges that Alstom never submitted or attempted to submit an insurance claim to defendant's CGL carrier. *Id.* The record contains no written documentation concerning the Redbank lawsuit, and plaintiff's damages analysis, provided in discovery, makes no claim for any liability to third party Redbank. *See* Def.App. Ex. 22 (claiming materials, labor and overhead for repairing the sliding frames and cylinders).

> FN12. When Stalph was asked whether he prepared a certain damages analysis at the request of an attorney, Alstom's attorney refused to allow Stalph to answer "because it's related to the Red Bank [sic] claim," the recent lawsuit against Alstom."Stalph Depo., Pl. Surreply Ex. D, at 34. No further information about the lawsuit appears to have been provided to Schwing in discovery and Alstom does not argue that it actually made a formal claim for coverage

related to the Redbank suit.

Regardless of whether plaintiff's claim is characterized as a breach of contract action or an indemnity action related to Redbank, it is not properly before this Court. If it is a breach of contract claim, it is precluded by the statute of limitations, for the reasons discussed above. If, as plaintiff now contends, it is a third-party indemnity action arising from the Redbank lawsuit, liability for Redbank's damages is properly determined within or following resolution of Redbank's case.

Under Connecticut law, a cause of action based on an agreement to indemnify loss accrues when the loss occurs, *i.e.,* when the indemnitee "has paid something he is legally obligated to pay."*Amoco Oil Co. v. Liberty Auto and Elec. Co.,* 262 Conn. 142, 150, 810 A.2d 259, 264 (Conn.2002). A cause of action based on an agreement to indemnify liability "would accrue as soon as an indemnitee becomes liable to a third party."*Id.*"When an agreement indemnifies against both loss and liability, ... the statute of limitations begins to run as soon as liability is incurred.... Thus, the first moment in time when an indemnitee can successfully maintain an action to enforce the terms of an indemnity agreement ... is when liability is incurred."*Id.* at 150-51.Connecticut statute provides that "an action for indemnification may be brought within three years from the date of the determination of the action against the party which is seeking indemnification *by either judgment or settlement.*" Conn. Gen.Stat. § 52-598a (emphasis supplied). Thus, the earliest appropriate time to bring an indemnification action is after the indemnitee's liability to a third party has been determined "by either judgment or settlement."The record in this case contains nothing about the Redbank lawsuit, and certainly does not establish that Alstom has been found liable to Redbank via a judgment or settlement. Therefore Alstom's indemnification action is premature.

*8 The fact that Alstom seeks a declaratory judgment rather than money damages does not change this analysis, because even a declaratory judgment

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

Page 9

concerning whether Schwing is liable for Alstom's damages stemming from Redbank's suit would ask this Court to impermissibly determine whether Schwing must indemnify Alstom prior to final determination of liability in the AlstomRedbank case. Not only is this improper under Connecticut law, it would be inefficient, as this Court would be asked to duplicate determinations to be made in the Redbank case.

Alternatively, if Alstom seeks only a declaratory judgment that Schwing breached the contract by failing to name Alstom as an additional insured, this does not present an actual case or controversy between the parties in the absence of any showing that Alstom suffered tangible injury caused by Schwing's failure to name Alstom on the policy-a showing that could only be made, if ever, after Alstom was found liable to Redbank.

Thus, however plaintiff seeks to characterize its claim related to the contract's indemnity provision, it is not one on which this Court can grant relief.

**E. CUTPA/CUIPA/Negligent Misrepresentation as to Insurance**

Plaintiff has not briefed its CUTPA/CUIPA claim (Count Six) or its negligent misrepresentation claim as to insurance coverage (Count Seven). The allegations in the complaint are similar to Count Four, alleging that Schwing misrepresented that it would name Alstom as an additional insured on its CGL policies for the Redbank project but neglected to do so.

The statute of limitations under CUTPA and CUIPA is three years from the date of the act or omission complained of. Conn. Gen.Stat. § 42-110g(f); Conn. Gen.Stat. § 52-577; *Grant v. City of New Haven*, No. 382068, 1998 WL 59472, at *2 (Conn.Super.Ct. Feb. 3, 1998). Here, plaintiff complains that Schwing misrepresented in the terms of the written contract that it would name Alstom as an additional insured on its CGL policy but failed

to do so. The latest date on which the action could have accrued, therefore, is the date the contract was formed, in this case October 29, 1999, when the purchase order was executed. This date falls outside the three-year statute of limitations. Accordingly, plaintiff's claims under CUTPA and CUIPA are barred and defendant is entitled to summary judgment on those claims.

Plaintiff's negligent misrepresentation claim, also rolled into Count Seven, is based on the identical facts as the CUTPA/CUIPA claim and the breach of contract claim in Count Four, *i.e.,* that defendant promised to name Alstom as an additional insured but failed to do so. As previously discussed with respect to the negligent misrepresentation claim in Count Three, the Connecticut Supreme Court's ruling in *Flagg,* 244 Conn. at 153-55, precludes plaintiff from bringing a misrepresentation claim on the identical facts alleged to be a breach of contract. Furthermore, "pecuniary loss" is an element of negligent misrepresentation, and without any showing of damages resulting from Schwing's alleged misrepresentations concerning its insurance coverage, Alstom cannot succeed on its negligent misrepresentation claim. *Sav. Bank of Manchester v. Ralion Fin. Servs., Inc.,* 91 Conn.App. 386, 389, 881 A.2d 1035, 1037 (Conn.App.Ct.2005).

*\*9 For the reasons above, defendants are entitled to summary judgment on the CUTPA, CUIPA and negligent misrepresentation allegations in Count Seven.

**IV. Conclusion**

Accordingly, defendants' motion for summary judgment [Doc. # 78] is GRANTED in its entirety and this case will be closed.

IT IS SO ORDERED.

D.Conn.,2006.
Alstom Power, Inc. v. Schwing America, Inc.
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

Page 10

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.