# EXHIBIT A



Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)
**(Cite as: 1986 WL 15663 (D.Conn.))**

C

Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.
Loren J. ANDREO, et al.
v.
FRIEDLANDER, GAINES, COHEN, ROSENTH-
AL & ROSENBERG, et al.
**Civ. No. H-85-551(MJB).**

April 28, 1986.

Howard Rosenfield, Plainville, Connecticut, for
plaintiff.
Dennis M. Laccavole & Arnold Bai, Bridgeport,
Conn., Deborah S. Freeman, Joseph F. Seklley, Jr.,
Joel J. Rottner & Carl F. Yeich, Skelley, Clifford,
Vinkels, William & Rottner, P.C., Hartford, Conn.,
Sharon Tisher, John B. Nolan, Robert A. Brooks,
Day, Berry & Howard, Hartford, Conn., John A.
Redmon & Robert B. Murray, David Markel Dwyer
& Edwards, New York City, Warren Kaps, Hacken-
sack, N.J., for defendants.

*RULING ON MOTIONS TO DISMISS OF DE-
FENDANTS PEAT, MARWICK & MITCHELL AND
ZARROW, ZARROW & KLEIN*

BLUMENFELD, Senior District Judge.
**\*1** This action arises out of a series of private
placements of limited partnership interests in satel-
lite communications facilities. The plaintiffs are a
number of investors who bought interests in one or
more of three limited partnerships. The defendants
are a law firm, two public accounting firms, a law-
yer/promoter, two named corporations, and a group
of unknown defendants designated "John Does
1-25" and "XYZ Corporations 1-25." The
plaintiffs, claiming that the defendants were part of
a scheme to defraud them through the sale of the
partnership interests, have brought suit under the
federal securities laws, 15 U.S.C. §§ 77*l*,77q, and
78j; the federal racketeering statute (RICO), 18
U.S.C. §§ 1961*et seq.;* and state and common law

theories.

The two defendant accounting firms, Peat, Marwick
& Mitchell ("PMM") and Zarrow, Zarrow & Klein
("ZZK") have moved to dismiss the complaint on a
variety of grounds, including failure to plead fraud
with particularity as required by Rule 9(b), failure
to state a claim under the securities laws or under
RICO, and failure to comply with the statute of lim-
itations. Taken together, their motions attack the
sufficiency of all of the plaintiffs' federal claims,
and they have moved that the pendent state claims
be dismissed along with the federal claims. For the
reasons stated below, the complaint will be dis-
missed as against defendants PMM and ZZK, with
leave to the plaintiff to amend.

*Facts*

On a motion to dismiss, the plaintiffs' allegations
must be taken to be true and all reasonable infer-
ences must be drawn in the plaintiffs' favor. There-
fore, the facts recited below are taken from the
complaint. That 53-page document contains many
details concerning the formation and sale of the
limited partnership interests at issue. Despite its vo-
luminous and diffuse nature, however, the com-
plaint fails to articulate the role that these particular
defendants played in the alleged fraudulent scheme
or to recite facts that might support liability on their
part.

The investments at issue in this case are interests in
three limited partnerships, Star Link Associates
(Star Link), Sky Link Associates (Sky Link), and
Galactic Link Associates (Galactic). These partner-
ships were formed to build and operate earth station
facilities for satellite communications. (¶¶ 31-32.)

The moving force behind the partnerships was a
man named Bejamin Rabin and a network of cor-
porations that he controlled. The plaintiffs refer to
this network throughout the complaint as "Rabin
and affiliates." Rabin organized the three partner-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)
**(Cite as: 1986 WL 15663 (D.Conn.))**

ships at issue. (¶ 29.) The general partner of each of the partnerships was a corporation called Satellite Communications Network, Inc. ("SCNI"). (¶¶ 30, 32.) SCNI's sole shareholder was another corporation, Prime Network, Inc. ("Prime"). Twenty percent of the stock of Prime was owned by Digital Video Network, Inc. ("Digital"), a corporation which is a named defendant in this action. The other 80 percent of Prime's stock was owned by Continental Consultants Corporation ("CCC"), a corporation whose sole shareholder was Benjamin Rabin. (¶ 24.) Other than Digital, the only named defendant in Rabin's network of corporations is SCN Management, Inc., a wholly-owned subsidiary of SCNI that entered into management contracts with Sky Link and Galactic. (¶ 21.) One final corporation whose name appears among the allegations is Alpha Technologies Construction Corporation ("Alpha"), which was "controlled by Benjamin Rabin and his relatives." (¶ 36.) Alpha was to finance the construction of the earth stations by taking back a promissory note from each of the partnerships, to be executed on behalf of the partnerships by the general partner, SCNI. (¶ 48(Q).)

**\*2** Rabin was president of SCNI. He was also an officer of CCC, Prime, SCN Management, and Alpha. (¶ 29.) It is this network of "Rabin and affiliates" that was the major player in the ensuing saga.

The sales of interests in the limited partnerships were held out to be private placements and were not registered with the Securities Exchange Commission. (¶ 48(P).) They were offered through private offering memoranda to a number of investors throughout the nation. (¶ 34.) Although many features of the partnerships were similar, a separate offering memorandum was issued for each partnership. The private offering memorandum for Star Link was issued on or about November 21, 1979; the Sky Link memorandum on or about April 21, 1980; and the Galactic memorandum on or about December 17, 1980. (¶¶ 33, 38, 40.)

The partnership investments all had essentially the same structure. Star Link consisted of 35 limited

partnership units. Each unit required an investment of $55,000 together with an "assumption agreement" signed by the purchaser for an amount not to exceed $81,000 plus 6% interest per annum. The assumption agreements permitted Rabin, as president of SCNI, to convert non-recourse financing to recourse financing debt, with the result that each investor would assume a portion of the partnership's outstanding liabilities to Alpha. The purpose of this device was to create tax losses for the investors. (¶¶ 33-37.)

Sky Link and Galactic were similar to Star Link. Sky Link consisted of 35 limited partnership units, each requiring an investment of $65,000 and an assumption agreement for not more than $108,000 plus 9% interest. (¶ 39.) Each of the 35 Galactic units required an investment of $50,000 and an assumption agreement for not more than $90,000 plus 9% interest. (¶ 40.)

Rabin and SCNI retained Friedlander, Gaines, Cohen, Rosenthal and Rosenberg, a law firm (which is a defendant in this action), to prepare the private placement memoranda and tax opinions for distribution to potential investors. Plaintiffs claim that the offering memoranda and tax opinions misrepresented and omitted numerous material facts.

Many of the undisclosed facts relate to Rabin's prior history of securities violations and his involvement as a defendant in a variety of pending legal actions. (¶ 48(M).) Other misrepresentations and omissions relate to the partnerships themselves. Plaintiffs allege that conflicts of interest were not revealed, including the amount of profit that Alpha would derive from the partnerships (¶ 48(0)) and the fact that SCNI had sold partnership assets for its own profit (¶ 48(N)). They also allege that the offering documents misrepresented the frequency with which investors would receive financial statements (¶ 48(L)), the necessity to register the securities with the SEC (¶ 48(P)), and the tax benefits that the partnerships would produce (¶¶ 49-52).

The plaintiffs received the offering memoranda and

Not Reported in F.Supp.                                                                                  Page 3
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)
**(Cite as: 1986 WL 15663 (D.Conn.))**

the tax opinions prepared by Friedlander, Gaines. They purchased the interests with the expectation of making profits from the operation of the earth stations and receiving tax benefits.

**\*3** The tax opinions and the offering memoranda indicated that the deductibility of certain expenses connected with the establishment of the partnerships was open to question (¶¶ 49-50), and that such deductions might be disallowed by the Internal Revenue Service as "pre-opening expenses." Nonetheless, defendant Zarrow, Zarrow & Klein, in preparing tax returns for the partnerships and limited partners included those deductions and characterized them as "advertising expenses." (¶ 51.)

The IRS commenced an audit of the three partnerships in 1982. Rabin and the defendants represented to the plaintiffs and their representatives that the audit was routine and that the deductions that they had taken were in little danger of being successfully challenged. Apparently, however, those deductions were disallowed. (¶ 58.)

In early August 1984, the limited partners including the plaintiffs learned that a trustee in bankruptcy had been appointed to supervise the affairs of the partnerships, petitions having been filed in bankruptcy court for SCNI, Prime, Alpha, CCC and Rabin. (¶ 59.)

*Discussion*

The most prominent feature of this complaint, as the foregoing recitation of the facts illustrates, is that it contains many allegations of wrongdoing by a group of individuals and corporations and then names as defendants a different group of individuals and defendants as to whom very few specific allegations are made. While plaintiffs may have substantial grounds for claims of securities fraud against Rabin and his affiliates for their actions in organizing and selling these partnership interests, they have demonstrated no basis for bringing such claims against the named defendants. The com-

plaint is extremely vague as to the role that the defendants played in the allegedly fraudulent scheme. Most of the factual allegations refer simply to "the defendants." It is left to the court and the defendants to infer what connection there may be between the defendants and any injury that the plaintiffs may have suffered. This task is complicated by the length and unfocused nature of the complaint which makes it difficult to tell precisely what the plaintiffs have and have not alleged.[FN1]   It seems clear, however, that the defendants' motions are well taken.

The motions to dismiss filed by PMM and ZZK attack every count of the complaint on a variety of grounds. The plaintiffs' federal claims will be considered seriatim.

A. *Section 10(b) and Rule 10b-5*

Count One alleges a violation of Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The plaintiffs allege that, in connection with the sale of the partnership interests, "the defendants" knowingly made numerous misrepresentations and omissions upon which the plaintiffs relied in purchasing the interests. (¶¶ 61-66.)

The moving defendants have attacked this claim for failure to plead fraud with specificity, failure to state a claim, and failure to comply with the statute of limitations.

**\*4** The failure to plead fraud with particularity and the failure to state a claim are necessarily intertwined. Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." This requirement applies to allegations of fraud in a 10b-5 action. *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557-59 (2d Cir.1979, *cert. denied,* 446 U.S. 946 (1980); *Denny v. Barber,* 576 F.2d 465, 468-69 (2d

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                 Page 4
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)
**(Cite as: 1986 WL 15663 (D.Conn.))**

Cir.1978). Thus, a failure to plead fraud with the re-quisite specificity in a 10b-5 action can result in failure to state a claim justifying dismissal under Rule 12(b)(6).

While it is often appropriate to view a plaintiff's complaint tolerantly at the most preliminary stages and to relegate defendants to discovery as a means of ascertaining the particulars of the plaintiff's claim, *see Schreiber v. Blankfort,* 76 F.R.D. 474, 480 (D.Conn.1977) (denying motion for more def-inite statement); a plaintiff must have some basis for believing that defendants engaged in securities fraud before bringing such an action against them. *Segal v. Gordon,* 467 F.2d 602, 607-08 (2d Cir.1972); *Ross* at 558; *Denny* at 470. Where, as here, plaintiffs do not make even a minimal effort to sort out the relationship between their claims and the individual defendants and "the complaint is re-plete with vague accusations against 'the defend-ants' without reference to the specific parties or the specific acts, it is insufficient under 10b-5." *Natowitz v. Mehlman,* 542 F.Supp. 674, 676 (S.D.N.Y.1982).

In order to state a claim under Rule 10b-5, a plaintiff must allege that the defendant, in connec-tion with the purchase or sale of a security, and with scienter, made misrepresentations or omis-sions of material fact upon which the plaintiff justi-fiably relied to its detriment. *Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1231 (S.D.N.Y.1981); *Lloyd v. Industrial Bio-Test Laboratories, Inc.,* 454 F.Supp. 807, 810 (S.D.N.Y.1978).

At the outset, it is important to note that this case involves three separate private placements made pursuant to three separate offering memoranda. Each plaintiff's right to recover depends upon the facts concerning the particular partnership in which that plaintiff invested. A plaintiff who bought a unit of Star Link cannot recover for a misrepresentation in the Galactic offering memorandum. Likewise, the defendants' liability hinges in part on which of-ferings they participated in. A defendant's participa-

tion in preparing the Galactic offering memor-andum would not render that defendant liable for misrepresentations in the Star Link offering memorandum. Plaintiffs' failure to distinguish among the three partnerships in their allegations and claims is a major defect that pervades the com-plaint. *See, e.g., Zerman v. Ball,* 735 F.2d 15 (2d Cir.1984); *Denny v. Barber,* 576 F.2d 465 (2d Cir.1978). This defect also hinders an accurate as-sessment of the validity of the claims as pleaded.

**\*5** 1. *Zarrow, Zarrow & Klein*

Turning first to the section 10(b) claim against ZZK, the plaintiffs' failure to make specific allega-tions concerning the named defendants is especially evident. ZZK's name appears very rarely in the complaint.

Paragraph 51 alleges that:

Despite the characterization of Defendant Fried-lander Gaines, Defendant Zarrow, Zarrow & Klein completed the tax returns for the partnership and limited partners included the deductions including but not limited to those characterized as "pre-opening expenses" for the partnerships despite their knowledge of the foregoing facts and improp-erly characterized them as "advertising expenses".

This allegation, although not crystal clear, appears to refer to actions taken by ZZK *after* the plaintiffs purchased their interests, since it is hard to imagine why ZZK would have prepared tax returns for the plaintiffs involving the partnership interests prior to their purchase. The defendant's post-purchase pre-paration of tax returns for investors in the limited partnerships could not give rise to a claim of fraud in connection with the purchase or sale of a secur-ity. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975); *Pross v. Katz,* slip op. at 7186-89 (2d Cir. Feb. 28, 1986); *Ross v. A.H. Robins,* 607 F.2d at 558; *Denny v. Barber,* 576 F.2d at 468-69.

The next reference to ZZK is in Paragraph 57,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                          Page 5
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)
(Cite as: 1986 WL 15663 (D.Conn.))

which alleges that:

Plaintiffs, in the exercise of reasonable diligence, could not have known of the facts constituting Defendants [sic ] misconduct, or the full extent or gravity thereof, until late 1984 at the earliest. In view of the Defendants' misrepresentations with respect to the worth and value of the limited partnership interests; the legitimacy of using the valuation of the earth stations as formulated by Defendant Zarrow, Zarrow & Klein; the tax returns as compiled by Defendant Zarrow, Zarrow & Klein; and the fact that Defendants failed to correct the inaccuracy of such representations; Plaintiffs had no reason to believe that further investigation or inquiry was necessary.

This paragraph and the one that follows it apparently go to the fraudulent concealment that plaintiffs claim should serve to toll the statute of limitations. Again, these are post-purchase actions which cannot support a claim for securities fraud under Rule 10b-5. Nowhere in the complaint do the plaintiffs set forth any action by ZZK prior to the sale of the partnership interests.

Many of the plaintiffs' allegations center upon the defendants' failure to disclose various facts to them. Mere nondisclosure is not actionable under Rule 10b-5, however, absent some duty on the part of the defendant towards the plaintiff. *Chiarella v. United States,* 445 U.S. 222, 235 (1980). The mere possession of information, without more, does not give rise to a duty to disclose. *Id.* The plaintiffs in this case have not alleged any facts from which a pre-purchase duty on the part of ZZK to disclose to these plaintiffs facts concerning the investments, let alone facts concerning Rabin's past, can be inferred.[FN2]

*6 In order to establish that such a duty existed, plaintiffs would have to plead some facts that would suggest a relationship between the defendant and the plaintiffs prior to the purchase at issue. Thus far, they have not done so.

As it stands, the complaint does not allege any claim under section 10(b) or Rule 10b-5 against ZZK because it is not possible to detect from its contents that this defendant did anything prior to the sale of the investments upon which the plaintiffs could have relied in deciding to purchase. Absent some indication in the pleadings that ZZK played an active role in the offering or sale of these partnership units, or that it had some pre-existing duty to disclose facts to the plaintiffs, it cannot be held liable for fraud in connection with the purchase or sale of securities. *Pross,* slip op. at 7186-89; *In re Investors Funding Corp.,* 523 F.Supp. 563 (S.D.N.Y.1980).[FN3]   The plaintiffs' 10b-5 claim against ZZK must therefore be dismissed.

### 2. *Peat, Marwick & Mitchell*

For the most part, plaintiffs' claims against PMM suffer from the same defects as their claims against ZZK. There is no way to ascertain from the complaint whether or not the plaintiffs are claiming that PMM was involved at all in the offer and sale of the Star Link and Galactic partnership interests.[FN4] Therefore, the claims of those plaintiffs who purchased units in those two partnerships will be dismissed against PMM for the same reason that they were dismissed against ZZK.

Plaintiffs have alleged pre-purchase activity on the part of PMM in connection with the Sky Link offering a trifle more specifically. Paragraph 38 of the complaint states that:

On or about April 21, 1980 and thereafter Benjamin Rabin acting by himself and through his affiliates in concert with other Defendants including but not limited to PM & M issued the Sky Link Associates private offering memorandum.

Here, plaintiffs have at least taken the first step of tying PMM to this offering by the bald statement that PMM "issued" the offering memorandum. Unfortunately, they have not stated in even conclusory terms what role PMM played in that issuance.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

While plaintiffs need not specify in great detail at this early stage the role that PMM played, they must allege some facts supporting their claim for securities fraud. The plaintiffs must have had a reason for deciding to bring this action against PMM, but they have not stated it in their complaint.[FN5] Therefore, the claims of plaintiffs who invested in Sky Link will be dismissed against PMM as well.

### 3. *Aiding and Abetting*

The plaintiffs also seek to assert a claim against PMM and ZZK for aiding and abetting a securities violation. Although they make this argument more clearly in their memorandum of law than in their complaint, the complaint makes mention of aiding and abetting. Their aiding and abetting claims, however, are insufficient for much the same reasons as their claims of a direct violation by these defendants.

*7 In order to establish a claim against a defendant for aiding and abetting a 10b-5 violation, a plaintiff must allege: 1) that someone other than the defendant committed a primary violation of 10b-5; 2) that the aider and abettor knew of the primary violation; and 3) that the aider and abettor knowingly rendered substantial assistance to the primary violator. *IIT, An International Investment Trust v. Cornfeld,* 619 F.2d 909 (2d Cir.1980); *Edwards & Hanley v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478 (2d Cir.1979), *cert. denied,* 444 U.S. 1045 (1980); *Rolf v. Blyth, Eastman, Dillon & Co., Inc.,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039 (1978).

Plaintiffs claim that they have alleged a primary violation by Rabin and affiliates, and that PMM and ZZK aided and abetted that violation. One cannot aid and abet a fraudulent securities transaction after it has been completed, however. In order to constitute substantial assistance in the accomplishment of the primary violation, defendants would have had to act or omit to act in breach of a duty to the plaintiffs prior to the sale of the securities. *See*

*Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069 (D.Cal.1979); *Morgan v. Prudential Funds, Inc.,* 446 F.Supp. 628 (S.D.N.Y.1978). As has already been pointed out, plaintiffs have not alleged in their complaint any pre-sale involvement by these defendants. They have therefore not stated a claim for aiding and abetting a violation of 10b-5.

### 4. *Statute of Limitations*

Both defendants have also asserted that any claims under section 10(b) and Rule 10b-5 are time-barred. Although these claims have been dismissed for lack of specificity and failure to state a claim, a discussion of this contention is merited because of the likelihood that it will recur if the plaintiffs amend their complaint.

The 1934 Act does not expressly provide for a private right of action under section 10(b); such a right of action was implied by the courts. Not surprisingly, then, the Act does not furnish a statute of limitations for 10(b) actions. Lacking a Congressional directive, courts look to the most closely analogous statute of limitations of the forum state. *See Auto Workers v. Hoosier Cardinal Corp.,* 383 U.S. 696, 703-04 (1966); *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 406 (2d Cir.1975).

In Connecticut, the federal courts have held consistently that 10b-5 claims are governed by the statute of limitations in the state blue sky laws, section 36-498(e) of the Connecticut General Statutes. *Clute v. Davenport Co.,* 584 F.Supp. 1562, 1577 (D.Conn.1984); *Dandorph v. Fahnstock & Co.,* 462 F.Supp. 961, 963 n. 4 (D.Conn.1979); *Hitchcock v. DeBruyne,* 377 F.Supp. 1403, 1407 (D.Conn.1974). This state statute bars suits brought "more than two years after the contract of sale."

Courts very rarely dismiss 10b-5 claims on statute of limitations grounds. *See, e.g., Taylor v. Bear Stearns & Co.,* 572 F.Supp. 667, 672 (N.D.Ga.1983) (denying motion to dismiss 10b-5 claim under statute of limitations as premature); *Fuls v. Shastina Properties, Inc.,* 448 F.Supp. 983,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)
**(Cite as: 1986 WL 15663 (D.Conn.))**

986-87 (N.D.Cal.1978); *Kramer v. Loewi & Co., Inc.,* 357 F.Supp. 83, 88 (E.D.Wis.1973). It may be appropriate to do so, however, where the running of the statute appears on the face of the complaint. *Hendrickson v. Westland Mineral Corp.,* 463 F.Supp. 826 (S.D.Fla.1978). Defendants argue that, although plaintiffs have not alleged the dates on which they entered into their contracts of sale, they were clearly not within the two-year period, since the last of the offering circulars was issued on December 17, 1980, four and a half years before the plaintiffs filed suit.

**\*8** It is not necessary to decide whether the defendants' argument would justify the conclusion that the complaint shows that the statute has run, however, because plaintiffs invoke the doctrine of equitable tolling and claim that the statute of limitations did not begin to run until they knew of the fraud that had been perpetrated.

Although the federal courts look to state law for the statute of limitations in a 10b-5 action, federal law governs the question of when the statutory period begins to run. As a result, courts in this district have incorporated federal standards of equitable tolling into the Connecticut statute of limitations for purposes of 10b-5 actions. *See Clute v. Davenport* at 1578; *Long v. Abbott Mortgage Corp.,* 459 F.Supp 108, 113 (D.Conn.1978). Under the equitable tolling doctrine, the limitations period does not begin to run until the plaintiff discovers or in the exercise of due diligence should have discovered the fraud. *Clute* at 1578; *Long* at 1099.

Here, the plaintiffs have alleged that they did not and could not have known of the facts constituting the defendants' misconduct, nor of the truth regarding the alleged misrepresentations and nondisclosures, until late August of 1984. (¶¶ 56-59.) In support of this contention they have cited acts of concealment by the defendants, including sending misleading status reports to the plaintiffs, and misrepresenting the gravity of certain IRS audits. Plaintiffs' assertions that defendants engaged in a common course of conduct to conceal the fraud

may or may not be valid. At this early stage, however, they suffice to bring the equitable tolling doctrine into play. It is not clear from the face of the complaint that this action is time-barred; therefore, the statute of limitations alone would not be grounds for dismissing this claim. *See Chute* at 1579.

*B. RICO*

Count Two alleges a violation of the federal racketeering statute, 18 U.S.C. § 1962(c) and (d). The relevant sections of the RICO statute provide:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of ... this section.

The plaintiffs assert that Rabin and affiliates, and the named defendants, including PMM and ZZK, comprised an "enterprise," and that the defendants conducted the affairs of the enterprise through a pattern of racketeering activity. (¶¶ 68-69.)

*1. Section 1962(c)*

To establish a RICO violation, plaintiffs must allege 1) conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity. *Sedima, SPRL v. Imrex Co.,* 105 S.Ct. 3275 (1985). Defendants assert that plaintiffs have not alleged the necessary pattern of racketeering activity.

**\*9** As defined in the statute, a pattern of racketeering activity "requires at least two acts of racketeering activity" within a particular time period. 18 U.S.C. § 1961(5). In its most recent consideration of the scope of RICO, the Supreme Court commented upon this definition, noting that the statute says that:

Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)
**(Cite as: 1986 WL 15663 (D.Conn.))**

a pattern "*requires* at least two acts of racketeering activity" ... not that it "means" two such acts. The implication is that while two such acts are necessary, they may not be sufficient. Indeed, in common parlance, two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern.

*Sedima,* 105 S.Ct. at 3285 n. 14. Thus, plaintiffs must allege at the very least two acts of racketeering activity by the defendants.

The statute defines racketeering activity as any of a number of specific predicate offenses. 18 U.S.C. § 1961(1). The predicate offenses that are relevant in this case are mail fraud indictable under 18 U.S.C. § 1341, wire fraud indictable under 18 U.S.C. § 1343, and offenses involving fraud in the sale of securities.

As with the 10(b) claims, plaintiffs' RICO allegations fail because they have made no attempt to specify which defendants committed what predicate acts. The Rule 9(b) requirement that fraud be pleaded with particularity applies to fraud being alleged as the basis for a RICO claim. *Lopez v. Dean Witter Reynolds, Inc.,* 591 F.Supp. 581, 585 (N.D.Cal.1984); *Rich-Taubman Associates v. Stamford Restaurant Operating Co.,* 587 F.Supp. 875 (S.D.N.Y.1984); *Clute v. Davenport* at 1570.

Plaintiffs have alleged that "Each of the defendants transmitted or caused to be transmitted private offering memoranda and other information, including, money by wire, in interstate commerce in the course of executing the fraudulent scheme." (¶ 69(b).) This conclusory statement does not serve to allege at least two acts of mail or wire fraud by PMM or ZZK, especially in light of the absence of any more specific allegations that these particular defendants engaged in such acts.

Since plaintiffs have failed to state a claim for securities fraud, the alleged securities frauds cannot serve as predicate offenses for RICO purposes. It

may be that plaintiffs can amend their complaint to allege two instances of securities fraud by these defendants which would then support a RICO claim. *See Mauriber v. Shearson/American Express, Inc.,* 546 F.Supp. 391, 397 (S.D.N.Y.1984) ("Until such time as plaintiff adequately pleads [securities] fraud it will not be known whether a RICO violation is properly alleged"). It should be noted, however, that fraudulent conduct by an accountant involving only one of the offerings might not suffice to allege a "pattern." *See Professional Assets Management, Inc. v. Penn Square Bank, Inc.,* 616 F.Supp. 1418 (W.D.Okla.1985) (noting that one engagement to perform one audit does not constitute a pattern of activity).[FN6]

**\*10** Plaintiffs' claim against PMM and ZZK under subsection (c) for conducting the affairs of an enterprise through a pattern of racketeering activity is dismissed for failure to allege a pattern of racketeering activity.

2. *Section 1962(d)*

Plaintiffs also allege in Count Two that the defendants conspired to violate section 1962(d). It is possible to allege a conspiracy offense under RICO separate from the underlying substantive racketeering offense. See *United States v. Tille,* 729 F.2d 615, 619 (9th Cir.), *cert. denied,* 105 S.Ct. 156, 164 (1984).

Participation in a RICO conspiracy, however, requires more than a mere agreement to commit predicate acts. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 792 n. 8 (3d Cir.1984), *cert. denied,* 105 S.Ct. 1179 (1985). To be held liable as a member of a conspiracy, a defendant must "by his words or actions have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes." *Laterza v. American Broadcasting Co., Inc.,* 581 F.Supp. 408, 413 (S.D.N.Y.1984) (quoting *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953 (1978)). It is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

insufficient merely to allege that a defendant "played an unspecified role in an undetailed conspiracy." *Laterza* at 413.

As it stands, the complaint does not plead any facts from which to draw an inference that PMM or ZZK conspired to participate in the affairs of an enterprise through a pattern of racketeering activity.[FN7] Again, it is possible that plaintiffs can amend the complaint to adequately plead a conspiracy, but they have not succeeded on the first try.[FN8]

### C. *Section 12(1)*

Count Three alleges a violation of sections 5(a) and 5(c) of the Securities Act of 1933, giving rise to liability under section 12(1) of that Act. Section 12(1), 15 U.S.C. § 77*l* (1) provides a right of action to a purchaser of a security against persons who offer or sell the security in violation of section 5. Section 5, 15 U.S.C. § 77e, makes it unlawful to offer, buy, sell or deliver a security unless a registration statement is in effect as to the security. Plaintiffs assert that the limited partnership interests were securities as to which no registration statements were filed with the SEC, and that the defendants offered, sold, and delivered them by use of means of interstate commerce.

The 1933 Act contains an express statute of limitations for actions brought under section 12(1). Section 13 of the 1933 Act provides that:

No action shall be maintained to enforce any liability created under ...section 77*l* (2) [section 12(2) ] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77*l* (1) [section 12(1) ] of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under ... 77*l* (1) of this title more than three years after the security was bona fide offered to the public, or under sec-

tion 77*l* (2) of this title more than three years after the sale.

*\*11* 15 U.S.C. § 77m.

Plaintiffs alleging a violation of section 12 must plead facts demonstrating compliance with the statute of limitations. *Wigand v. Flo-Tex, Inc.,* 609 F.2d 1028, 1033 n. 5 (2d Cir.1979); *Eriksson v. Galvin,* 484 F.Supp. 1108, 1118 (S.D.N.Y.1980); *Hagert v. Glickman, Lurie, Eiger & Co.,* 520 F.Supp. 1028, 1032 (D.Minn.1981). Plaintiffs have alleged in the complaint that the offering memoranda were issued on or about November 21, 1979; April 21, 1980; and December 17, 1980. There is no indication from the complaint that any violations of section 12(1) by the defendants occurred a significant length of time after the memoranda were issued. The allegation that defendants were offering to sell, selling, and delivering the interests "since 1979 and thereafter" does not suffice to avoid the bar of the statute of limitations. The plaintiffs should know when they purchased their interests and whether or not it was within the statutory period.

The three year statute of limitations in section 13 is an absolute bar and is not subject to equitable tolling. Plaintiffs argue that the three year portion of the statute should be equitably tolled, citing *In re Homestake Production Company Securities Litigation,* 76 F.R.D. 337 (N.D.Okla.1975). This court has recently considered and rejected that argument in the case of *Clute v. Davenport,* 584 F.Supp. 1562, 1576-77 (D.Conn.1984). *See also Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1308 (9th Cir.1982); *Summer v. Land & Leisure, Inc.,* 664 F.2d 965 (5th Cir.1981), *cert. denied,* 458 U.S. 1106 (1982); *Turner v. First Wisconsin Mortgage & Realty Trust,* 442 F.Supp. 283, 389-92 (W.D.N.Y.1977); *Cowsar v. Regional Recreations, Inc.,* 65 F.R.D. 394 (M.D.La.1974).

Each plaintiff, in order to maintain this action under section 12(1), must allege that the partnership interest that it bought was offered to the public within

Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)
(Cite as: 1986 WL 15663 (D.Conn.))

three years of the date suit was filed. Since there is no reason to believe that any of these interests were offered to the public by the defendants later than June 28, 1982, plaintiffs' claims under section 12(1) are dismissed against all the defendants.[FN9]

D. *Section 17(a)*

Count Eight alleges a violation of section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), which makes it unlawful:

for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly-

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Defendants argue that there is no private right of action under section 17(a).

**\*12** The existence of a private right of action under section 17(a) is a very controversial issue. This is particularly true within the Second Circuit. The Court of Appeals has held that a private right of action exists. *Kirshner v. United States,* 603 F.2d 234, 241 (2d Cir.1978), *cert. denied,* 442 U.S. 909 (1979). To date, the Supreme Court has declined to decide this issue, while recognizing it as unsettled. *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 557 n. 9 (1979); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 378 n. 2 (1983). Supreme Court decisions have called into question some of the premises underlying the

*Kirshner* decision, however. The *Kirshner* court assumed that the elements of an action under section 17 were identical to the elements of an action under section 10(b). This assumption is no longer valid, since the Supreme Court held in *Aaron v. SEC,* 446 U.S. 680, 697 (1980), that actions under sections 17(a)(2) and (3) do not require proof of scienter on the part of defendants but may be maintained for negligence as well. Under section 10(b), on the other hand, scienter on the part of the defendant is a necessary element. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976).

Two recent opinions of the Second Circuit Court of Appeals have hinted that *Kirshner* may not be the last word on the existence of a right of action under section 17(a) in this Circuit. *See Yoder v. Orthomolecular Nutrition Institute,* 751 F.2d 555, 559 n. 3 (2d Cir.1985); *Zerman v. Ball,* 735 F.2d 15, 20 (2d Cir.1984). *But see Pross v. Katz,* slip op. at 7183-84 (2d Cir. Feb. 28, 1986) (apparently assuming, without discussion, existence of right of action under 17(a)). Meanwhile, the district courts have been reaching a variety of conclusions on this issue. *See, e.g., Ackerman v. Clinical Data, Inc.,* Fed.Sec.L.Rep. ¶ 92,207 (S.D.N.Y. July 8, 1985) (no private right of action); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 545 F.Supp. 1314, 1354 n. 20 (S.D.N.Y.1982) (private right of action).

At this point, however, it is not necessary to grapple with this question. Even if a private right of action does exist, plaintiffs' claims under this section fail for the same reason as their claims under section 10(b). The only difference that has been identified between actions under 17(a) (if they exist) and actions under 10(b) is the question of scienter. Plaintiffs' securities claims suffer from defects that go beyond a failure adequately to allege scienter. They have not alleged any acts by PMM or ZZK which would support an inference that those defendants did anything untoward related to the offer or sale of a security. *Pross v. Katz.* Therefore, plaintiffs' claims under section 17(a) are dismissed against PMM and ZZK.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                    Page 11
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)
(Cite as: 1986 WL 15663 (D.Conn.))

E. *Pendent State Law Claims*

Defendants' final contention is that the remaining counts of the complaint should be dismissed since they arise under state law. Having dismissed all of the plaintiffs' state claims against defendants PMM and ZZK, it is appropriate to dismiss these pendent state law claims as well. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966); *McLearn v. Cowen & Co.,* 660 F.2d 845, 848 (2d Cir.1981); *Natowitz v. Mehlman,* 542 F.Supp. at 677. If plaintiffs amend their complaint to adequately allege federal claims against these defendants, it may be appropriate to reinstate the state law claims.

*Conclusion*

**\*13** Count One of the complaint is dismissed as it relates to defendants PMM and ZZK for failure to plead fraud with particularity and failure to state a claim under section 10(b) of the 1934 Act.

Count Two of the complaint is dismissed as it relates to defendants PMM and ZZK for failure to plead fraud with particularity and failure to state a claim under RICO.

Count Three of the complaint is dismissed in its entirety as being barred by the statute of limitations.

Count Eight of the complaint is dismissed as it relates to defendants PMM and ZZK for failure to state a claim under section 17(a) of the 1933 Act.

The remaining counts of the complaint are dismissed against PMM and ZZK because they state only pendent state claims and are not appropriate in view of the disposition of the federal claims.

Plaintiffs have 30 days from the date of this ruling to amend their complaint. In so doing, plaintiffs should attempt to allege some connection between these particular defendants and each of the three securities offerings and to give a clearer picture of the circumstances on which they base this suit against these defendants.

SO ORDERED.

FN1. In response to the defendants' assertions that they have failed to plead fraud with particularity, the plaintiffs respond that Rule 9(b) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim." This complaint, consisting of 53 pages and 134 paragraphs, satisfies neither standard.

FN2. In their memorandum of law in opposition to the motions to dismiss, the plaintiffs go into greater detail concerning the role of both accounting firms in the partnership scheme. This expanded explanation hints at the possibility that plaintiffs could adequately allege pre-sale participation by ZZK. For instance, plaintiffs state that ZZK prepared the financial projections and statements contained within the offering documents. *See* Memorandum in Opposition of Defendant Zarrow, Zarrow & Klein, P.A.'s Motion to Dismiss at 14. No such allegations are included in the complaint however. Even if these further facts would suffice to state a claim (even in the memorandum it remains unclear what plaintiffs are asserting that ZZK did and at what point), any such allegations must be included in the complaint to be effective. *See Pross v. Katz,* slip op. at 7182 (distinguishing between claim in plaintiff's brief and "forthright allegation[s]" in complaint).

FN3. The mere fact that a defendant acted as an accountant in connection with a securities offering (an allegation not made in this complaint) may not be enough to state a claim against it for failure to disclose. The Second Circuit Court of Appeals has held in dismissing a complaint for failure to state a claim under Rule 10b-5 that an accountant has "no independent duty to see to the correction of portions of the pro-

Not Reported in F.Supp.                                                                Page 12
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)
**(Cite as: 1986 WL 15663 (D.Conn.))**

spectus other than the financial statement it prepared." *IIT, An International Investment Trust v. Cornfeld,* 619 F.2d 909, 927 (2d Cir.1980). Thus, in the absence of any allegations from which an inference could be drawn that ZZK was acting in some way other than as a typical accountant, or that it had "a conscious and specific motivation for not acting" or "an independent duty to report," the plaintiffs may encounter difficulty in stating a claim against ZZK as to omissions and misrepresentations in the offering memoranda that were not part of the financial statements. *IIT* at 927. The same consideration is applicable to plaintiffs' claims against PMM.

FN4. Paragraph 37 states that:

> It was represented by Mr. Rabin and some of the Defendants including Peat Marwick Mitchell & Co.... that these assumption agreements and the debt conversion from nonrecourse to recourse would be utilized solely for the purpose of creating tax losses for their clients including some of the Plaintiffs.

> This paragraph appears following the description of the Star Link offering, but it is not clear whether it refers to the Star Link assumption agreements. Even if it does, there is no allegation that PMM took part in the Star Link offering, nor any explanation at all as to the when or how PMM made such representations.

FN5. As with ZZK, the plaintiffs have attempted to flesh out their allegations against PMM in their memorandum of law in opposition to the motions to dismiss. Plaintiffs cannot amend their complaint by means of a memorandum of law opposing a motion to dismiss. In addition, the plaintiffs' attempts to elaborate upon the complaint in their memorandum do not clarify their claims. They specify that paragraphs 36, 37, 38, 40, 42, 43, 45, 46, 48(J), 48(N), 48(O), 48(Q), 53(b), 54, 57, and 58 of the complaint concern PMM's actions. Of those paragraphs, only three (¶ ¶ 37, 38 and 57) mention PMM by name. Several of the others do not even purport to encompass PMM, but rather state specifically that they refer to activities of specific individuals or entities. Those paragraphs cannot be interpreted to include PMM. Paragraph 36 simply alleges the nature of the assumption agreements; paragraphs 42 and 45 allege the manner in which the units were sold through selling agents; paragraph 53(b) alleges activities by defendant Friedlander Gaines. Although the remainder of the referenced paragraphs of the complaint refer to "the defendants," many of them contain allegations which simply are not relevant to PMM. For instance, paragraph 48 lists a variety of material facts that the defendants failed to disclose to the plaintiffs. 48(J) refers to an omission in the Star Link offering memorandum, but there is no allegation that PMM had anything to do with that memorandum. 48(O) refers to certain representations contained in the three offering memoranda, concluding "these representations were misleading and were represented solely to secure tax deductions and credits to the limited partner." This allegation simply makes no sense.

FN6. In *Sedima,* the Supreme Court refused to require RICO plaintiffs to show the existence of a "racketeering injury" separate from the harm caused by the underlying predicate offenses. While rejecting what had become the most significant limitation on the scope of RICO, however, the Court indicated a more viable source of limitation-the "pattern" requirement. *Sedima,* 105 S.Ct. at 3285 n. 14. Quoting from the legislative history of RICO, the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)
**(Cite as: 1986 WL 15663 (D.Conn.))**

Supreme Court noted that:

> "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern."

*Id.* (quoting from S.Rep. No. 91-617, p. 158 (1969)) (emphasis supplied by Supreme Court). Other federal courts have begun to focus increasingly on defining the contours of the "pattern" requirement and have been requiring something more than simply the commission of two predicate offenses as part of one fraudulent undertaking. *See, e.g., Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828 (N.D.Ill.1985); *Allington v. Carpenter,* 619 F.Supp. 474 (C.D.Cal.1985) (to constitute a "pattern" of racketeering activity, racketeering acts must be connected in that they have common perpetrators, methods of commission, or victims, and yet be sufficiently unconnected in time or substance to warrant consideration as separate criminal episodes); *Soper v. Simmons International, Ltd,* 84 Civ. 0070 (S.D.N.Y. Feb. 27, 1986) (Sand, J.).

FN7. In their memorandum, plaintiffs refer vaguely to a "special relationship" which PMM entered into with Rabin and affiliates. In support thereof they append an unsigned, undated letter concerning an indemnification agreement. This allegation, if contained in a pleading and stated somewhat more coherently, might help to support a claim that PMM affirmatively participated in a conspiracy with Rabin and/or his corporations. As part of a memorandum of law, however, it is of no effect. *Car*

*Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984), *cert. denied,* 105 S.Ct. 1758 (1985); *Bowman v. Grolsche Bierbrouwerij B.V.,* 474 F.Supp. 725, 728 (D.Conn.1979).

FN8. Defendants also assert that the RICO claim is barred by the statute of limitations. Congress has not specified a statute of limitations for RICO actions. Defendants apparently invoke the same two-year statute of limitations that applies to the 10b-5 claim, Connecticut's section 36-498(e). *See also Clute* at 1577. As with the 10b-5 claim, if plaintiffs could assert a RICO claim, it would not be barred at this stage by the statute of limitations because of the possibility that the period should be equitably tolled.

FN9. In their memorandum, plaintiffs attempt to assert a claim under section 12(2). For purposes of avoiding the statute of limitations, the plaintiffs are in no better position under section 12(2) than under section 12(1), since there is no indication that any of them purchased their interests after June 28, 1982.

D.Conn.,1986.
Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg
Not Reported in F.Supp., 1986 WL 15663 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



**H**

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Loretta N. BANSAVICH d/b/a Lori's Mobil,
Plaintiff,

v.

McLANE COMPANY, INC., Defendants.

No. 3:07cv702 (WWE).

Oct. 31, 2008.

Mary Anne Alicia Charron, R. Bradley Wolfe, Gordon, Muir & Foley, Hartford, CT, for Plaintiff.
Brian R. Meiners, Jeffrey S. Spigel, King & Spalding LLP-DC, Washington, DC, Joseph G. Fortner, Jr., Halloran & Sage Llp, Hartford, CT, for Defendants.

*MEMORANDUM OF DECISION ON MOTION TO DISMISS THIRD AMENDED COMPLAINT*

WARREN W. EGINTON, Senior District Judge.

*1 In this action, plaintiff Loretta Bansavich, d/b/a Lori's Mobil, alleges that defendant McLane Company's conduct violates federal and state antitrust laws and the Connecticut Unfair Trade Practices Act ("CUTPA"). Specifically, plaintiff attacks defendant's tying the sale of its tobacco products to the sale of other franchise-related products as anti-competitive and exclusionary market activities designed to restrain trade in the relevant market.

This Court previously granted a defense motion to dismiss, holding that plaintiff's allegations had failed to set forth a plausible antitrust claim, but afforded plaintiff the opportunity to replead to provide facts that established the products comprising a relevant market. Plaintiff has filed an amended complaint and defendant has filed a subsequent motion to dismiss the third amended complaint. For the following reasons, the motion to dismiss will be granted.[FN1]

FN1. In ruling on this motion, the Court

includes facts and legal analysis from its prior ruling.

## BACKGROUND

For purposes of ruling on this motion, the Court takes the facts alleged in the complaint to be true.

In 1994, plaintiff entered into a franchise agreement with Mobil Oil Corporation to operate a gasoline station.

Since 1994, plaintiff has purchased cigarettes and tobacco products from Manchester Tobacco & Candy Company for sale at the gasoline station.

On July 1, 1997, plaintiff entered into a convenience Store Franchise Agreement with Mobil to operate a "Mobil on the Run" convenience store at the gasoline station. Pursuant to that agreement, plaintiff must maintain certain products defined as "Required Merchandise," which include proprietary products for the franchise program, wrappings, cups, containers, napkins, re-fill vessels, uniforms, signs, interior and exterior items, fixtures, furnishings, stationary, business cards, supplies or other products that bear the Mobil marks.

As an "On the Run" ("OTR") franchisee, plaintiff may participate in Mobil's "Exclusive Product Program," which enables the franchisee to offer certain products not otherwise available to consumers. The "Exclusive Product Program" also enables the franchisee to offer certain products free of charge or at special or reduced pricing. Exclusive products include free Mobil-branded coffee or soda with purchase of Mobil-branded pastries and Mobil-branded collectible glasses and figurines related to a sporting event or movie.

According to the franchise agreement, plaintiff must purchase certain franchise items solely from suppliers approved by Mobil. The agreement lists the following "Primary Merchandise Vendors" for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the purchase of "Required Merchandise" and other items: McLane, Eby Brown, CoreMark, Stomel Corporation, and H.T. Hackney. However, Stomel Corporation, Eby Brown, Core Mark and H.T. Hackney do not supply the "Required Merchandise" in Connecticut. McLane is also the only northeast distributor of the "Exclusive Products" comprising the "Exclusive Product Program."

Between July 1997 and March 2006, plaintiff purchased a portion of its "Required Merchandise" and all of its "Exclusive Products" from McLane. However, in March 2006, McLane informed plaintiff that it would not sell any of its products to plaintiff unless plaintiff agreed to purchase its tobacco products. In an e-mail to plaintiff, Ken Maag, Regional Sales Manager for McLane, informed her: "In order to continue doing business with you, we will need you to order your cigarettes and smokeless from us."

*2 Thereafter, plaintiff has been unable to purchase "Exclusive Products" or "Required Products" from McLane.

## DISCUSSION

The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The complaint must contain the grounds upon which the claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). A plaintiff is obliged to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the

claim plausible. *Iqbal v. Hasty,* 490 F.3d 143, 157 (2d Cir.2007), *cert. granted,* --- U.S. ----, 128 S.Ct. 2931, --- L.Ed.2d ---- (2008) (applying flexible "plausibility standard" to Rule 8 pleading).

*Failure to Plead the Elements of a Tying Claim*

Defendant argues that plaintiff has failed to remedy the flaw of her prior complaint to allege a cognizable antitrust claim.

To state a valid antitrust claim based on an invalid tying arrangement, plaintiff must allege: (1) a tying and a tied product; (2) actual coercion by the seller that forced the buyer to accept the tied product; (3) sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; (4) anti-competitive effects in the tied market; and (5) the involvement of a not insubstantial amount of interstate commerce in the tied market. *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.,* 880 F.2d 1514, 1516-17 (2d Cir.1989). In all claims involving a tying arrangement, plaintiff must prove that defendant has power in the relevant product market. *Illinois Tool Works, Inc. v. Independent Ink, Inc.,* 547 U.S. 28, 46, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006).

In analyzing market power, the court must first inquire into whether plaintiff has sufficiently pled a relevant product market. *See Todd v. Exxon Corp.,* 275 F.3d 191, 200 (2d Cir.2001). For antitrust claims, a relevant market has both product and geographic dimensions. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Products that have "reasonable interchangeability" define the relevant market. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The relevant market depends on how far buyers will go to substitute one product for another. *AD/SAT v. Associated Press,* 181 F.3d 216, 227 (2d Cir.1999). If consumers view products as substitutes, the products comprise the same market. *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1435 (9th

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                  Page 3
Slip Copy, 2008 WL 4821320 (D.Conn.), 2008-2 Trade Cases P 76,386
**(Cite as: 2008 WL 4821320 (D.Conn.))**

Cir.1995). *Queen City Pizza, Inc. v. Domino's Pizza*, 124 F.3d 430, 438 (3d Cir.1997) provides that relevant market power must flow from the market rather than from private knowing contractual relations.

**\*3** On a motion to dismiss, the Court need not engage in extensive analyses of reasonable interchangeability and cross elasticity of demand. *Pepsico, Inc. v. The Coca-Cola Co.*, 1998 WL 547088,\*6 (S.D.N.Y.). An antitrust plaintiff fails to state a claim only where a proposed market definition is patently implausible on the basis of the four corners of the complaint. *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F.Supp. 639, 647 (S.D.N.Y.1992).

Thus, dismissal is appropriate (1) where a plaintiff has improperly limited a product market to exclude potential substitutes, or (2) a plaintiff has failed to provide a plausible explanation as to why a market should be limited in a particular way.

This Court previously held that plaintiff had not sufficiently pled a valid relevant market for the tying products based on McLane's alleged tying the sale of "Exclusive Products" to that of its tobacco products. In its prior ruling, this Court noted that the plaintiff's tying market is confined to certain convenience store products known as "Exclusive Products" only available at an OTR franchise and that defendant was allegedly exploiting such a contractually-created market power to coerce plaintiff into a tying arrangement forcing plaintiff to purchase tobacco products that are not the subject of the contract at issue. The Court had no information regarding the types of products comprising the tying market and therefore held the claim to be insufficient as a matter of law.

The Court must now consider plaintiff's amended allegations to determine whether she has established a plausible relevant product market for the tying market.

The amended complaint alleges that defendant has impermissibly tied the sale of the "Required Products" and "Exclusive Products" to that of its tobacco products. Plaintiff asserts that, although she has been able to obtain some of the "Required Products" elsewhere, McLane is the only source of "Exclusive Products." However, the tying products known as "Exclusive Products" are unrelated products grouped together according to contractual terms.

Thus, plaintiff's relevant market is facially unsustainable. Plaintiff has impermissibly limited the product market to exclude potential substitutes, such as nonMobil-branded coffee, soda, pastries and promotional glassware or figurines that would be reasonably interchangeable by consumers; and plaintiff provides no plausible explanation as to why a market should be limited in a particular way, except for the fact that she is required to buy such items from McLane according to contractual terms. However, "particular contractual constraints assumed by a plaintiff are not sufficient by themselves to render interchangeable commodities non-interchangeable for purposes of relevant market definition."*Queen City Pizza*, 124 F.2d at 443;*see also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir.1997) (contractual limitations limiting Humana insureds to certain hospitals could not form relevant market or afford market power).

**\*4** Further, plaintiff's allegations do not establish that defendant is exploiting a contractual relationship to gain monopoly power in an aftermarket that is "wholly derivative from and dependent on the primary market" as described in *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir.2008), which involved Ikon's lease agreement and service contracts relative to copier equipment. The Ninth Circuit elaborated upon the important distinction between the "wholly derivative aftermarket for replacement equipment and lease-end services" from that of the aftermarkets for pizza ingredients and paper cups in *Queen City Pizza* and hospital care in *Forsyth:*

The markets for pizza ingredients and paper cups

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                                          Page 4
Slip Copy, 2008 WL 4821320 (D.Conn.), 2008-2 Trade Cases P 76,386
(Cite as: 2008 WL 4821320 (D.Conn.))

would exist whether or not there was a market for pizza chain franchises, and the market for acute care hospitals would exist whether or not there was a market for health insurance. But the market for durable micrographic equipment parts and services would not exist without the market for durable micrographic equipment, and the market for replacement copiers and lease-end services would not exist without the market for copier leases and copier services.

*Id.* at 1049. In this instance, plaintiff cannot plausibly allege the existence of a wholly derivative aftermarket. The market for any of the products referred to in the complaint-the listed items of "Required Products" or "Exclusive Products" and the tied tobacco products-would exist regardless of whether there was a market for ExxonMobil OTR franchises. Further, tobacco products cannot be construed as a derivative aftermarket for "Exclusive Products" or "Required Products." Accordingly, plaintiff's claim does not fit within *Newcal's* description of a plausible antitrust claim.

Further, defendant asserts that plaintiff's allegations have set forth neither a plausible market for the alleged tied tobacco products nor anti-competitive effects in the tied market. Defendant complains that plaintiff's alleged tied market of cigarettes and tobacco products is vague and cannot establish a relevant market in terms of cross-elasticity of demand or interchangeability of use. While the Court agrees that plaintiff's allegation of tobacco products market is vague, the Court will assume, for purposes of ruling on this motion, that she has alleged a relevant tied market.

However, plaintiff's complaint is still flawed because it does not allege factual allegations that render plausible its conclusory assertion that McLane's conduct has "anti-competitive effects on the Competing Vendor and other vendors of Tobacco Products in discouraging or prohibiting the purchase of cigarettes and tobacco from sources other than McLane" and was intended to "diminish competition in the market for Tobacco

Products."The complaint sets forth allegations supportive of an injury to plaintiff's business, but antitrust injury must represent an adverse effect on competition as a whole in the relevant market rather than to plaintiff. *Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d 537, 543 (2d Cir.1993). Thus plaintiff's complaint fails to satisfy the pleading requirement under *Twombly,* and the Court will grant the motion to dismiss count one.

**\*5** The Court will not afford the plaintiff the opportunity to replead her claim since it appears that she appears unable to cure the deficiencies in the complaint to plead a cognizable antitrust tying claim. *See Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986) (denial of leave to amend proper where plaintiff had already been given one opportunity to replead with greater specificity).

*State Law Claims*

Plaintiff's remaining claims of violations of state antitrust law and CUTPA arise under state law. Accordingly, under 28 U.S.C. § 1367(c)(3), the Court will decline to exercise supplemental jurisdiction over these claims. *See Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003).

**CONCLUSION**

For the foregoing reasons, the motion to dismiss [doc. # 52] is GRANTED. The state law claims are dismissed without prejudice due to this Court's declination of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).

The clerk is instructed to close this case.

D.Conn.,2008.
Bansavich v. McLane Co., Inc.
Slip Copy, 2008 WL 4821320 (D.Conn.), 2008-2 Trade Cases P 76,386

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Not Reported in A.2d                                    Page 1
Not Reported in A.2d, 2008 WL 2502563 (Conn.Super.)
(Cite as: 2008 WL 2502563 (Conn.Super.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut, Judicial District of
Middlesex.
Terry Oakes BOURRET
v.
Donald MILLER, Jr.
No. CV075002152.

June 5, 2008.

West KeySummary

Contracts 95 27

95 Contracts
    95I Requisites and Validity
        95I(B) Parties, Proposals, and Acceptance
            95k27 k. Implied Agreements. Most Cited
Cases

**Implied and Constructive Contracts 205H
81**

205H Implied and Constructive Contracts
    205HII Actions
        205HII(B) Pleading
            205Hk81 k. Declaration, Complaint, or
Petition. Most Cited Cases
Motorist and her husband failed to allege requisite
elements of additional claim for breach of implied
contract, either implied in law or implied in fact, in
their action that arose from automobile accident.
The alleged tortfeasor's vehicle purportedly struck
the motorist's vehicle from behind, allegedly dimin-
ishing the motorist's ability to paint in the family
business, resulting in a loss of income. The motorist
and her husband had no prior connection with the
alleged tortfeasor. The motorist and her husband
failed to allege that they rendered services under
circumstances indicating that they expected to be

paid and that the alleged tortfeasor, knowing such
circumstances, availed himself of the benefit of
those services. Also, the motorist and her husband
failed to allege that the alleged tortfeasor was be-
nefited and unjustly failed to pay the motorist and
her husband for the benefits.

Bruce A. Chaplin, Durham, for Terry Oakes Bour-
ret.
Farrell Brian J. Jr. Law Offices, New Haven, for
Donald Miller, Jr.

CLARANCE J. JONES, Judge.
*1 In her complaint, filed on March 30, 2007,
plaintiff Terry Oakes Bourret alleges in a single
count that the defendant, Donald Miller, negligently
operated a motor vehicle that struck her vehicle
from the rear, causing her multiple injuries. On
January 24, 2008, the plaintiff filed a pleading en-
titled "Motion to Add an Additional Party Plaintiff
and an Additional Count Claiming Implied Con-
tract."The motion was granted by the court on Feb-
ruary 9, 2008 which added Donald Bourret, Terry's
husband, as the additional plaintiff, and a second
count to the complaint, labeled *Implied Contract.*

In the second count plaintiffs Terry Oakes Bourret
and her husband, Donald Bourret, allege that they
operate a painting business and that on the day of
the collision, Terry Oakes Bourret was driving a
family owned vehicle to a location to paint. They
further allege that the injuries resultant from the
automobile accident has diminished her ability to
paint and resulted in a loss of income to their busi-
ness, and ultimately to them. In addition, the
plaintiffs allege that they "acted in reliance that the
defendant would not drive his vehicle into the rear
of their vehicle all to their detriment."

*Motion to Strike*

Defendant Donald Miller has filed a motion to
strike count two of the plaintiffs' amended com-
plaint on the following grounds: 1) that no cause of

action exists for the breach of an implied contract upon which a spouse can recover for injuries allegedly sustained by the other spouse in a motor vehicle accident under Connecticut law; and 2) that the plaintiffs have not alleged the necessary elements to sustain a breach of contract claim because there is "no connection" between the defendant and Donald Bourret other than the alleged motor vehicle accident between him and Terry Oakes-Bourret. The defendant also asserts that Donald Bourret's only realistic claim derivative of the alleged injuries to his wife is one for a loss of consortium. In ruling on a motion to strike a complaint the court assumes the truth of the allegations challenged, and determines whether as a matter of law they legally are sufficient to state a cause of action.

*Whether Contract Implied*

Connecticut courts have repeatedly held that the necessary elements for a breach of contract claim "are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages."(Internal quotation marks omitted.) *Pelletier v. Galske,* 105 Conn.App. 77, 81, 887 A.2d 420 (2007), cert. denied, 285 Conn. 921 (2008). This requirement has been held to apply to both express and implied contracts. See *id.*

Under Connecticut law there exists two distinct types of implied contracts, those implied in fact and those implied in law. See *Vertex v. Waterbury,* 278 Conn. 557, 573, 898 A.2d 178 (2006). The formation of "[a]n implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties." *Id.,* at 573-74, 898 A.2d 178. "Such a contract arises where a plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefor, and the defendant, knowing such circumstances, avails himself of the benefit of those services. In such a case, the law implies from the circumstances, a promise by the defendant to pay the plaintiff what those services are reasonably

worth."(Internal quotation marks omitted.) *Janusauskas v. Fichman,* 264 Conn. 796, 804-05, 826 A.2d 1066 (2003).

**\*2** Courts have distinguished the formation of a contract implied in fact from a contract implied in law. "[A]n implied in law contract is not a contract, but an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation ... It is based on equitable principles to operate whenever justice requires compensation to be made ... An implied in law contract may arise due to one party being unjustly enriched to the detriment of the other party ... Accordingly, an implied in law contract is another name for a claim for unjust enrichment."(Citations omitted, internal quotation marks omitted.) *Vertex v. Waterbury, supra,* 278 Conn. at 574, 898 A.2d 178. Although the language "may arise" is used in the opinion, implying that a contract implied in law is a broader concept, the Connecticut Supreme Court has repeatedly held unjust enrichment analogous with an implied in law contract, essentially rendering the two terms interchangeable. See *id.,* at 573-74, 898 A.2d 178; *Yale Diagnostic Radiology v. Estate of Foundation,* 267 Conn. 351, 359, 838 A.2d 179 (2004); *Meaney v. Connecticut Hospital Ass'n., Inc.,* 250 Conn. 500, 511-12, 735 A.2d 813 (1999); *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* 231 Conn. 276, 282-83, 649 A.2d 518 (1994). Furthermore, the same elements which are necessary to establish unjust enrichment are commonly used by the court when examining a breach of a contract implied in law claim. See, e.g., *Vertex v. Waterbury, supra,* 278 Conn. at 573-75, 898 A.2d 178 (trial court's jury instructions regarding an implied contract claim were inadequate due to failure to instruct jury on the requisite elements to prove unjust enrichment).

"Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract ... A right of recovery under the doctrine of unjust enrichment is

Not Reported in A.2d                                                                 Page 3
Not Reported in A.2d, 2008 WL 2502563 (Conn.Super.)
(Cite as: 2008 WL 2502563 (Conn.Super.))

essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another ... With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard ... Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy ... Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment."(Internal quotation marks omitted.) *Vertex v. Waterbury, supra,* 278 Conn. at 573, 898 A.2d 178.

In their response to the defendant's motion to strike, the plaintiffs cite the Connecticut Appellate Court case *Bross v. Hillside Acres Inc.,* 92 Conn.App. 773, 887 A.2d 420 (2005) in support of their argument that an implied contract may be pleaded in the alternative or in conjunction with a tort action. Although the outcome of the *Bross* decision does support the plaintiffs' proposition, that case is distinguishable from the present case. In *Bross,* the court held that the plaintiff stated a claim upon which relief could be granted because he "alleged all of the essential elements of a breach of an implied contract claim." *Id.,* at 782, 887 A.2d 420. The court further noted that "[a]lthough the plaintiff's second amended complaint is sparse, the allegations and their accompanying implications, if proved, would support the claim for breach of an implied contract."*Id.*

**\*3** In this case, the plaintiffs have not alleged the requisite elements in their complaint, and, therefore, *Bross* is distinguished. The plaintiffs have not alleged the formation of an implied in fact contract, which requires that (1) they rendered services under circumstances indicating that they expected to be

paid therefor, and (2) the defendant, knowing such circumstances, availed himself of the benefit of those services; nor have the plaintiffs alleged the formation of an implied in law contract, which requires that (1) the defendant was benefitted, (2) the defendant unjustly did not pay the plaintiffs for the benefits, and (3) the failure of payment was to the plaintiffs' detriment.

*Conclusion*

Accordingly, for the foregoing reasons, the defendant's motion to strike the second count should be and hereby is granted.[FN1]

> FN1. Plaintiff Terry Oakes Bourret's claim for loss income as a painter is alleged in the First Count.

Conn.Super.,2008.
Bourret v. Miller
Not Reported in A.2d, 2008 WL 2502563 (Conn.Super.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Slip Copy
Slip Copy, 2008 WL 4000611 (D.Conn.)
(Cite as: 2008 WL 4000611 (D.Conn.))

Page 1

**H**

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.
FLEET DEVELOPMENT VENTURES, LLC Derivatively for and in the Name of Freedom Communications of Connecticut, Inc.

v.

Stephen BRISKER.
**Civil No. 3:06CV0570 (HBF).**

Aug. 26, 2008.

Gregory W. Nye, Bracewell & Giuliani, LLP, Houston, TX, Seth N. Stratton, Bingham McCutchen, Hartford, CT, Michael D. Blanchard, for Plaintiff. Gardiner B. Davis, Spencer Fane Britt & Browne, LLP, Kansas City, MO, Maurice T. Fitzmaurice, Reid & Riege, P.C., Hartford, CT, for Defendant.

### RULING ON MOTION FOR SUMMARY JUDGMENT

HOLLY B. FITZSIMMONS, United States Magistrate Judge.

*1 Counterclaim-Plaintiff Olevni, LLC ("Olevni"), brings this counterclaim against Freedom Communications of Connecticut, Inc.[FN1] (hereinafter "Freedom"), as a putative third-party beneficiary. Olevni alleges that Freedom contractually assumed the obligations of Hartcom, Inc. ("Hartcom"), to pay Olevni's loan obligations.

> FN1. Counterclaim-Defendant is Fleet Development Ventures, LLC, derivatively for and in the name of Freedom Communications of Connecticut, Inc.

Pending is Freedom's Motion for Summary Judgment arguing, first, that the Contribution Agreement by which Hartcom contributed its radio station assets to Freedom was the only agreement between Freedom and Hartcom, and second, that this Agreement expressly provides that Freedom assumed none of Hartcom's liabilities and created no

third-party beneficiary rights in Olevni. For the reasons that follow, Freedom's Motion for Summary Judgment **[Doc. # 119]** is **GRANTED.**

### PROCEDURAL BACKGROUND

Plaintiff Fleet Development Ventures, LLC ("Fleet"), brought a lawsuit derivatively for and in the name of Freedom against defendant Stephen Brisker, a fifty-percent shareholder and senior executive of Freedom, alleging mismanagement and misappropriation of Freedom's assets. Fleet's interest derived from its prior capital investment in Freedom.

On September 13, 2006, the Court appointed a temporary receiver for Freedom to prevent Stephen Brisker from continuing to abuse his corporate office. [Doc. # 65]. On September 18, 2006, a preliminary injunction entered against Stephen Brisker to prevent him from continuing in the abuse of his corporate office. [Doc. # 68].

On July 19, 2007, the Court granted Olevni's motion to intervene as a defendant as of right for the purpose of asserting counterclaims against Freedom. [Doc. # 105]. Olevni then filed counterclaims alleging breach of contract or unjust enrichment in regards to debts related to radio station assets that were conveyed to Freedom. [Doc. # 107]. Pending is counterclaim-defendant Freedom's Motion for Summary Judgment. [Doc. # 119].

### STANDARD OF LAW

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986). The non-moving party may not rely on con-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                Page 2
Slip Copy, 2008 WL 4000611 (D.Conn.)
**(Cite as: 2008 WL 4000611 (D.Conn.))**

clusory allegations or unsubstantiated speculation. *See D'Amico,* 132 F.3d at 149. Instead, the non-moving party must produce specific, particularized facts indicating that a genuine factual issue exists. *See Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998). To defeat summary judgment, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252. If the evidence produced by the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249-50.

Pursuant to D. Conn. L. Civ. R. 56(a)(3),

> Each statement of material fact in a Local Rule 56(a)1 Statement by a movant or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. The affidavits, deposition testimony, responses to discovery requests, or other documents containing such evidence shall be filed and served with the Local Rule 56(a)1 and 2 Statements in conformity with Fed.R.Civ.P. 56(e). Counsel and pro se parties are hereby notified that failure to provide specific citations to evidence in the record as required by this Local Rule may result in sanctions, including, when the movant fails to comply, an order denying the motion for summary judgment, and, when the opponent fails to comply, an order granting the motion.

**\*2** A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements. *See Securities & Exchange Comm'n v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). Nor may he rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).*See also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993) (holding that party may not rely on conclusory

statements or an argument that the affidavits in support of the motion for summary judgment are not credible). A self-serving affidavit which reiterates the conclusory allegations of the complaint in affidavit form is insufficient to preclude summary judgment. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)."The nonmovant, plaintiff, must do more than present evidence that is merely colorable, conclusory, or speculative and must present concrete evidence from which a reasonable juror could return a verdict in her favor." *Page v. Connecticut Department of Public Safety,* 185 F.Supp.2d 149, 152 (D.Conn.2002) (citations and internal quotation marks omitted).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the plaintiff fails to provide any proof of a necessary element of the plaintiff's case, then there can be no genuine issue as to any material fact. *Id.* A complete failure to provide proof of an essential element renders all other facts immaterial.*Id.; see also Goenaga,* 51 F.3d at 18 (movant's burden is satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim).

*FACTS*

Based on Freedom's Local 56(a)(1) Statement [doc. # 121] and exhibits [FN2] and Olevni's Local 56(a)2 Statement [doc. # 130] and exhibits [FN3], the following facts are undisputed.

> FN2. Freedom's 56(a)(1) exhibits include Affidavit of Receiver W. Lawrence Patrick [doc. # 122], attaching exhibit "Closing Binder" dated March 31, 2004, which includes Preferred Stock Purchase Agreement (Tab 1) and Contribution Agreement (Tab 5); and Affidavit of Attorney Michael

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4000611 (D.Conn.)
**(Cite as: 2008 WL 4000611 (D.Conn.))**

D. Blanchard [doc. # 122], attaching full Deposition Transcript of Richard Weaver-Bey, dated October 9, 2007, filed in support of motion for summary judgment.

FN3. Olevni's 56(a)(2) exhibits include Affidavits of Richard Weaver-Bey, dated January 22, 2008, April 12, 2006 [Doc. # 12], and September 12, 2006 [Doc. # 64], and Affidavit of Alan Neigher (Ex. C) filed in opposition to Freedom's motion for summary judgment. Alan Neigher is a shareholder in Olevni and former shareholder in Hartcom.

*The Asset*

1. In 2003, Richard Weaver-Bey [FN4] partnered with Stephen Brisker to form Freedom Communications of Connecticut, Inc. ("Freedom") to acquire and operate radio stations. Weaver-Bey and Brisker each hold fifty percent (50%) of its voting common stock. [Doc. # 121, Countercl.-Def. Local 56(a)(1) (hereinafter "Doc. # 121") Stat. ¶ 1; Doc. # 130, Countercl.-Pl. Local 56(a)(2) (hereinafter "Doc. # 130") Stat. ¶ 1].

FN4. Richard Weaver-Bey passed away on May 17, 2008. Jeffrey B. Cohen, *Civic Leader Weaver-Bey Dies,* HARTFORD COURANT, May 20, 2008, at B11. For the purposes of this ruling, the Court will refer to him in the present tense consistent with the parties' documents.

2. Prior to forming Freedom, Weaver-Bey was a partial owner and director of Hartcom, Inc. ("Hartcom") which owned and operated a radio station known as WKND-AM. [Doc. # 121 Stat. ¶ 2; Doc. # 130 Stat. ¶ 2].

3. Weaver-Bey and Brisker intended that WKND would be contributed to Freedom, that Freedom would obtain start-up capital, and that Freedom would purchase more radio stations with that capital. [Doc. # 121 Stat. ¶ 3; Doc. # 130 Stat. ¶ 3].

*The Olevni Loan*

*3 4. Olevni, LLC ("Olevni") is a Connecticut limited liability company, of which Weaver-Bey is a member, formed for the purpose of assuming Hartcom's loan obligations. [Doc. # 121 Stat. ¶ 4; Doc. # 130 Stat. ¶ 4].

5. In 2000, Olevni became indebted for $350,000 (the "Olevni Loan"), the proceeds of which were used to discharge a Hartcom obligation in the same amount. [Doc. # 121 Stat. ¶ 5; Doc. # 130 Stat. ¶ 5].

6. Olevni made payments on the Olevni Loan prior to March 2004. [Doc. # 121 Stat. ¶ 6; Doc. # 130 Stat. ¶ 6].

*Weaver-Bey's Assumption of Hartcom Liabilities*

7. On March 28, 2004, pursuant to a "Resolution of the Board of Directors of Hartcom, Inc.," Weaver-Bey agreed to assume personally all liabilities of Hartcom as well as Olevni's obligations on the Olevni Loan:

WHEREAS, Richard Weaver-Bey has agreed to assume all past, present and future liability of Hartcom, Inc., including repayment of the Connecticut Development Authority loan and the obligations of OLEVNI, LLC pursuant to a Memorandum of Understanding dated April 18, 2000;

(hereinafter "Weaver-Bey Assumption Resolution"). [Doc. # 121 Stat. ¶ 7; Doc. # 130 Stat. ¶ 7].

8. On the same date, March 28, 2004, in exchange for Weaver-Bey's assumption of Hartcom's liabilities, the above the shareholders of Hartcom entered into a resolution transferring all shares of Hartcom to Weaver-Bey (the "Hartcom Buy-Out Resolution"). Pursuant to the Hartcom Buy-Out Resolution, the shareholders acknowledged that Weaver-Bey had assumed "all past, present and future liability of Hartcom, Inc., including ... the obligations

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2008 WL 4000611 (D.Conn.)

(Cite as: 2008 WL 4000611 (D.Conn.))

of OLEVNI, LLC," and "in consideration of the foregoing, the shareholders have agreed to authorize Richard Weaver-Bey to sell, transfer and convey all of the assets of Hartcom, Inc." The shareholders also indicated that they wished to sell their shares in Hartcom to Weaver-Bey, and Weaver-Bey "has agreed to indemnify each of the sellers from any and all liability for the payment of the foregoing indebtedness ..." (i.e. including the Olevni Loan).[FN5] [Doc. # 121 Stat. ¶ 8; Doc. # 130 Stat. ¶ 8].

> FN5. Both movant and opposing party state that these agreements transferring Hartcom shares and liability to Weaver-Bey were for the ultimate purpose of transferring the Hartcom assets to Freedom. [Doc # 120. at 3; Doc. # 129 at 6].

*The Closing Documents: Hartcom Contribution and Fleet Investment*

9. Following negotiations between Fleet Development Ventures, LLC ("Fleet"), and Freedom, and pursuant to several interrelated agreements, Fleet agreed to invest $3.5 million in Freedom (the "Fleet Investment"). The agreements were as follows: (i) under a contribution agreement among Fleet, Freedom, Weaver-Bey, Brisker, and Hartcom (the "Hartcom Contribution Agreement"), Weaver-Bey contributed certain of the assets of Hartcom (the FCC license for WKND) to Freedom, and (ii) Fleet agreed to purchase Series A Preferred Stock from Freedom (the "Stock Purchase Agreement"). Quoting the Hartcom Contribution Agreement, "[a]s a condition precedent to Fleet's obligation to consummate the transactions contemplated by the Stock Purchase Agreement ... the Senior Executives [Weaver-Bey and Brisker] have agreed to cause the Station Owner [Hartcom] to transfer all of its assets ... to the Company [Freedom]...." [Doc. # 121 Stat. ¶ 9; Doc. # 130 Stat. ¶ 9].

*4 10. Both of these agreements, as well as several other agreements concurrently entered into as part

of the Fleet Investment, together comprised the "Closing Documents." [Doc. # 121 Stat. ¶ 10; Doc. # 130 Stat. ¶ 10].

11. There is no provision in the Closing Documents by which Freedom agreed to assume any of Weaver-Bey's, Olevni's, or Hartcom's liabilities. [Doc. # 121 Stat. ¶ 11; Doc. # 130 Stat. ¶ 11].

12. The Closing Documents included a Certificate from Hartcom signed by Mr. Weaver-Bey, attaching the Weaver-Bey Assumption Resolution, *see supra* ¶ 7. The Closing Documents, section 2.1(c), also included the Hartcom Contribution Agreement, *see supra* ¶ 9, which stated:

> [T]he transfer of the Contributed Assets [WKND included] pursuant to this Agreement (i) shall not include the assumption of any liability related to the Contributed Assets unless the Company expressly assumes any such liability pursuant to Section 2.1(f).

[Doc. # 121 Stat. ¶ 12; Patrick Aff. Ex. A at tab 5, p. 5; Doc. # 130 Stat. ¶ 12].

13. The Closing Documents, section 2.1(f), further provided:

> Except for the Assumed Liabilities which the Company [Freedom] hereby assumes and agrees to discharge and perform, the Company [Freedom] shall assume no liabilities or obligations relating to the Contributed Assets.

"Assumed Liabilities" is defined as certain obligations arising after certain license and non-license closing dates, and are referenced in sections 3.1 and 3.2 of the Hartcom Contribution Agreement, neither of which references the Olevni Loan Obligation. [Doc. # 121 Stat. ¶ 13; Patrick Aff. Ex. A at tab 5, pp. 2, 7; Doc. # 130 Stat. ¶ 13].

14. The Hartcom Contribution agreement also stated:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                      Page 5
Slip Copy, 2008 WL 4000611 (D.Conn.)
(Cite as: 2008 WL 4000611 (D.Conn.))

The Station Owner [Hartcom] shall assign, transfer, convey, and deliver to the Company [Freedom] free and clear of all Encumbrances (other than Encumbrances listed on Schedule 2.1(a)) .....

[Doc. # 121 Stat. ¶ 14; Patrick Aff. Ex. A at tab 5, p. 5; Doc. # 130 Stat. ¶ 14].

Schedule 2.1(a), titled "Permitted Encumbrances," lists such encumbrances as "None." [Doc. # 121 Stat. ¶ 15; Patrick Aff. Ex. A at tab 5, sched. 2.1(a); Doc. # 130 Stat. ¶ 15].

15. The Hartcom Contribution Agreement further provided:

This Agreement contains the entire understanding of the parties .... [and] shall not be amended, modified or supplemented except by a written instrument....

[Doc. # 121 Stat. ¶ 15; Patrick Aff. Ex. A at tab 5, p. 18; Doc. # 130 Stat. ¶ 15].

16. In the Closing Documents, specifically in section 5.7 of the Preferred Stock Purchase Agreement, *see supra* ¶ 9, Freedom represented,

Except as contemplated by the Acquisition Agreement, the Company [Freedom] will have (after the Closing and consummation of the acquisitions of the Stations [defined to include WKND] ) no Indebtedness.

[Doc. # 121 Stat. ¶ 16; Patrick Aff. Ex. A at tab 1, p. 7; Doc. # 130 Stat. ¶ 16].

**\*5** 17. The Hartcom Contribution Agreement also provided:

Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and their successors and permitted assigns any right, remedy or claim under or by reason of this Agreement.

[Doc. # 121 Stat. ¶ 17; Patrick Aff. Ex. A at tab 5, p. 18; Doc. # 130 Stat. ¶ 17].

The Court granted plaintiff's Motion for Appointment of Receiver/Custodian on September 12, 2006. [Doc. # 65]. Based on the credible testimony, the exhibits, and the entire record developed during evidentiary hearings on August 28 and 29, 2006, the Court made the following findings in that ruling, to which defendant filed no objection:

18. Plaintiff's highly qualified forensic accountant, Alan R. Mandell, CPA, CFE, DABFA, provided credible and uncontroverted testimony regarding Freedom's finances. [Doc. # 65 ¶ 15].

19. During the 2002-2004 period, Mandell found that "funds totaling nearly $92,000 appear to have been paid for Hartcom's liabilities."[Doc. # 65 ¶ 35].

20. Mandell's report states, "[a]ccording to the Assignment and Transfer Agreement between Freedom and Hartcom, only certain assets were contributed to the new organization. According to a resolution of the board of directors of Hartcom, Inc. dated March 28, 2004, Richard Weaver-Bey agreed to assume all past, present, and future liabilities of Hartcom, Inc."[Doc. # 65 ¶ 36].

21. Mandell cited the payment of Hartcom's liabilities as another example of corporate mismanagement of Freedom. [Doc. # 65 ¶ 37].

*DISCUSSION*

*Breach of Contract*

Counterclaim-Defendant Freedom first argues that the written Closing Documents [FN6] of March 31, 2004, by which Hartcom contributed its radio station assets to Freedom was the only contract between Freedom and Hartcom, and second, that this Agreement expressly provides that Freedom assumed none of Hartcom's liabilities and created no third-party beneficiary rights in counterclaim-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                         Page 6
Slip Copy, 2008 WL 4000611 (D.Conn.)
(Cite as: 2008 WL 4000611 (D.Conn.))

plaintiff Olevni.

> FN6. The full title of these documents was "Contribution Agreement Among Fleet Development Ventures LLC and Freedom Communications of Connecticut, Inc. and Senior Executives and Hartcom, Inc. March 31 2004."Patrick Aff. Ex. A. p. 1. The Senior Executives were Stephen Brisker and Richard Weaver-Bey. *See* Findings of Fact ¶ 1.

### A. The Controlling Agreement

#### 1. Alleged Prior Agreement

Olevni alleges in its complaint, "Shortly after the March 2004 transaction,[FN7] Hartcom, acting through Weaver-Bey, conveyed the Radio Station Assets to Freedom, in consideration of which Freedom agreed to assume Weaver-Bey's obligations to Olevni specified in Paragraph 11 herein."[Doc. # 107 at ¶ 12]. Specifically, those obligations were to "(1) make the remaining payments due on the Olevni Loan and (2) reimburse Olevni for all prior payments of principal and interest that had been made on the Olevni Loan from the date of its inception."[*Id.* at ¶ 11]. Olevni repeatedly alleges that this asset transfer was a separate agreement, made sometime between Weaver-Bey's buy-out of other Hartcom shareholders of March 28, 2004 and the formal Closing with Fleet of March 31, 2004. *See e.g.*[Doc. # 129 at 7, 10, 14-16]; [Doc. # 138-2 at 3 ("Freedom cannot use the parol evidence rule (as it relates to the *subsequent* [Closing Documents] ) to exclude evidence of a *prior,* valid third party beneficiary contract between Olevni, Freedom, and Hartcom.")(emphasis added) ]. Freedom answers that the assets were not transferred from Hartcom to Freedom until March 31, 2004, as part of the Closing Documents, and denies that there is any evidence that Freedom assumed the obligations alleged in Olevni's complaint. [Doc. # 110 at ¶ 12].

> FN7. This refers to the "Weaver-Bey As-

sumption Resolution" and "Hartcom Buy-Out Resolution" of March 28, 2004. *See* Findings of Fact ¶¶ 7-8.

*6 As the non-moving party, Olevni must produce specific, particularized facts indicating that a genuine factual issue exists. *See Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998). Olevni relies upon deposition testimony and an affidavit by Weaver-Bey to allege a prior agreement between Hartcom and Freedom to assume Weaver-Bey's obligations to Olevni. Specifically, the deposition states:

> Q. [L]ook at paragraph 12 of Exhibit 1 [the counterclaim of intervenor Olevni]. It reads, "Shortly after the March 2004 transaction[FN8], Hartcom, acting through Weaver-Bey, conveyed the radio station assets to Freedom. In consideration of which, Freedom agreed to assume Weaver-Bey's obligations to Olevni, specified in paragraph 11 herein."Have I read that correctly?

> > FN8.*See* note 7 *supra.*

> A. Yes, you did.

> Q. Do you recall that event described in paragraph 12 ever occurring?

> A. Yes, it did.

> Q. Do you recall when it occurred?

> A. It was either the end of March or the beginning of April when the transaction was concluded with Fleet Development Ventures.

> Q. Are you saying that this agreement that's described in paragraph 12 of Exhibit 1 is part of the same agreement whereby Fleet purchased its preferred shared position, equity position in Freedom?

> [Objection to the form] ...

> A. That was my understanding, yes.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4000611 (D.Conn.)
**(Cite as: 2008 WL 4000611 (D.Conn.))**

[Weaver-Bey Dep. at 34:8-35:4; Doc. # 130] The deposition continues:

Q. We talked before about the agreement by which Fleet purchased shares in Freedom. That was an agreement pursuant to written documents you signed, right?

A. That's correct.

Q. The agreement that's described in paragraph 12, do you recall if that was part of the same written documentation?

[Objection to the form] ...

A. It was my understanding that, that was part of the entire transaction.

Q. The transaction by which Fleet purchased stock in Freedom?

A. That's correct.

Q. So it wasn't a side deal made between Freedom and yourself.

[Objection to the form] ...

A. No, it was not a side deal. It was-everything was done at the closing table between Fleet Development Ventures and Freedom Communications, which involved the three radio stations, the assets, and the licenses of the three radio stations.

[Weaver-Bey Dep. at 35:13-36:12; Doc. # 130]. Finally, Weaver-Bey testified:

Q. So the closing in Washington, that concerned Fleet's purchase of equity in Freedom; correct?

A. That's correct.

Q. My question is: The agreement reflected by paragraph 12 of Exhibit 1, to the best of your knowledge, was that part of that same written agreement by which Fleet purchased the shared in Freedom?

A. To the best of my knowledge, yes.

[Weaver-Bey Dep. at 41:2-9].

To clarify the nature of the exchange described in paragraph 12, Olevni submitted Weaver-Bey's affidavit FN9, which states in part:

> FN9. The parties dispute whether the Weaver-Bey affidavit is admissible, given Freedom's contention that the affidavit contradicts the Weaver-Bey deposition. *See e.g. Bank Brussels Lambert v. Credit Lyonnais (Suisse),* Nos. 93CIV6876LMM, 94CIV2713LMM, 2000 WL 1694323 at *1 (S.D.N.Y. Nov.13, 2000). The Court does not reach this question because it finds that the two documents are not contradictory.

9. Shortly after the March 2004 transaction, Hartcom, acting through me, conveyed the Radio Station Assets to Freedom in consideration for which Freedom agreed to assume my obligations to Olevni.... Mr. Brisker and I, as the only owners and officers of Freedom, specifically discussed the transfer of assets from Hartcom to Freedom in exchange for Freedom assuming the aforesaid liability ..., among others. Otherwise, there would have been no reason for Hartcom to transfer the assets to Freedom.FN10

> FN10. Freedom counters with Weaver-Bey's testimony that WKND was not meeting its operating costs at the time of the transfer, *see* [Weaver-Bey Dep. at 22], arguing that for Freedom to assume operation of WKND was in itself a consideration to Hartcom. [Doc. # 137 at 12 n. 15].

*7 ....

11. Prior to conveying the Radio Station Assets to Freedom, I discussed the proposed transfer with Brisker who agreed to the terms of the transfer as outlined above and authorized me to make such a transfer.

12. At about the same time, Fleet invested funds into Freedom to enable Freedom to purchase ad-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4000611 (D.Conn.)
(Cite as: 2008 WL 4000611 (D.Conn.))

Page 8

ditional Radio Station Assets. Mr. Brisker and I traveled to a law firm in Washington, D.C. to sign documents relating to the capital infusion and to transfer Hartcom's assets to Freedom.... It had been my understanding that the agreement between me and Freedom by which Freedom agreed to assume the Olevni Loan would be incorporated into the capital infusion documentation. I have since learned that such information was not contained in the documents, although Freedom had absolutely agreed to assume said obligation, among others, in exchange for receiving Hartcom's assets.

[Weaver-Bey Aff. ¶¶ 9, 11-12].

Olevni argues that Weaver-Bey's affidavit raises a genuine issue of material fact as to whether Freedom assumed the Olevni Loan in conversations with Hartcom prior to the Closing Documents.[FN11] However, a party may not create a genuine issue of material fact by presenting contradictory or unsupported statements. *See Securities & Exchange Comm'n v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). A self-serving affidavit which reiterates the conclusory allegations of the complaint in affidavit form is insufficient to preclude summary judgment. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). The only evidence provided to support the allegation of a prior oral contract are statements made after the fact by Weaver-Bey, which in themselves cannot be construed to establish a genuine dispute.

> FN11. A conversation between Brisker and Weaver-Bey at that time can be characterized as a negotiation between Freedom and Hartcom because no one else held shares in either company.

While Weaver-Bey attests to reaching an oral understanding of intent between Freedom and Hartcom, he further asserts that all transactions between the parties were memorialized in a contract in the Closing Documents.

[W]hen the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing.

*Schilberg Integrated Metals Corp. v. Continental Gas Co.,* 263 Conn. 245, 277, 819 A.2d 773 (2003)(regarding the parol evidence rule). Throughout his deposition and affidavit, Weaver-Bey repeatedly discredits the allegation of a prior agreement by insisting that "everything was done at the closing table between Fleet Development Ventures and Freedom Communications, which involved the three radio stations, the assets, and the licenses of three radio stations."[Weaver-Bey Dep. at 36:8-12].*See also* [Weaver-Bey Dep. at 34:23-35:4, 35:18-24, 41:5-9; Weaver-Bey Aff. ¶ 12 ("I traveled to a law firm in Washington, D C to transfer Hartcom's assets to Freedom") ]. Additionally, Weaver-Bey signed the Closing Documents [Weaver-Bey Dep. 35:14-17] with the advice of counsel, who represented that Hartcom's execution of the Contribution Agreement would not "[v]iolate or conflict or constitute a default under or with any agreements between the stockholders and the Company [Hartcom] or among stockholders related to the Company."[Doc. # 122 Ex. A at tab 25, p. 3] (memo from Kee Borges and Silvestri, counsel to Hartcom).

*8 On this record the Court finds that the Closing Documents signed by Brisker and Weaver-Bey represent the full extent of the agreements between Hartcom and Freedom. Weaver-Bey's affidavit characterizing his prior conversations with Brisker as an "agreement" does not constitute "concrete evidence from which a reasonable juror could return a verdict in [non-movant's] favor." *Page v. Connecticut Department of Public Safety,* 185 F.Supp.2d 149, 152 (D.Conn.2002). There is no dispute that the Closing Documents do not reference any assumption of Hartcom's liabilities. Find-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                Page 9
Slip Copy, 2008 WL 4000611 (D.Conn.)
**(Cite as: 2008 WL 4000611 (D.Conn.))**

ings of Fact ¶¶ 11-14, 16.

B. *Olevni's Status Under the Controlling Agreement*

1. *Express Provisions*

It is undisputed that the Closing Documents expressly deny the assumption of Hartcom's obligations by Freedom, including the Olevni Loan. *Id.*

The Closing Documents also expressly deny the creation of any third-party beneficiaries, as Olevni claims to be. Findings of Fact ¶ 17. In Connecticut,

> the ultimate test to be applied in determining whether a person has a right of action as a third party beneficiary is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party beneficiary and ... that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties....

*Gazo v. City of Stamford,* 255 Conn. 245, 261, 765 A.2d 505 (2001) (citations omitted; brackets omitted). Both the Weaver-Bey and Neigher affidavits set forth that at least two parties, Freedom and Hartcom, indicated motive, purpose, and intent to create third-party beneficiary rights in Olevni. [Doc. # 130 Ex. B. ¶¶ 9-11, Ex. C. ¶¶ 9-10]. However, there is no evidence that Fleet, a party in privity to the Closing Documents, had any knowledge or intent to make Olevni a third-party beneficiary. "[T]he only way a contract could create a direct obligation between a promisor and a third party beneficiary would have to be, under our rule, because the parties to the contract so intended." *Gazo,* 255 Conn. at 261, 765 A.2d 505 (internal citation omitted). Given the express denial of any third-party rights in the Closing Documents and the lack of any evidence that Fleet knew of Olevni, the Court finds that Olevni was not a third party to that contract.

Even assuming arguendo that the Brisker/Weaver-Bey discussion was a contract (it was not) creating third-party rights in Olevni, the parties to that alleged contract could "discharge or alter the promisor's obligations" as long as the terms did not prohibit it, there was no reliance upon it, and the third party had not yet brought suit. *See The Detroit Institute of Arts Founders Society v. Rose,* 127 F.Supp.2d 117, 130 (2001)(citing Restatement (Second) of Contracts § 311). Olevni has provided no evidence of terms, reliance, or a suit that occurred in the three days between March 28, 2004, when Weaver-Bey assumed the Hartcom obligations, and March 31, 2004, when the Closing Documents were transacted. The only reliance in evidence is that the Hartcom shareholders, who were also the members of Olevni, transferred their shares to Weaver-Bey in exchange for his assumption of the Olevni Loan. *See* Findings of Fact ¶¶ 7-8; Neigher Aff. ¶¶ 9-10. There was no reliance by Olevni that could invalidate the Closing Documents, and Olevni has no claim to third-party rights.

2. *Parol Evidence Rule*

*9 The merger clause contained in the Closing Documents lends further support to the express provisions and militates against reading the Olevni Loan obligation into that contract. *See* Findings of Fact ¶ 15. The parol evidence rule bars consideration of extrinsic evidence of an agreement where a written agreement on the same subject matter is unambiguous and fully integrated. *Schilberg,* 263 Conn. at 277-278, 819 A.2d 773;*see also Alstom Power, Inc. v. Balcke-Durr, Inc.,* 269 Conn. 599, 609, 849 A.2d 804 (2004)."After this, to permit oral testimony, or prior contemporaneous conversations, or circumstances, or usages ... in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme." *Schilberg,* 263 Conn. at 277, 819 A.2d 773.

Parol evidence is admissible, however, to show

Slip Copy                                                                                          Page 10
Slip Copy, 2008 WL 4000611 (D.Conn.)
**(Cite as: 2008 WL 4000611 (D.Conn.))**

mistake or fraud. *Id.* Olevni alleges fraud in its opposition to the motion for summary judgment, arguing that Brisker defrauded Fleet by not disclosing Freedom's alleged intention to pay the Olevni Loan obligation, and/or that Brisker defrauded Weaver-Bey by substituting terms different from those discussed prior to the Closing. [Doc. # 129 at 18-22]. Weaver-Bey asserts in his affidavit that he thought that the Closing Documents he signed would oblige Freedom to assume the Olevni Loan, and that he was surprised to learn that they did not. [Weaver-Bey Aff. ¶ 12]. Olevni also submits that Brisker signed monthly payments on the Olevni Loan from April 14, 2004 until March 24, 2006 FN12 [doc. # 130 at ¶ 44], which reinforces Weaver-Bey's assertions. However, it is noteworthy that while Olevni concludes that this is evidence of fraud [doc. # 129 at 18-22], Weaver-Bey never directly accuses anyone of fraudulently omitting this intention [*see* Weaver-Bey Aff. ¶ 12].

> FN12. Freedom argues that evidence of subsequent conduct is barred by the parol evidence rule where the terms of a contract are unambiguous. *See e.g. Cahill v. Cahill,* No. FA00044002S, 2006 WL 1530118, at *3 (Conn.Super.May, 22, 2006). However, as noted above, parol evidence is admissible to show fraud. *Schilberg,* 263 Conn. at 277, 819 A.2d 773.

To the extent that Weaver-Bey contends he did not read the Closing Documents, "[t]he general rule is that where a person of mature years, and who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it, and notice of its contents will be imputed to him if he negligently fails to do so...." *Ursini v. Goldman,* 118 Conn. 554, 173 A. 789 (1934); *see also Phoenix Leasing, Inc. v. Kosinski,* 47 Conn.App. 650, 654, 707 A.2d 314 (Conn.App.1998). This rule is qualified by the intervention of fraud or artifice, or mistake not due to negligence. *Id.* Here the Court does not merely rely

upon Weaver-Bey's reputation as a "civic leader" in Connecticut, *see supra* note 4, to find that he was fully responsible for the documents that he signed. The Court also notes that Hartcom's counsel vetted the documents for inconsistencies and warranted that the Closing Documents would not "[v]iolate or conflict or constitute a default under or with any agreements between the stockholders and the Company [Hartcom] or among stockholders related to the Company."[Doc. # 122 Ex. at tab 25, p. 3](memo from Kee Borges and Silvestri, counsel to Hartcom). Weaver-Bey's passive suggestion of fraud in his affidavit is not sufficient concrete evidence to raise a genuine issue of material fact for Olevni's claim. *See Securities & Exchange Comm'n,* 585 F.2d at 33; *Lujan,* 497 U.S. at 888; *Page,* 185 F.Supp.2d at 152.

**\*10** Nor would an allegation of mistake be availing to read the Olevni Loan obligation into the Closing Documents. "[W]here a party realizes he has only limited information upon the subject of a contract, but treats that knowledge as sufficient in making the contract he is deemed to have assumed the risk of mistake." *Wallenta v. Moscowitz,* 81 Conn.App. 213, 222-223, 839 A.2d 641 (Conn.App.2004)(quoting *Holly Hill Holdings v. Lowman,* 226 Conn. 748, 757, 628 A.2d 1298, (1993), citing 1 Restatement (Second), Contracts § 154). Second, even if mistake were proved, the remedy is rescission or reformation; however, "a contract should not be reformed if doing so would affect the rights of an innocent third party ... who relied on the previous contract and lacked notice of the mistake." *Wesley v. Schaller Subaru, Inc.,* 277 Conn. 526, 542 n. 15, 893 A.2d 389 (2006). Here, the contract cannot be reformed because of Fleet's reliance.

Moreover, even assuming there were sufficient evidence of fraud or mistake on Freedom's part to raise a genuine issue of fact as to Freedom's intentions, it would not be material to Olevni's claim. As the Court found above, the alleged prior oral understanding between Brisker and Weaver-Bey did not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 11
Slip Copy, 2008 WL 4000611 (D.Conn.)
(Cite as: 2008 WL 4000611 (D.Conn.))

constitute a binding agreement, and Olevni was not party to the Closing Documents. Therefore Olevni has no standing to bring a breach of contract claim against Freedom.

*Unjust Enrichment*

Finally, count two of Olevni's complaint alleged unjust enrichment as an alternative cause of action in case Olevni failed to prove its breach of contract claim. But where a contract governs, there can be no claim for unjust enrichment on the same subject matter. *See Vertex, Inc. v. City of Waterbury,* 278 Conn. 557, 570 n. 12, 898 A.2d 178 (2006) ("proof of an operative contract would have been incompatible with recovery on unjust enrichment"); *see also Meaney v. Connecticut Hospital Assn., Inc.,* 250 Conn. 500, 517, 735 A.2d 813 (1999) ("express contract between the parties precludes recognition of an implied-in-law contract governing the same subject matter") (citation omitted). Here the Closing Documents govern the conveyance of the WKND asset from Hartcom to Freedom, so it is presumptively impossible to say that Freedom was unjustly enriched by the conveyance.

Accordingly, counterclaim-defendant's Motion for Summary Judgment is **GRANTED.**

*CONCLUSION*

For the reasons stated, counterclaim-defendant's Motion for Summary Judgement [**Doc. # 119**] is **GRANTED.**[FN13]

> FN13. This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. # 104] on July 12, 2007, with appeal to the Court of Appeals.

D.Conn.,2008.
Fleet Development Ventures, LLC v. Brisker
Slip Copy, 2008 WL 4000611 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)
**(Cite as: 2006 WL 2642412 (D.Conn.))**

**H**

Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.
ALSTOM POWER, INC., Plaintiff,
v.
SCHWING AMERICA, INC., Defendant.
**Civil No. 3:04cv1311 (JBA).**

Sept. 14, 2006.

Patrick M. Fryer, Steven Berglass, Seeley & Ber-glass, New Haven, CT, for Plaintiff.
Alan H. Maclin, Jeffrey F. Shaw, Briggs & Mor-gan, St. Paul, MN, Barry J. Waters, Murtha Cullina LLP, New Haven, CT, for Defendant.

Ruling on Motion for Summary Judgment [Doc. # 78]

JANET BOND ARTERTON, U.S.D.J.

*1 This diversity case arises out of a contract dis-pute between plaintiff Alstom Power, Inc. ("Alstom"), a Delaware corporation with its prin-cipal office in Windsor, Connecticut, and defendant Schwing America, Inc. ("Schwing"), a Minnesota corporation with its principal office in White Bear, Minnesota. Alstom brought a complaint alleging breach of contract (Count One), unjust enrichment (Count Two), negligent misrepresentation as to the goods/services to be provided under the contract (Count Three), declaratory judgment with respect to insurance coverage (Counts Four and Five), viola-tion of the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § 42-110a*et seq.* and the Connecti-cut Unfair Insurance Practices Act, Conn. Gen.Stat. § 38a-816(b) (Count Six), and negligent misrepres-entation as to insurance coverage (Count Seven). Am. Compl. [Doc. # 66]. Defendant now moves for summary judgment on all counts, which will be granted for the following reasons.

**I. Factual Background**

In April 1999, ABB, a member of the Alstom Power Group,[FN1] was awarded a contract to con-struct a portion of a 150-megawatt power plant in Redbank, Australia. Def. L.R. 56(a)1 Stmt. [Doc. # 79] at ¶¶ 2, 4. The plant is near a coal mine and was designed to convert coal byproducts into energy. *Id.* at ¶¶ 5, 7; Pl. L.R. 56(a)2 Stmt. ¶ II.5. ABB was to provide steam generators and related equipment for the plant, a contract worth $130 million of the total $230 million (Australian dollars) Redbank budget. Def. L.R. 56(a)2 Stmt. ¶ 10.

> FN1. The record is unclear concerning the relationship between ABB and Alstom. Defendant characterizes ABB as a prede-cessor corporation to Alstom, and plaintiff denies this characterization but does not say what it believes the relationship to be. Regardless, both parties' briefs assume that Alstom is the proper party plaintiff to as-sert claims arising under ABB's contract.

The parties dispute the relationship between ABB and Schwing. ABB characterizes Schwing as a "supplier" who was to provide one component for its part of the Redbank project, a "material handling system used to store, mix and transport the coal slurry."*Id.* at ¶ 12.Schwing, by contrast, character-izes its role as a subcontractor responsible for "complete provision of a major portion of the Red-bank power plant, not just for component parts, and plaintiff's bid included design, engineering, plan-ning, specifications, services, on-site supervision, inspection and performance...." Pl. L.R. 56(a)2 Stmt. ¶ 12.

Schwing's response to the bid package, however, proffers a "price for the *material handling system* used to store, mix and transport the coal slurry."Def.App. Ex. 4 (9/21/99 letter from Thomas Lyons to R.T. Smuda) (emphasis added). The letter further states that Schwing has "included a parts only warranty in our base equipment offering; however, we offered a price adder to incur the cost

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)
(Cite as: 2006 WL 2642412 (D.Conn.))

of labor. Labor to service our equipment must be provided by either a Schwing employee or authorized agent, specifically Sulzer of Australia."*Id.*

Alstom responded to Schwing's package with a 29-page purchase order dated October 8, 1999, which requested four BDT[FN2] storage tanks, four storage tank sliding frame silo systems, four BDT paddle mixers, and four BDT transfer pumps. Def.App. Ex. 5. Included in the purchase order was one service trip for one Schwing employee to go to Australia for two weeks. *Id.* ABB also requested various inspection and test reports, contract drawings, and instruction manual specifications. *Id.*

> FN2. Although not fully explained in the record, BDT appears to be a type of coal byproduct that is processed in the Redbank plant.

**\*2** On October 29, 1999, Schwing responded to the purchase order with a letter acknowledging receipt of the order and assuring "successful and timely completion." Def.App. Ex. 6 at 1. The letter also requested a few modifications to the terms of the purchase order, including a limitation of warranties.*Id.* at 2. ABB never signed the letter to indicate its agreement to the changed terms. *Id.* at 6 (showing blank signature lines).

On June 23, 2000, ABB's Redbank Construction Manager confirmed the delivery at the Redbank site of the equipment that was ordered through the original purchase order, stating that the goods were received and "of good quality and condition." Def. L.R. 56(a)1 Stmt. ¶ 19; Pl. L.R. 56(a)2 Stmt. ¶ II.19; Def.App. Ex. 8. Schwing billed ABB approximately $1.8 million (U.S.Dollars), which was paid timely. Def. L.R. 56(a)1 Stmt. ¶ 20-21; Pl. L.R. 56(a)2 Stmt. ¶ II.20-21.[FN3]

> FN3. Plaintiff denies that this amount represented payment in full, given the subsequent dispute that arose between the parties over costs of repairs in 2001-2002; however, plaintiff does not dispute that

ABB paid Schwing's original invoice, representing the original equipment ordered.

On May 11, 2001, while the power plant was operating on BDT fuel, one of the "sliding frame power cylinder trunion arms broke," or, as plaintiff characterizes the accident, "exploded including but not limited to a cylinder flying through the system causing extensive and major damage."Def. L.R. 56(a)1 Stmt. ¶ 22; Pl. L.R. 56(a)2 Stmt. ¶ II.22. Schwing, through its contractor Parker Hannifin, replaced all eight cylinders at Redbank. Def. L.R. 56(a)1 Stmt. ¶ 27. However, plaintiff alleges that the replacement cylinders, which were due on June 30, were delayed until July 16, 2001, and then failed again in December 2001 and in 2002 and 2003. Pl. L.R. 56(a)2 Stmt. ¶ 27. Plaintiff seeks damages of approximately $700,000 for replacement material, commissioning, transportation, repair labor, and 15% overhead. Defendant argues that all of plaintiff's contract claims are barred by the statute of limitations. Defendant also argues that most of these costs are excluded by the parts-only warranty agreed by the parties or because the costs were not incurred by plaintiff.

**II. Standard**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). Materiality is determined by the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."*Id.*"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex,* 477 U.S. at 322-23. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.' " *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 111 (2d Cir.2001) (quoting *Celotex,* 477 U.S. at 324); *see also Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-1224 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The nonmoving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson,* 477 U.S. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed.R.Civ.P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. *Matsushida,* 475 U.S. at 586 (citations omitted).

### III. Discussion

### A. Breach of Contract: Statute of Limitations

*3 Central to determination of this summary judgment motion is the parties' dispute as to the applicable statute of limitations for this lawsuit filed August 6, 2004. The Uniform Commercial Code, governing sales of goods, establishes a four-year limitations period, *see*Conn. Gen.Stat. § 42a-2-725,[FN4] while construction and other general contract matters have a six-year limitations period, *see*Conn. Gen.Stat. § 52-576.[FN5] Thus, the critical issue is whether the parties' contract is a contract for the sale of goods, as Schwing argues, or a construction services contract, as Alstom argues.

> FN4. "An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued."Conn. Gen.Stat. § 42a-2-725(1).

> FN5. "No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues ..."Conn. Gen.Stat. § 52-576(a).

"To determine whether a contract ... is governed by the U.C.C., the court must determine whether the dominant factor or 'essence' of the transaction is the sale of the materials or the services." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 747 (2d Cir.1998) (quoting *Incomm, Inc. v. Thermo-Spa, Inc.,* 41 Conn. Supp. 566, 570, 595 A.2d 954, 956-57 (Conn.Super.Ct.1991)). This is a fact-specific determination that requires examination of "the main objective sought to be accomplished by the contracting parties." *Consol. Edison Co. of N .Y. v. Westinghouse Elec. Corp.,* 567 F.Supp. 358, 361 (S.D.N.Y.1983) (internal citation and quotation marks omitted) (denying motion to dismiss contract action relating to construction of nuclear power plant because factual development required to determine whether it was primarily a construction contract or contract for sale of goods).

The contract was formed pursuant to ABB's Bid Package requisitioning a "BDT Storage Tank (Sliding Frame Silo System)," Def. Ex. 3, by Schwing's acceptance of ABB's "Purchase Order," which sets forth a list of "deliverable items," Def. Ex. 5 at 1, 6. The purchase order refers to the parties as "Seller" and "Purchaser." *Id.* at 2. The

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)
(Cite as: 2006 WL 2642412 (D.Conn.))

items were to be manufactured by Schwing either in the United States or Germany and shipped to Australia. *Id.* at 4. Schwing provided one of its employees to supervise installation in Australia for two weeks, *id.* at 4, but the purchase order did not include the full price of labor necessary for complete installation, which was undertaken by another firm. Alstom emphasizes the fact that Schwing was to engineer and quality-test the items provided and also supply instruction manuals. Under the U.C.C., however, " '[g]oods' means all things, *including specially manufactured goods,* which are movable at the time of identification to the contract...."Conn. Gen.Stat. § 42a-2-105 (emphasis supplied). Thus, the fact that the BDT storage tanks were specially manufactured items that required unique engineering, testing and instruction manuals for operation is not inconsistent with a finding that they are goods within the meaning of the U.C.C.

The cases plaintiff cites for the proposition that its contract is not subject to the U.C.C. are factually distinguishable. In *Insurance Company of North America v. ABB Power Generation, Inc.,* 925 F.Supp. 1053, 1056 (S.D.N.Y.1996), the defendant was retained to construct an entire power generation facility, including "design[ing] and construct[ing] the facility and procur[ing] necessary equipment."The contract, which "define[d][the] defendant's undertaking as 'services,' " obligated the defendant-denominated as a "contractor"-to "provide [the owner] with a Project that functions...." *Id.* at 1061.Likewise, in *Niagara Mohawk Power Corporation v. Graver Tank & Manufacturing Company,* 470 F.Supp. 1308, 1324 (N.D.N.Y.1979), the contract obligated the "contractor" to "provide all the materials, equipment and apparatus, ... all the labor, tools, services and facilities ... [and] perform all the work and do all things necessary for the proper construction and erection and completion" of a "containment liner" in a nuclear power plant. Here, Schwing was obligated to provide certain component parts of the Redbank plant but not to install those parts. The contract did not require Schwing to provide "all the

labor, tools, services and facilities," *compare id.,* but only obligated Schwing to provide one employee to oversee another subcontractor's work. Finally, the purchase order issued by ABB requests "deliverable items," not "services," and the bid package offered by Schwing is for the component parts of a "material handling *system,* " not for the construction services associated with that system. The fact that Schwing designed and engineered the system does not transmute the purchase order into a construction contract.

**\*4** For these reasons, the Court concludes that this contract is predominantly one for the sale of goods, governed by the U.C.C. Accordingly, a four-year statute of limitations is applicable.

Plaintiff's original complaint [Doc. # 1] was filed on August 6, 2004. Thus the question is whether any breach of contract is alleged to have occurred within four years of that date. Schwing contends that its performance of the contract was complete on June 23, 2000, when ABB's John King sent an email to Schwing confirming that the "BDT Bins and Support structures" were "received at [the Redbank] site and ... [are] of good quality and condition."Def.App. Ex. 8. Alstom, however, contends that performance was not complete in 2000, but "continu[ed] into 2001 and 2002" due to the "failure with the sliding frame cylinder arrangement," which was not fully repaired until July 16, 2001, and failed again in 2002. *See* Pl. L.R. 56(a)2 Stmt. ¶ 19.

Alstom conflates two different issues. Although Alstom contends that the 2001 sliding frame cylinder failure breached the contract, this is a separate question from when Schwing completed its original performance pursuant to the purchase order. Schwing's parts were delivered to Redbank on June 20, 2000, *see* Def.App. Ex. 8 ("All Items Report"), and there is no material dispute of fact that ABB certified Schwing's delivery complete and of acceptable quality as of June 23, 2000, *id.* at Ex. 8 (e-mail from John King to Keith Ireson). There is also no genuine dispute that the Redbank power

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)
(Cite as: 2006 WL 2642412 (D.Conn.))

plant was fully constructed and operating before Spring 2001, because the cylinder failure occurred during the firing of BDT fuel.

*See* Def. L.R. 56(a)1 Stmt. ¶ 22; Pl. L.R. 56(a)2 Stmt. ¶ 22. The real dispute between the parties thus is whether the cylinder failure is covered under the agreed warranty, not whether Schwing completed performance under the contract initially.[FN6]

> FN6. Although the Court finds that breach of warranty is the proper characterization of the parties' dispute, Alstom expressly disclaims a breach of warranty claim. Pl. Mem. in Opp. to Def. Summ. J. Mot. [Doc. # 96] at 1 ("Plaintiff's Amended Complaint dated November 3, 2005 (the operative complaint) alleges breach of contract, and does not allege breach of warranty.").

Under Conn. Gen.Stat. § 42-a-725(2), a "breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."[FN7] The operative warranty language in the Alstom-Schwing agreement, which is an amendment[FN8] to the purchase order, reads: "Schwing America, Inc. to include two (2) year parts only warranty or [sic] thru 9-30-02. This warranty does not obligate Schwing America Inc. to bear the cost of labor in replacement of defective parts or the cost of transportation of such parts."Def.App. Ex. 5 at 16.

> FN7. Schwing proposed additional language to the warranty ("This warranty is in lieu of any other warranty expressed or implied ...") in a letter sent to ABB on Oct. 29, 1999, *see* Def.App. Ex. 6, but ABB never agreed to the modification.

> FN8. Although ABB contends that their boilerplate warranty language on the following page of the purchase order applies,

the purchase order explicitly sets forth the negotiated warranty as part of the "Commercial Requirements Amendments" modifying the boilerplate. *See* Def.App. Ex. 5 at 16-17.

This warranty is not an explicit guarantee of future performance, such as would be required under § 42a-2-725 to toll the statute of limitations until the time the defect is discovered. The parties' agreed language is a "parts only warranty" obliging Schwing to "replac[e] ... defective parts." It does not oblige Schwing to guarantee that its materials handling system will perform to a certain level over the warranty period. Accordingly, a breach of warranty "occurs when tender of delivery is made."Conn. Gen.Stat. § 42a-2-725(2).

*5 In *Flagg Energy Development Corp. v. General Motors Corp.*, 244 Conn. 126, 151, 709 A.2d 1075, 1087 (Conn.1998), a case with very similar facts, the Connecticut Supreme Court expressly "reject[ed] the ... contention that [a] repair or replacement clause in [a] purchase agreement tolls the running of the statute of limitations under § 42a-2-725."In *Flagg*, the parties contracted (via a purchase order) for gas turbine engines for a construction project. The engines malfunctioned approximately 1.5 years after acceptance by the plaintiff, and the plaintiff claimed that because the contract included a repair or replacement clause for defective materials or equipment, the statute of limitations started to run on the date of the malfunction. The Connecticut Supreme Court held that the repair/replacement clause in the contract was not a guarantee of the engines' future performance, *i .e.* an ongoing contractual commitment, but merely an additional remedy promised to the buyer in case of defect, and therefore the statute of limitations started to run on the date performance was tendered. *See Flagg*, 244 Conn. at 150. Likewise, the replacement-parts warranty agreed between Alstom and Schwing is not an explicit guarantee of future performance, and thus the statute of limitation began to run when delivery of the goods was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)
(Cite as: 2006 WL 2642412 (D.Conn.))

tendered.[FN9]

> FN9. *Coakley & Williams, Inc. v. Shatterproof Glass Corp.,* 706 F .2d 456 (4th Cir.1983), on which plaintiff heavily relies, is distinguishable from this case and from *Flagg.*In *Coakley,* a contractor did replace the allegedly defective parts, and the Fourth Circuit held that the warranty on the replacement parts began to run when the replacements were installed. 706 F.2d at 462-63. In the present case, Alstom complains not that the replacement parts were defective, but that Schwing breached the contract because the original parts broke. Accordingly, the warranty period here begins to run upon tender of the original parts.

Because there is no genuine dispute of the material fact that ABB accepted Schwing's materials handling system as of June 23, 2000, Alstom's August 6, 2004 breach of contract claim was filed outside the four-year statute of limitations. Accordingly, defendant is entitled to summary judgment on Count One.

**B. Unjust Enrichment**

As an alternative to its breach of contract claim, Alstom alleges a quasi-contractual unjust enrichment claim. "Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.... Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." *Gagne v. Vaccaro,* 255 Conn. 390, 401, 766 A .2d 416, 424 (Conn.2001). In other words, the remedy of unjust enrichment provides that "a plaintiff may recover the benefit conferred on a defendant in situations where no express contract has been entered into by the parties." *Burns v. Koellmer,* 11 Conn.App. 375, 383, 527 A.2d 1210, 1215 (Conn.App.Ct.1987) (citing 5 *Williston on*

*Contracts* § 1479 (3d ed.1970); *Restatement of Restitution* §§ 40, 41, 107). However, where an express contract exists, restitution for unjust enrichment, a quasi contractual remedy, is unavailable. *Lieberman v. Emigrant Mortg. Co.,* --F.Supp.2d----, 2006 WL 1699515, at *6 (D. Conn. June 2, 2006) (Hall, J.) ("Parties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations. Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment.") (quoting *Polverari v. Peatt,* 29 Conn.App. 191, 199, 614 A.2d 484 (Conn.App.Ct.1992)).

**\*6** Here, there is no argument that the parties' express written contract is unenforceable, *e.g.,* for lack of consideration or lack of mutual agreement. *Cf. Restatement of Restitution* § 40(2). Plaintiff's action on the contract exists; it is simply barred by the statute of limitations. Therefore, due to the existence of a written contract, plaintiff cannot recover on an unjust enrichment theory, and defendant is entitled to summary judgment on Count Two.[FN10]

> FN10. Schwing argues that Alstom's unjust enrichment claim also should be barred by a four-year statute of limitations. The Court finds no Connecticut appellate authority concerning the applicable statute of limitations for unjust enrichment claims; some Superior Courts have applied a six-year period in contracts not involving the sale of goods. *See Bailey, Moore, Glazer, Schaefer & Proto, LLP v. Hippeau,* No. CV054007301S, 2006 WL 573888, at *2 (Conn.Super.Ct. Feb. 22, 2006) (six-year limitations period in quasi-contract action brought by accountant who was not paid for services rendered); *Gianetti v. Greater Bridgeport Indiv. Practice Assoc.,* No. (X02)CV4001686, 2005 WL 2078546, at *4 (Conn.Super.Ct. July 21, 2005) (six-year period applied to nonpayment of debt action). Defendant argues that a four-

year period applies here because Connecticut courts apply the statute of limitations for analogous legal claims to equitable claims, *see Dowling v. Finley Assocs., Inc.,* 248 Conn. 364, 367-68 n. 7, 727 A.2d 1245, 1248 n. 7 (1999), but the Court need not resolve this unsettled issue of state law.

### C. Negligent Misrepresentation

Plaintiff's third count alleges that Schwing negligently misrepresented "certain services, materials, equipment, and products" it provided to plaintiff. Am. Compl., Third Claim, ¶ 16. Defendant moves for summary judgment on this count on the grounds that: it is barred by the statute of limitations; Alstom has proffered no evidence of reasonable reliance on Schwing's statements; and Alstom's breach of warranty claim from Count One cannot be combined with a negligent misrepresentation claim. Alstom has not addressed any of these arguments, and appears to have abandoned Count Three.

Even if plaintiff intended to pursue this claim, the Court agrees that it is barred by the applicable three-year statute of limitations. *See* Conn. Gen.Stat. § 52-577 (three-year statute of limitations applies to tort actions); *Krondes v. Norwalk Sav. Soc.,* 53 Conn.App. 102, 113-15, 728 A.2d 1103, 1110-11 (1999) (three-year statute of limitation applied to fraudulent misrepresentation claim). On the facts of plaintiff's complaint, any misrepresentation concerning the quality of the goods took place either when the contract was formed (Schwing's acceptance took place October 29, 1999), or, at the latest, when the goods were delivered to Redbank on June 20, 2000. Either point predates the filing of the August 2004 complaint by more than three years.

Moreover, the Connecticut Supreme Court held in *Flagg,* 244 Conn. at 153, that "commercial losses arising out of the defective performance of contracts for the sale of goods cannot be combined with negligent misrepresentation."Thus, where the "factual underpinnings" of both claims are identic-

al, a plaintiff is limited to a breach-of-contract claim. *Id.* at 155.Here, the allegations of plaintiff's negligent misrepresentation claim are identical to its breach of warranty claim, namely, that defendant's sliding frame and cylinder components were defective and malfunctioned in May 2001, causing damage to the Redbank plant. Accordingly, under *Flagg,* plaintiff cannot maintain this negligent misrepresentation claim.

For these reasons, defendant is entitled to summary judgment on Count Three.

### D. Insurance Coverage

Plaintiff's Fourth and Fifth Counts [FN11] relate to the insurance coverage provisions of the parties' agreement, which requires that "Seller will maintain general liability insurance on an occurrence basis, having limits of not less than $1,000,000 per occurrence ... and naming Purchaser as an additional insured with respect to any claim arising out of Seller's performance hereunder."Purchase Order, Pl.Ex. B at 18. It is undisputed that defendants breached this requirement because, although they obtained Commercial General Liability policies with limits of $2 million, ABB/Alstom was not a named insured on these policies. *See* Insurance policies, Def.App. Ex. 21 (only Schwing entities are named insureds); Def. L.R. 56(a)1 Stmt. ¶ 39 (claiming Schwing had CGL policies in effect but not alleging that the policies named ABB/Alstom). Schwing did put up a construction bond in ABB's favor of approximately $240,000, or 10% of the contract. *See* Def.App. Ex. 20. However, Schwing does not argue that this bond satisfied its insurance obligation under the agreement. Rather, Schwing argues that Alstom's insurance coverage claims fail because Alstom has not suffered or claimed any third-party losses for which it sought insurance coverage.

> FN11. Count Five does not set forth a separate cause of action but claims costs and attorney fees relating to the insurance cov-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)
**(Cite as: 2006 WL 2642412 (D.Conn.))**

erage claim in Count Four. Am. Compl. ¶ 29.

*7 The parties dispute whether Redbank's owners have filed a claim against Alstom. At the deposition of Clifton Stalph (Alstom's designated corporate representative knowledgeable about damages), Alstom's attorney stated that Redbank had sued Alstom, but refused to allow Stalph to divulge information about the lawsuit on the grounds of attorney-client privilege.[FN12] Stalph Depo., Pl. Surreply Ex. D, at 32-35. On this basis, plaintiff argues that it "informed" Schwing about the pending Redbank lawsuit, and that this lawsuit is the third-party claim that should be insured. Pl. Surreply Br. at 5. Plaintiff's Local Rule 56(a)2 Statement ¶ 40 alleges that Schwing was aware of Redbank's third-party claims "as the result of numerous meetings and communications with plaintiff throughout 2001, 2002, and 2003," but it also frames its cause of action as one for breach of contract for "defendant's failure to honor defendant's indemnity obligations," and acknowledges that Alstom never submitted or attempted to submit an insurance claim to defendant's CGL carrier. *Id.* The record contains no written documentation concerning the Redbank lawsuit, and plaintiff's damages analysis, provided in discovery, makes no claim for any liability to third party Redbank. *See* Def.App. Ex. 22 (claiming materials, labor and overhead for repairing the sliding frames and cylinders).

> FN12. When Stalph was asked whether he prepared a certain damages analysis at the request of an attorney, Alstom's attorney refused to allow Stalph to answer "because it's related to the Red Bank [sic] claim, the recent lawsuit against Alstom."Stalph Depo., Pl. Surreply Ex. D, at 34. No further information about the lawsuit appears to have been provided to Schwing in discovery and Alstom does not argue that it actually made a formal claim for coverage related to the Redbank suit.

Regardless of whether plaintiff's claim is character-

ized as a breach of contract action or an indemnity action related to Redbank, it is not properly before this Court. If it is a breach of contract claim, it is precluded by the statute of limitations, for the reasons discussed above. If, as plaintiff now contends, it is a third-party indemnity action arising from the Redbank lawsuit, liability for Redbank's damages is properly determined within or following resolution of Redbank's case.

Under Connecticut law, a cause of action based on an agreement to indemnify loss accrues when the loss occurs, *i.e.*, when the indemnitee "has paid something he is legally obligated to pay." *Amoco Oil Co. v. Liberty Auto and Elec. Co.*, 262 Conn. 142, 150, 810 A.2d 259, 264 (Conn.2002). A cause of action based on an agreement to indemnify liability "would accrue as soon as an indemnitee becomes liable to a third party."*Id.*"When an agreement indemnifies against both loss and liability, ... the statute of limitations begins to run as soon as liability is incurred.... Thus, the first moment in time when an indemnitee can successfully maintain an action to enforce the terms of an indemnity agreement ... is when liability is incurred."*Id.* at 150-51.Connecticut statute provides that "an action for indemnification may be brought within three years from the date of the determination of the action against the party which is seeking indemnification *by either judgment or settlement*." Conn. Gen.Stat. § 52-598a (emphasis supplied). Thus, the earliest appropriate time to bring an indemnification action is after the indemnitee's liability to a third party has been determined "by either judgment or settlement."The record in this case contains nothing about the Redbank lawsuit, and certainly does not establish that Alstom has been found liable to Redbank via a judgment or settlement. Therefore Alstom's indemnification action is premature.

*8 The fact that Alstom seeks a declaratory judgment rather than money damages does not change this analysis, because even a declaratory judgment concerning whether Schwing is liable for Alstom's damages stemming from Redbank's suit would ask

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)
(Cite as: 2006 WL 2642412 (D.Conn.))

this Court to impermissibly determine whether Schwing must indemnify Alstom prior to final determination of liability in the AlstomRedbank case. Not only is this improper under Connecticut law, it would be inefficient, as this Court would be asked to duplicate determinations to be made in the Redbank case.

Alternatively, if Alstom seeks only a declaratory judgment that Schwing breached the contract by failing to name Alstom as an additional insured, this does not present an actual case or controversy between the parties in the absence of any showing that Alstom suffered tangible injury caused by Schwing's failure to name Alstom on the policy-a showing that could only be made, if ever, after Alstom was found liable to Redbank.

Thus, however plaintiff seeks to characterize its claim related to the contract's indemnity provision, it is not one on which this Court can grant relief.

**E. CUTPA/CUIPA/Negligent Misrepresentation as to Insurance**

Plaintiff has not briefed its CUTPA/CUIPA claim (Count Six) or its negligent misrepresentation claim as to insurance coverage (Count Seven). The allegations in the complaint are similar to Count Four, alleging that Schwing misrepresented that it would name Alstom as an additional insured on its CGL policies for the Redbank project but neglected to do so.

The statute of limitations under CUTPA and CUIPA is three years from the date of the act or omission complained of. Conn. Gen.Stat. § 42-110g(f); Conn. Gen.Stat. § 52-577; *Grant v. City of New Haven,* No. 382068, 1998 WL 59472, at *2 (Conn.Super.Ct. Feb. 3, 1998). Here, plaintiff complains that Schwing misrepresented in the terms of the written contract that it would name Alstom as an additional insured on its CGL policy but failed to do so. The latest date on which the action could have accrued, therefore, is the date the contract was

formed, in this case October 29, 1999, when the purchase order was executed. This date falls outside the three-year statute of limitations. Accordingly, plaintiff's claims under CUTPA and CUIPA are barred and defendant is entitled to summary judgment on those claims.

Plaintiff's negligent misrepresentation claim, also rolled into Count Seven, is based on the identical facts as the CUTPA/CUIPA claim and the breach of contract claim in Count Four, *i.e.,* that defendant promised to name Alstom as an additional insured but failed to do so. As previously discussed with respect to the negligent misrepresentation claim in Count Three, the Connecticut Supreme Court's ruling in *Flagg,* 244 Conn. at 153-55, precludes plaintiff from bringing a misrepresentation claim on the identical facts alleged to be a breach of contract. Furthermore, "pecuniary loss" is an element of negligent misrepresentation, and without any showing of damages resulting from Schwing's alleged misrepresentations concerning its insurance coverage, Alstom cannot succeed on its negligent misrepresentation claim. *Sav. Bank of Manchester v. Ralion Fin. Servs., Inc.,* 91 Conn.App. 386, 389, 881 A.2d 1035, 1037 (Conn.App.Ct.2005).

*9 For the reasons above, defendants are entitled to summary judgment on the CUTPA, CUIPA and negligent misrepresentation allegations in Count Seven.

**IV. Conclusion**

Accordingly, defendants' motion for summary judgment [Doc. # 78] is GRANTED in its entirety and this case will be closed.

IT IS SO ORDERED.

D.Conn.,2006.
Alstom Power, Inc. v. Schwing America, Inc.
Not Reported in F.Supp.2d, 2006 WL 2642412 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



**c**

Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.
Charles D. GIANETTI, M.D., Plaintiff,
v.
BLUE CROSS AND BLUE SHIELD OF CON-
NECTICUT, INC., et al., Defendants.
No. 3:07cv01561 (PCD).

May 6, 2008.

Charles D. Gianetti, Bridgeport, CT, pro se.
Matthew H. Geelan, Michael G. Durham, Donahue,
Durham & Noonan, P.C., Guilford, CT, for Defend-
ants.

### *RULING ON MOTION TO DISMISS*

PETER C. DORSEY, District Judge.

*1 Plaintiff Charles D. Gianetti, M.D. brought this
action against Defendants Blue Cross and Blue
Shield of Connecticut, Inc., Anthem Health Plans,
Inc., Anthem Insurance Companies, Inc.,
(collectively, "Defendant Anthem" or "Anthem"),
as well as Defendants Samaris Rose ("Rose") and
Cynthia Bellamy ("Bellamy"), in Bridgeport Super-
ior Court for state law claims of breach of contract,
quantum meruit, unjust enrichment, fraud and mis-
representation, and violations of Connecticut Unfair
Trade Practices Act ("CUTPA"). Defendant An-
them removed the action to this Court on the
grounds that Plaintiff's claims are preempted by the
Employee Retirement Income Security Act of 1974,
29 U.S.C. § 1001, *et seq.* (2000) ("ERISA") and the
claims raise substantial federal questions. Defend-
ant Anthem filed a Motion to Dismiss the Com-
plaint pursuant to Federal Rule of Civil Procedure
12(b)(6). For the reasons stated herein, the Motion
to Dismiss [Doc. No. 9] is **granted** as to all claims
and all Defendants.

## I. BACKGROUND

For purposes of deciding this motion, the following
factual allegations are assumed to be true. *See Mir-
ee v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct.
2490, 53 L.Ed.2d 557 (1977). Plaintiff's explana-
tion of the facts is less than clear, but the Court
gathers the following. On March 10, 1999, Plaintiff,
a physician in the State of Connecticut, performed
reconstructive plastic surgery and other services on
Rose, a minor child at the time of the surgery, who
was named as a defendant in Plaintiff's state law
complaint. (Compl. Count 1 ¶¶ 1, 5.) Bellamy, also
so named, is the mother of Rose. (Compl. Count 1
¶¶ 3, 4.) As of the date of these medical procedures,
Bellamy and Rose were covered by an employer
sponsored health benefit plan operated by Anthem
and governed by ERISA.^FN1 According to Plaintiff,
Bellamy and Rose signed a statement acknow-
ledging their responsibility for payment of all fees
regardless of insurance, and agreed that Plaintiff
would not send them a statement of charges until
Defendant Anthem paid Plaintiff and completed its
review process. (Compl. Count 2 ¶¶ 11, 15.)

> FN1. Defendant Anthem states that the
> plan in question is an employer sponsored
> health benefit plan governed by ERISA.
> (Aff. of Linda Brink ¶¶ 4, 5.) Plaintiff does
> not dispute this assertion, and the Court ac-
> cepts it as true for the purposes of this rul-
> ing.

Plaintiff subsequently sent Defendant Anthem: (1)
a statement of charges for services performed on
Rose, in the amount of $7,695; and (2) the patient's
assignment of benefits to Plaintiff. (Compl. Count 1
¶ 6.) Defendant Anthem remitted a payment of
$3,019.50 to Plaintiff, stated that it had erroneously
remitted a payment to Rose and/or Bellamy, and
denied part of Plaintiff's charges as not covered.
(Compl. Count 1 ¶¶ 7, 8, 9.) According to the
Plaintiff, Defendant Anthem maintains that it made
payments to Bellamy and Rose, but Plaintiff states
that Bellamy and Rose have denied receiving such
payments. (Compl. Count 5 ¶¶ 24, 26, 27.) Further-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                        Page 2
Slip Copy, 2008 WL 1994895 (D.Conn.), 44 Employee Benefits Cas. 1552
**(Cite as: 2008 WL 1994895 (D.Conn.))**

more, Plaintiff asserts that a September 8, 2000 statement does not reflect Defendant Anthem's payment to Bellamy and Rose or to Plaintiff. (Compl. Count 4 ¶¶ 24, 25.)

Plaintiff made numerous requests to Anthem for the remaining charges, and sent a statement of amount due to Bellamy and Rose. (Compl. Count 1 ¶¶ 10, 11; Compl. Count 2 ¶ 14.) Plaintiff reports that Bellamy and Rose have refused to pay the amount due to Plaintiff. (Compl Count 2 ¶ 16.) Despite having stated that Rose's records had been purged from its files, Defendant Anthem's employee subsequently submitted a listing of the claim's disposition. (Compl. Count 5 ¶¶ 30, 31.)

*2 On September 17, 2007, Plaintiff brought this action in Bridgeport Superior Court against Anthem, Rose, and Bellamy. The complaint alleges breach of contract, quantum meruit, and unjust enrichment against all Defendants, and fraud and misrepresentation and violation of CUTPA against Defendant Anthem. Plaintiff prays for monetary damages, costs, interest, and punitive damages.

On October 24, 2007, Defendant Anthem removed the action to this Court stating that removal was appropriate on the grounds that Plaintiff's claims are preempted by ERISA and the claims raise substantial federal questions.[FN2] (Def. Anthem's Pet. for Removal ¶ 2.) On November 27, 2007, Plaintiff was granted leave for extension of time to respond to the notice of removal, though he did not subsequently file a response. On January 24, 2008, Defendant Anthem filed a motion to dismiss on the grounds that Plaintiff's state law claims are preempted by ERISA. Plaintiff requested and was granted an extension of time until March 14, 2008 to file an objection. On March 17, 2008, without leave from the court, Plaintiff filed a late objection to the motion to dismiss. In deference to Plaintiff's *pro se* status,[FN3] the Court has considered the arguments therein, notwithstanding the late filing.

> FN2. Bellamy and Rose never joined Defendant Anthem's Notice of Removal. De-

fendant Anthem informed the Court that Bellamy and Rose were contacted by Defendant Anthem regarding the Notice of Removal and they took no position on removal. (Def. Anthem's Removal Statement ¶ 5.) Remand to State court is not appropriate on this ground because Bellamy and Rose have waived any objection to removal by their failure to respond. *See Allstate Ins. Co. v. Zhigun*, No. 03 Civ. 10302, 2004 WL 187147, at *3 n. 2 (S.D.N.Y. Jan. 30.2004) (citing *Loftis v. United Parcel Service, Inc.,* 342 F.3d 509, 516-517 (6th Cir.2003); *Parrino v. FHP,* 146 F.3d 699, 703 (9th Cir.1998)) ("Failure to comply with the rule of unanimity in a notice of removal, is, unlike lack of subject matter jurisdiction, a procedural defect that is waived thirty days after the notice of removal is filed.").

> FN3. While *pro se,* Plaintiff is in fact an experienced litigator, as he has filed almost 200 cases similar to this one. *See Gianetti v. Siglinger,* No. CV980349830, 2004 WL 1098443, at *4 (Conn.Super.Ct. Apr.26, 2004). The State of Connecticut has also brought suit against Plaintiff for violations of CUTPA, alleging balance billing of clients in situations similar to those involved here. Complaint, *State of Connecticut v. Gianetti,* No. CV-04-4033348-S (Conn.Super.Ct. Jul. 21, 2004).

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) must be decided on "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999). In deciding a motion to dismiss, well-pleaded facts must be accepted as true and considered in the light most favorable to the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                        Page 3
Slip Copy, 2008 WL 1994895 (D.Conn.), 44 Employee Benefits Cas. 1552
**(Cite as: 2008 WL 1994895 (D.Conn.))**

Plaintiff. *Patane v. Clark,* 508 F.3d 106, 111 (2d Cir.2007). The issue in deciding a motion to dismiss is "not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995). The factual allegations made in the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1959, 167 L.Ed.2d 929 (2007). This requires the complaint to contain "enough fact to raise a reasonable expectation that discovery will reveal evidence" of the Plaintiff's claim. *Id.*

## II. DISCUSSION

### A. Jurisdiction

A defendant may only remove an action to district court if the plaintiff could have brought the action in the district court in the first instance. *See* 28 U.S.C. § 1441(a) (2002) ("[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant ... to the district court of the United States."). Among the cases over which federal courts have original jurisdiction are those cases "arising under" federal law. 28 U.S.C. § 1331 (1980)."It is long settled law that a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law." *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (citing *Gully v. First Nat'l Bank,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936)). Generally, the plaintiff is "master" of the complaint and the defendant's federal defense to a state law complaint does not provide grounds for removal to district court. *The Fair v. Kohler Die & Specialty Co.,* 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913); *Gully,* 299 U.S. at 116. A major exception to the well-pleaded complaint rule is that "Congress may so completely pre-empt a particular area that any

civil complaint raising this select group of claims is necessarily federal in character." *Metropolitan Life Ins. Co.,* 481 U.S. at 63-64. ERISA is one such area. A cause of action within the scope of the civil enforcement provisions of ERISA § 502(a) [29 U.S.C. § 1132(a) ] is "necessarily federal in character by virtue of the clearly manifested intent of Congress" and is removable to federal court. *Metropolitan Life Ins. Co.,* 481 U.S. at 66-67. Despite the absence of any federal issue on the face of Plaintiff's complaint, this case falls within the scope of ERISA's civil enforcement provisions and, therefore, was properly removed to this Court. This Court, as a result, has jurisdiction over this case.

### B. ERISA Preemption of State Law Claims Brought by the Assignee of Benefits

*3 It is uncontested that Plaintiff is a health benefit plan beneficiary by way of Bellamy and Rose's assignment of rights to Plaintiff. (Def. Mot to Dismiss 10 n. 2; Pl. Obj. to Mot. to Dismiss 6.) Plaintiff contends, however, that as a third-party healthcare provider, as opposed to a plan participant, his state law claims cannot be preempted by ERISA because his claims do not relate to the plan's administration. (Pl.'s Mot. to Dismiss 5.) Plaintiff argues that as a third-party health care provider, he may bring claims in his capacity as an assignee and in his own right, concurrently. (*Id.* at 6.)

A participant or beneficiary is empowered under ERISA's civil enforcement scheme to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."29 U.S.C. § 1132(a)(1)(B) (2006). Accordingly, the Second Circuit has held that third-party health care providers, as assignees of beneficiaries, have standing to bring suit under ERISA claiming their assigned benefits. *I.V. Servs. of Am., Inc. v. Trs. of Am. Consulting Eng'rs Council Ins. Trust Fund,* 136 F.3d 114, 117 n. 2 (2d Cir.1998) ("[T]he assignees of beneficiaries to an ERISA-governed insurance plan have

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                     Page 4
Slip Copy, 2008 WL 1994895 (D.Conn.), 44 Employee Benefits Cas. 1552
**(Cite as: 2008 WL 1994895 (D.Conn.))**

standing to sue under ERISA."). Given that Plaintiff had standing to bring suit under ERISA, Plaintiff's state law claims are subject to ERISA preemption, if appropriate. *See, e.g., Weisenthal v. United Health Care Ins. Co. of N. Y.,* Nos. 07 Civ. 1175, 07 Civ. 0945, 2007 WL 4292039, at *4 (S.D.N.Y. Nov.29, 2007) (holding that ERISA preempted the plaintiff heath care provider's state law claims after finding the plaintiff had standing to sue).

### C. The Preemption Clause

In enacting ERISA,

> "Congress sought principally to address concerns that lack of uniformity and the administrative and financial burdens of compliance with conflicting state laws might work to the detriment of plan beneficiaries, and reduce the willingness of employers to adopt such plans, or lead to a reduction in the level of benefits furnished."

*Plumbing Indus. Bd. v. Howell Co.,* 126 F.3d 61, 66 (2d Cir.1997) (citing *Ingersoll-Rand Co. v. Mc-Clendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990)). Thus, Congress's principle goal was to "protect ... the interests of participants in employee benefit plans and their beneficiaries." *Aetna Health Inc. v. Davila,* 542 U.S. 200, 208, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004) (quoting 29 U.S.C. § 1001(b)). To ensure the uniformity of benefits law, ERISA contains an express preemption clause, providing, with some exceptions, that ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a) (2006).*See also Howell,* 126 F.3d at 66.

To find ERISA preemption, however, the moving party must defeat the presumption that Congress did not intend to supersede state law. *Howell,* 126 F.3d at 66-67. In considering whether Congress intended preemption, the Supreme Court noted that

"if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), [29 U.S.C. § 1132(a)(1)(B),] and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)." *Davila,* 542 U.S. at 210. The Court must determine, therefore, "whether plaintiff 'at some point in time, could have brought [his] claim under ERISA § 502(a)(1)(B)' and if so, whether any 'independent legal duty is implicated by [defendants'] actions." *Curcio v. Hartford Fin. Servs. Group,* 469 F.Supp.2d 18, 22 (D.Conn.2007) (quoting *Davila,* 542 U.S. at 210). Further, "[i]f the alleged liability is derived from or dependent upon the existence and administration of an ERISA-regulated benefit plan, then the state-law claims are not 'entirely independent of the federally regulated contract itself,' and are therefore preempted."*Id.* (quotation omitted). State laws are not independent of the ERISA plan if the interpretation of the terms of the benefits "forms an essential part of" the plaintiff's claims and the defendant's alleged liability.*Davila,* 542 U.S. at 213.

### D. Counts One, Three, and Four: Breach of Contract, Quantum Meruit, and Unjust Enrichment as to Defendant Anthem

*4 Defendant Anthem contends that all of Plaintiff's claims are preempted by ERISA because of courts' "expansive construction of ERISA's preemption clause," because the claims relate to the ERISA plan, and because precluding preemption would undermine ERISA's comprehensive civil enforcement scheme. (Def.'s Mot. to Dismiss 3, 10.) In reply, Plaintiff argues that his breach of contract claim is not preempted by ERISA because ERISA's civil enforcement provisions authorize him to bring such a claim. (Pl.'s Obj. to Mot. to Dismiss 2.)

According to the Supreme Court's decision in *Davila,*"if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independ-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 5
Slip Copy, 2008 WL 1994895 (D.Conn.), 44 Employee Benefits Cas. 1552
(Cite as: 2008 WL 1994895 (D.Conn.))

ent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)." *Davila,* 542 U.S. at 210. Plaintiff's breach of contract, quantum meruit, and unjust enrichment state law claims are all interrelated for purposes of the *Davila* analysis. For these state law claims, the first *Davila* factor for preemption is satisfied because, as previously discussed, Plaintiff could have brought his claim under ERISA. As a plan beneficiary, pursuant to his assigned rights, Plaintiff had standing to recover benefits under ERISA. *Curcio v. Hartford Fin. Servs. Group,* 469 F.Supp.2d 18, 23 (D.Conn.2007).

The second *Davila* factor is whether defendant's actions implicate any legal duty independent of the ERISA plan. Plaintiff's breach of contract, quantum meruit, and unjust enrichment claims are "derived from or dependent upon the existence and administration of" the ERISA plan. *Curcio,* 469 F.Supp.2d at 23 (quotation omitted). Plaintiff alleges that Defendants have received the value of his services and have failed to pay the amount due for the services. (Compl. Count 3 ¶¶ 29, 30.) Recovery of benefits under the ERISA plan requires an initial determination of the nature and extent of Plaintiff's benefits under the plan. Plaintiff's benefits under the ERISA-regulated plan dictate both the value of the services and, as a result, the amount due for those services. *Curcio,* 469 F.Supp.2d at 23. "[I]nterpretation of the terms of [plaintiff's] benefit plan[ ] forms an essential part of [his state law claim], and ... liability would exist here only because of [defendant's] administration of ERISA-regulated benefits plans. [Defendant's] potential liability under [state law] in [this case], then, derives entirely from the particular rights and obligations established by the benefit plans." *Davila,* 542 U.S. at 213. Plaintiff's breach of contract, quantum meruit, and unjust enrichment claims, thus, are "not entirely independent of the federally regulated contract itself." *See Curcio,* 469 F.Supp.2d at 23 (citing *Davila,* 542 U.S. at 210). Rather, Plaintiff brings suit to recover payments he alleges were promised

or due to him under the ERISA plan.

**\*5** In *Weisenthal v. United Health Care Insurance Co. of New York,* the Southern District of New York decided a similar case in which the plaintiff brought various state law claims seeking damages for the defendant's decision not to cover certain medical procedures under its ERISA-regulated healthcare insurance plans. 2007 WL 4292039, at *1, 6 (S.D.N.Y. Nov.29, 2007). The Southern District of New York explained that all of the claims were grounded in the ERISA-regulated plan and thus the defendant's actions did not implicate an independent legal duty.

> "Plaintiffs allege fraud insofar as Defendants [refused to provide] reimbursement for procedures that should have been reimbursed. By failing to reimburse patients for procedures that should have been reimbursed, Plaintiffs allege that Defendants were unjustly enriched, and that Plaintiffs are now entitled to the reasonable value of the services rendered in quantum meruit. By refusing to reimburse patients, Plaintiffs allege that Defendants infringed on the contractual relationship established in the Agreements.... The conduct of which Plaintiffs complain, however, is nothing more than the manner by which Defendants decided not to reimburse patients. Such was the same situation confronted by the *Davila* Court, and the same result obtains here: Plaintiffs' common law claims seek 'only to rectify a wrongful denial of benefits promised under ERISA-regulated plans and do not attempt to remedy any violation of a legal duty independent of ERISA.'"

*Id.* at *6 (quoting *Davila,* 542 U.S. at 213) (internal citations omitted).*See also Berry v. MVP Health Plan, Inc.,* No. 1:06-CV-120, 2006 WL 4401478, at *8 (N.D.N.Y. Sept. 30, 2006) (holding that ERISA preempted the plaintiff's unjust enrichment claim because "[c]onsideration of this claim necessarily entails an examination of the [ERISA] plan which governs each of plaintiffs' claims, as assignees, for benefits.").

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

For the reasons stated herein, Plaintiff's claims of breach of contract, quantum meruit, and unjust enrichment as to Defendant Anthem are **dismissed.**

### E. Counts Five and Six: Fraud, Misrepresentation, and Connecticut Unfair Trade Practices Act (CUTPA) Violation as to Defendant Anthem

Defendant Anthem contends that ERISA preempts Plaintiff's fraud and misrepresentation claims. (Def.'s Mot. to Dismiss 1; Def's Reply in Supp. of Mot. to Dismiss 1-6.) Plaintiff argues that ERISA does not preempt claims when the "deception only incidentally concerned" the benefits, or because fraud is of special interest to the state. (Pl.'s Obj. to Mot. to Dismiss 3-4.) Plaintiff also suggests that because the misrepresentation claim would exist regardless of ERISA coverage, it is not preempted. (*Id.* at 6.)

The Second Circuit has held that "ERISA preempts state common law claims of fraudulent or negligent misrepresentation when the false representations concern the existence or extent of benefits under an employee benefit plan." *DaPonte v. Manfredi,* 157 Fed. Appx. 328, 330 (2d Cir.2005) (quotation omitted). In *DaPonte,* the Second Circuit held that ERISA did not completely preempt plaintiffs' state law claims of negligent and fraudulent misrepresentation when the defendant promised medical coverage upon a certain date and subsequently failed to provide the coverage, but made no "misrepresentations regarding the existence or extent of benefits *under an employee benefit plan.*" *Id.* at 330-31 (internal quotation omitted) (emphasis in original). The Second Circuit distinguished *Cicio v. Does 1-8,* 321 F.3d 83, 92-93 (2d Cir.2003), in which ERISA preempted a claim for state law malpractice when a Defendant misrepresented "crucial terms in the plan ... which materially affected the extent of plaintiff's coverage under the plan." *DaPonte,* 157 Fed. Appx. at 330.

**\*6** In *Geller v. County Line Auto Sales, Inc.,* on which Plaintiff relies, the Second Circuit held that

ERISA did not preempt a state law fraud claim. 86 F.3d 18, 22-23 (2d Cir.1996). There, the plaintiffs alleged that the defendants fraudulently misrepresented the employment status of an individual and, in reliance on the misrepresentation, the plaintiffs paid benefits on her behalf. *Id.* at 19-20.Unlike in this case, the claim in *Geller* did not "rely on the [ ] plan's operation or management." *Id.* at 22-23.Instead, "[t]he plan [in *Geller]* was only the context in which this garden variety fraud occurred."*Id.* Plaintiff alleges that Defendant Anthem fraudulently concealed and misrepresented payments and its denial of review of claims made under the ERISA plan. (Compl. Count 5 ¶ 32.) Assuming the facts alleged in the complaint, Anthem's fraud and misrepresentation concern both the existence and extent of benefits under the plan and involve the plan's management. The denial of charges, the alleged lack of timely review of the denial of charges, and the alleged purging of the patient's records from Anthem's files (Compl. Count 5 ¶¶ 28-32) are all closely related to the manner in which Anthem manages the plan and have substantial impact on Plaintiff's benefits under the plan. These are not akin to the garden variety fraud in *Geller.*ERISA, therefore, preempts Plaintiff's fraud and misrepresentation claims, and these claims are **dismissed** as to Defendant Anthem.

Plaintiff's Connecticut Unfair Trade Practices Act (CUTPA) claim is similarly preempted by ERISA. Plaintiff alleges that the acts of fraud and misrepresentation constitute violations of CUTPA. (Compl. Count 6 ¶ 34.) Under controlling precedent, ERISA preempts CUTPA claims. *See, e.g., Levine v. Hartford Life Ins. Co.,* No. Civ. A. 302CV81, 2002 WL 1608330, at \*2 (D. Conn. June 28, 2002); *Krass v. Connecticare, Inc.,* No. Civ. 3:96CV2565, 1998 WL 26409, at \*5 (D.Conn. Jan.14, 1998). The reasoning supporting ERISA preemption of fraud and misrepresentation claims extends to CUTPA claims. The alleged unfair and deceptive acts are closely related to the operation of the plan and have a substantial impact on the existence of and the extent to which Defendant Anthem

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1994895 (D.Conn.), 44 Employee Benefits Cas. 1552
(Cite as: 2008 WL 1994895 (D.Conn.))

owes payments to Plaintiff under the plan. There-fore, Plaintiff's CUTPA claims as to Defendant An-them are also **dismissed.**

### F. The "Savings Clause"

Plaintiff does not argue that his state law claims fall within ERISA's "savings clause," and the Court agrees with Defendant Anthem's contention that the claims do not fall within the savings clause. ERISA does not preempt state laws falling within its "savings clause," 29 U.S.C. § 1144(b)(2)(B). The savings clause provides that ERISA plans are not exempt from state laws "regulat[ing] insurance companies, insurance contracts, banks, trust companies, or investment companies."29 U.S.C. § 1144(b)(2)(B) (2006).

*7 The Supreme Court held that a court should con-sider two factors in determining whether a state law regulates insurance within the meaning of the sav-ings clause. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 50, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). First, the court must "consider the 'common-sense view' of the term 'regulates insurance' which suggests that 'in order to regulate insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that in-dustry.'" *Howard v. Gleason Corp.,* 901 F.2d 1154, 1158 (2d Cir.1990) (emphasis omitted) (quoting *Pi-lot Life,* 481 U.S. at 50). Second, in interpreting the savings clause, the court should by guided by judi-cial interpretation of "the business of insurance" under the McCarran-Ferguson Act, 15 U.S.C. § 1011, *et seq. Pilot Life,* 481 U.S. at 48. Under the McCarran-Ferguson Act, courts determine, "[f]irst, whether the [state law] has the effect of transferring or spreading a policyholder's risk; second, whether the [state law] is an integral part of the policy rela-tionship between the insurer and the insured; and third, whether the [state law] is limited to entities within the insurance industry." *Id.* at 48-49 (emphasis omitted).

Under the first consideration, Plaintiff's state law

claims of breach of contract, quantum meruit, un-just enrichment, fraud, misrepresentation and viola-tions of CUTPA are not directed specifically at the insurance industry, but rather are laws of general application. *See, e.g., UNUM Life Ins. Co. of Am. v. Ward,* 526 U.S. 358, 377 n. 7, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) (noting that a common law cause of action for bad-faith breach of contract was not "specifically directed to the insurance industry and therefore not saved from ERISA preemption"); *see also Bailey-Gates v. Aetna Life Ins. Co.,* 890 F.Supp. 73, 79 (D.Conn.1994) ("[I]t is well-established in this district that ERISA's savings clause does not except [ ] CUTPA ... claims from preemption.").

Similarly, Plaintiff's state law claims do not satisfy the McCarren-Ferguson Act criteria, and are thus not saved by the savings clause. None of the state law claims presented here transfer or spread policy-holder's risk, constitute an integral part of the policy relationship between the insurer and the in-sured, nor are the laws limited to entities within the insurance industry.

### G. Supplemental Jurisdiction Over Claims Against Bellamy and Rose

Plaintiff contends that his state law breach of con-tract, quantum meruit, and unjust enrichment claims against Bellamy and Rose are not preempted by ERISA. (Obj. to Mot. to Dismiss 1.) Indeed, Plaintiff's state law claims against Bellamy and Rose are not preempted by ERISA because they im-proper defendants to an ERISA suit. The Second Circuit has held that "in a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." *Crocco v. Xerox Corp.,* 137 F.3d 105, 107 (2d Cir.1998) (quoting *Leonelli v. Pennwalt Corp.,* 887 F.2d 1195 (2d Cir.1989)). Plaintiff does not suggest that Bellamy and Rose are administrat-ors nor trustees of the plan, and therefore, as plan participants, Bellamy and Rose are improper de-fendants to this ERISA suit.

Slip Copy                                                                    Page 8
Slip Copy, 2008 WL 1994895 (D.Conn.), 44 Employee Benefits Cas. 1552
(Cite as: 2008 WL 1994895 (D.Conn.))

**\*8** This Court has supplemental jurisdiction over Plaintiff's state law claims against Bellamy and Rose. "In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."28 U.S.C. § 1367(a) (1990). Accordingly, "28 U.S.C. § 1367(a)... makes pendent party jurisdiction possible where the claim in question arises out of the same set of facts that give rise to an anchoring federal question claim against another party." *Kirschner v. Klemons,* 225 F.3d 227, 239 (2d Cir.2000); *see also City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 164, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (holding state law claims form part of the same case if they and the federal claims "derive from a common nucleus of operative fact").

Plaintiff's claims against Defendants Anthem, Bellamy and Rose arise from the same operative facts. Plaintiff could not have a claim against Anthem without the assignment of Bellamy and Rose's ERISA-governed rights and benefits to Plaintiff, nor could he have a claim against Bellamy and Rose without Anthem's denial of charges. Plaintiff's claims against Anthem, Bellamy, and Rose all arise out of their alleged failure to compensate Plaintiff for the services performed on March 10, 1999. (Compl. Count 1 ¶¶ 5, 11; Compl. Count 2 ¶ 16.) Since Plaintiff's state law claims against Bellamy and Rose derive from the same set of facts as his federal claims against Anthem, the Court has supplemental jurisdiction over Plaintiff's state law claims against Bellamy and Rose.

**H. Count Two, Three, and Four: Breach of Contract, Quantum Meruit, and Unjust Enrichment as to Bellamy and Rose**

Plaintiff alleges that minor child Rose and her mother, Bellamy, had signed a contract with Plaintiff stating that they were "responsible for the payment of all fees [in connection to the March 10, 1999 medical care] regardless of insurance."He further alleges that they breached the contract by failing to remit payment for the services he performed after Anthem denied payment and completed its review process. (Compl. Count 2 ¶¶ 12-17.) Plaintiff also makes claims against Bellamy and Rose for quantum meruit and unjust enrichment.

Bellamy and Rose are not liable under this contract. Connecticut General Statutes § 20-7f(b) provides: "It shall be an unfair trade practice in violation of Chapter 735a [Conn. Gen.Stat. § 42-110a, *et seq.]* for any health care provider to request payment from an enrollee, other than a co-payment or deductible, for medical services covered under a managed care plan."Furthermore, Plaintiff has been instructed by Connecticut state courts that "he cannot engage in balance billing for covered services." *Gianetti v. Siglinger,* No. CV980349830, 2004 WL 1098443, at \*4 (Conn.Super.Ct. Apr.26, 2004); *see also Gianetti v. Siglinger,* 279 Conn. 130, 900 A.2d 520, 524 (Conn.2006) ("[P]laintiff was well aware that the practice [of balancing billing] was prohibited through court decisions and statutes."). Therefore, with respect to his claims against Bellamy and Rose, Plaintiff has failed to state a cause of action upon which relief can be granted. Plaintiff's claims against Bellamy and Rose may also be time-barred, given that the medical procedures took place in March 1999 and Plaintiff did not file his complaint until September 2007.[FN4]For the reasons stated herein, Plaintiff's claims against Defendants Bellamy and Rose are **dismissed** pursuant to Federal Rule of Civil Procedure 12(b)(6).

> FN4. The applicable Connecticut statute of limitations for breach of contract, quantum meruit, and unjust enrichment is six years. Conn. Gen.Stat. § 52-576(a). While Plaintiff's Complaint fails to state the date of the alleged contract, it seems reasonable to assume that it was signed on or about

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the date of the procedures to which it relates.

## I. Plaintiff's Request to Amend the Complaint

*9 Plaintiff requests that the Court consider his claims as if they had been made under ERISA or, in the alternative, grant him leave to amend his complaint. (Pl.'s Obj. to Mot. to Dismiss 3.) Defendant Anthem objects to this request. (Def.'s Reply in Supp. of Mot. to Dismiss 7 n. 1.) The Court declines to grant Plaintiff leave to amend his complaint, nor will the Court consider ERISA claims that Plaintiff has not pled. When, as is the case here, a party cannot amend the complaint as a matter of course, the party "may amend its pleading only with the opposing party's written consent or the court's leave."Fed.R.Civ.P. 15(a)(2). The Court's discretion is properly exercised to deny leave to amend in the presence of an "apparent or declared reason," including "undue delay, bad faith ... on the part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The Court finds that such factors are present here.

As noted previously, Plaintiff has filed numerous unsuccessful suits against insurers and former patients, raising claims similar to those in this suit. *See Gianetti v. Siglinger,* 279 Conn. 130, 900 A.2d 520, 524 (Conn.2006) ( "[T]he trial court noted other litigation arising out of the plaintiff's practice of balance billing and concluded that the plaintiff was well aware that the practice was prohibited through court decisions and statutes.").*See also Gianetti v. Greater Bridgeport Individual Practice Ass'n,* 2005 WL 2078546, n. 15 (Conn.Super. July 21, 2005) ("[T]he plaintiff's tactics in filing multitudinous lawsuits, most of which have proven to have no merit, overburden the public courts to further the plaintiff's selfish interests and amount to an abuse of the judicial process."). The appearance of bad faith on the part of Plaintiff in the filing of this suit

makes the Court disinclined to permit him to amend his Complaint. Furthermore, the incidents underlying Plaintiff's allegations against Anthem took place between 1999 and 2001, and thus it appears that Plaintiff's claims against Anthem, raised in 2007, are likely time-barred, which would render amendment futile.[FN5] Plaintiff's request for leave to amend his Complaint is denied.

> FN5. "As ERISA does not prescribe a limitations period for actions under § 1132, the controlling limitations period is that specified in the most nearly analogous state limitations statute." *Miles v. N.Y. State Teamsters Conference Pension & Ret. Plan,* 698 F.2d 593, 598 (2d Cir.1983). Here, the applicable statute of limitations are those under Connecticut state law. *See Cole v. Travelers Ins. Co.,* 208 F.Supp.2d 248, 252 & n. 2 (D.Conn.2002). The applicable Connecticut statutes of limitations are six years for breach of contract, quantum meruit, and unjust enrichment, Conn. Gen.Stat. § 52-576(a); three years for fraud and misrepresentation, Conn. Gen.Stat. § 52-577; and three years for CUTPA violations, Conn. Gen.Stat. § 42-110g(f).

For the reasons stated herein, the Motion to Dismiss [Doc. No. 9] is **granted** as to all parties and claims. The Clerk shall close the case.

SO ORDERED.

D.Conn.,2008.
Gianetti v. Blue Cross and Blue Shield of Connecticut, Inc.
Slip Copy, 2008 WL 1994895 (D.Conn.), 44 Employee Benefits Cas. 1552

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.

Not Reported in F.Supp., 1985 WL 1979 (S.D.N.Y.)

**(Cite as: 1985 WL 1979 (S.D.N.Y.))**

**c**

Only the Westlaw citation is currently available.

United States District Court; S.D. New York.

UNION ENGINEERING COMPANY, Plaintiff,

v.

THE TITAN INDUSTRIAL CORPORATION, Defendant.

No. 83 Civ. 6369-CSH.

June 27, 1985.

MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

*1 Defendant's motion for summary judgment dismissing the complaint is granted.

If the document plaintiff attached to its complaint constitutes the contract of sale between the parties, plaintiff's suit is time barred for failure to commence it within one year of the date of delivery of the goods, as required by ¶3(d) of the contract. Plaintiff does not suggest that this time limitation is unconscionable; nor could it do so in view of the express provision in U.C.C. § 2-725(1).[FN1]

The question therefore arises whether there is a genuine issue as to the material fact of whether this document constitutes the contract between the parties. Rule 56(c), F.R.Civ.P. In his affidavit, Stephen A. Levy, executive vice president of Titan, swears that the document to which plaintiff referred in its complaint does in fact constitute the written agreement between the parties. Plaintiff attached only a partial copy of the contract to the complaint; the Levy affidavit attaches a full copy, and it is in that full copy that the limitation of time for suit appears.

Faced with this presentation, it was plaintiff's burden in opposing the motion for summary judgment to demonstrate 'specific facts showing that there is a genuine issue for trial.'Failing such showing, summary judgment will issue.Rule 56(e). In the

case at bar, plaintiff is at something of a disadvantage in denying the existence of the contract upon which defendant relies, plaintiff itself having pleaded the contract in its complaint and having attached a copy of it, albeit partial. It is of course well recognized that a plaintiff is bound by the allegations made in the complaint; they are regarded as conclusive judicial admissions. O'Neil v. Four States Builders and Remodelers, Inc., 484 F.Supp. 18 (E.D.Pa. 1979); Giles v. St. Paul Fire and Marine Insurance Co., 405 F.Supp. 719 (N.D.Ala. 1975); Hall v. United States, 314 F.Supp. 1135 (N.D.Cal. 1970).

Notwithstanding that rule, I would consider releasing Union from its rigors if the papers in opposition to defendant's motion coupled a foursquare denial under oath that the document constituted the agreement between the parties with a plausible explanation as to why counsel, in drafting the complaint, alleged otherwise. But the papers in opposition to defendant's motion are entirely deficient in these respects. There is no categorical, sworn statement from an officer of the corporate plaintiff that the document in question did not constitute the agreement between the parties. Surely, in the present posture of the pleadings, that is the least which plaintiff should have offered. All we have in the present record is the following passage from the deposition of Mr. Venkateswaran, plaintiff's president (Exhibit 3 to plaintiff's papers). The witness testified (Tr. 22):

Q. But you did sign a sales contract with Titan, did you not?

A. I signed so many papers after that. I signed so many letters after that-I mean, a sales contract I signed, if I remember right. But it is of not much importance to us because the LC is the main thing. The letter of credit is the main thing for that.

*2 Even as you mean that I am signing a sales contract or not, the LC, if I don't open LC, it is not a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1985 WL 1979 (S.D.N.Y.)
**(Cite as: 1985 WL 1979 (S.D.N.Y.))**

valid one.

On the controlling question of whether or not plaintiff executed the document in question, it is difficult to say whether this testimony is guileless or artful. In either event, it fails to satisfy the burden falling upon plaintiff, in view of the unequivocal declarations made by defendant in support of its motion for summary judgment on the ground of time bar.

Accordingly defendant is entitled to summary judgment dismissing the complaint with prejudice.

Plaintiff's cross-motion seeks to establish the letter of credit entered into to facilitate this transaction as the contract of sale between the parties. That argument, if well founded, would implicate the four-year period of time for suit under § 2-725(1). But there is nothing to this argument. As noted, defendant's motion establishes the existence of the contract of sale; and it is well recognized that a letter of credit, far from being a substitute for the contract of sale, is instead 'a contract between the bank and the beneficiary of the letter that is separate and district from the commercial contract between the beneficiary (usually the seller) and the bank's customer (usually the buyer). The letter of credit is not tied to or dependent upon the underlying commercial transaction.'Marino Industries v. Chase Manhattan Bank, N.A., 686 F.2d 1112, 1115 (2d Cir. 1982).

Defendant's motion for summary judgment is granted. Plaintiff's cross-motion is denied. The Clerk of the Court is directed to dismiss the complaint with prejudice.

It is SO ORDERED.

FN1 This provides:

'(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may

not extend it.' 62- 1/2 McKinney's Consol. L. of N.Y. at 702 (1964).

S.D.N.Y. 1985.
Union Engineering Co. v. Titan Industrial Corp.
Not Reported in F.Supp., 1985 WL 1979 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1277991 (S.D.N.Y.), 33 Employee Benefits Cas. 1273
**(Cite as: 2004 WL 1277991 (S.D.N.Y.))**

▷

United States District Court, S.D. New York.
Sue DOWNES, Plaintiff,
v.
JP MORGAN CHASE & CO., Employee Welfare
Benefit Plans, Employee Benefit Plans, 401k Sav-
ings Plan and Employee Stock Option Program,
Defendants.
**No. 03 Civ.8991(GEL).**

June 8, 2004.

Shira J. Rosenfeld, New York, NY, for Plaintiff.
Mark G. Cunha, Simpson Thacher & Bartlett LLP,
New York, N.Y. (Vincent R. FitzPatrick III, on the
brief), for Defendants.

### OPINION AND ORDER

LYNCH, J.

*1 Sue Downes brought this action under the Em-
ployee Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. § 1001*etseq.,* the Equal Pay
Act, 29 U.S.C. § 206(d)(1), and New York State
law to recover certain employee benefits. Downes
alleges that defendant J.P. Morgan Chase &
Co.[FN1] wrongfully classified her as an independent
contractor rather than as an employee and on that
basis denied her, among other benefits, health care,
bonuses, vacation, and severance pay. She also al-
leges that J.P. Morgan discriminated against her by
paying similarly-situated male employees more
than she received. J.P. Morgan moves to dismiss,
arguing that Downes's complaint is largely time-
barred and, as to most counts, fails to state a claim
on the merits. For the reasons that follow, the mo-
tion will be granted in part and denied in part.

> FN1. Defense counsel represents J.P. Mor-
> gan and 401K Savings Plan, and states that
> it is unaware of the existence of the other
> named defendants, but nevertheless sub-
> mits this motion on behalf of any J.P. Mor-

gan plan or program to the extent that such
have been validly named and served by
Downes. (D. Br. 1 n. 1.) The defendants
will be referred to collectively as "J.P.
Morgan."

### BACKGROUND

The following facts, drawn from the complaint,
must be accepted as true for purposes of this motion
to dismiss. *See Bolt Elec., Inc. v. City of New York,*
53 F.3d 465, 469 (2d Cir.1995). J.P. Morgan main-
tains and administers various benefits plans for its
employees, which entitle them to health care, vaca-
tion, paid sick and holiday leave, severance, and a
pension plan. (Compl.¶ 10.) In June 1993, Downes
began to perform work for Chase Manhattan Bank-
ing Corporation, J.P. Morgan's
predecessor.[FN2] (*Id.* ¶ 14 .)

> FN2. Downes's complaint repeatedly refers
> to Downes as an employee and alleges that
> J.P. Morgan employed her. (*E.g.,* Compl.
> ¶¶ 3, 14-15, 34.) Insofar as Downes
> thereby alleges that J.P. Morgan
> "employed" her within the meaning of the
> relevant federal statutes, the Court need
> not and does not accept as true such legal
> conclusions couched as factual allegations.
> *Mason v. Am. Tobacco Co.,* 346 F.3d 36,
> 39 (2d Cir.2003).

In February 2003, Downes and J.P. Morgan entered
into a one-year employment contract. In May 2003,
Downes stopped working for J.P. Morgan because,
she alleges, it discharged her. (*Id.* ¶ 15.) At no time
did J.P. Morgan or its predecessor provide her em-
ployee benefits of any kind. (*Id.* ¶¶ 10, 21, 35, 48.)
Nor, after she ceased to perform work for J.P. Mor-
gan, did it provide her severance pay or continuing
healthcare coverage. (*Id.* ¶¶ 27, 41.)

Downes alleges that J.P. Morgan deliberately
"misclassif[ied] her as a consultant and/or inde-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1277991 (S.D.N.Y.), 33 Employee Benefits Cas. 1273

**(Cite as: 2004 WL 1277991 (S.D.N.Y.))**

pendent contractor with the specific intent to deny her benefits."(*Id.* ¶ 38.) She also alleges that J.P. Morgan paid similarly-situated male employees, "who had jobs that required equal skill, effort and responsibility and were performed under similar working conditions," higher wages than she received. (*Id.* ¶ 57.)

## DISCUSSION

### I. *Standard on a Motion to Dismiss*

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in her favor. *Leeds v.. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The Court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of h[er] claim that would entitle h[er] to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

### II. *ERISA Claims*

The gravamen of the complaint is that J.P. Morgan misclassified Downes with the intent to deny her various benefits enjoyed by J.P. Morgan employees under ERISA-governed plans that it maintains and administers. Downes brings her first three claims under ERISA §§ 404, 502(a)(1)(B), and 510, codified, respectively, at 29 U.S.C §§ 1104, 1132(a)(1)(B), and 1140. J.P. Morgan argues that the statute of limitations bars all of these claims, and that each in any event fails on the merits.

### A. *Denial of Benefits*

***2** As a threshold issue, the Court notes that while Downes brings her first two claims under distinct statutory sections, each seeks substantially the same relief: damages for benefits that Downes alleges J.P. Morgan wrongfully withheld from her. J.P.

Morgan correctly argues that insofar as Downes purports to bring her first claim pursuant to ERISA § 409, 29 U.S.C. § 1109 (Compl.¶ 32), she fails to state a claim. ERISA § 409 makes fiduciaries liable for breaches of the standard of care set forth in § 404.[FN3] But it makes them liable to the plan, not to individuals. Section 409(a) provides in relevant part that a fiduciary "shall be personally liable to make good to [an ERISA] plan any losses to the plan resulting from [his or her] breach, and to restore to such plan any [wrongful] profits of such fiduciary."29 U.S.C. § 1109(a). ERISA § 409 therefore does not provide a private right of action for individual damages; suits under § 409 must seek recovery on behalf of the plan as a whole. *See Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 140 (1985); *Rudolph v. Joint Indus. Bd. of the Elec. Indus.,* 137 F.Supp.2d 291, 297 (S.D.N.Y.2001). To the extent that Downes purports to bring her first claim for breach of fiduciary duty "[p]ursuant to ERISA § 409" (Compl.¶ 32), she therefore fails to state a cognizable claim.

> FN3. In general, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."29 U.S.C. § 1104(a)(1)(B).

But Downes may, and does in her second claim (Compl.¶¶ 33-36), seek essentially the same relief under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), which gives participants in or beneficiaries of plans a right of action "to recover benefits due to [them] under the terms of the plan[s], or to clarify [their] rights to future benefits."*Id.;see Rudolph,* 137 F.Supp.2d at 297. Furthermore, while the complaint does not cite ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Downes argues in her brief that she also can bring a cause of action for breach of fiduciary duty under that subsection, which provides a right of action to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                        Page 3
Not Reported in F.Supp.2d, 2004 WL 1277991 (S.D.N.Y.), 33 Employee Benefits Cas. 1273
**(Cite as: 2004 WL 1277991 (S.D.N.Y.))**

a "participant, beneficiary or fiduciary" seeking to enjoin violations of an ERISA plan or "(B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."*Id.* (P. Br.4-5.) While *Devlin v. Empire Blue Cross and Blue Shield,* 274 F.3d 76, 89 (2d Cir.2001), cited by Downes, arguably supports that argument, it is questionable (1) whether Downes seeks "other appropriate *equitable* relief" within the meaning of § 502(a)(3), see*Bona v. Barasch,* No. 01 Civ. 2289, 2003 WL 1395932, at *10-*12 (S.D.N.Y. Mar. 20, 2003), and (2) whether an action pursuant to § 502(a)(3) can seek "*appropriate* equitable relief" where, as here, another ERISA provision (here, § 502(a)(1)(B)) offers the plaintiff adequate relief. *See Varity Corp. v. Howe,* 516 U.S. 489, 515 (1996) ("[W]e should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.' "); *Mead v. Arthur Andersen, LLP,* 309 F.Supp.2d 596, 598 (S.D.N.Y.2004) (distinguishing *Devlin* on this ground).

**\*3** The Court need not delve further into these issues, however, because the applicable statutes of limitations bar Downes's benefits claims whether she brings them pursuant to § 502(a)(3), that is, under the rubric of a breach of fiduciary duty, or pursuant to § 502(a)(1)(B), which explicitly authorizes actions to recover allegedly due ERISA benefits. First, insofar as Downes properly alleges an ERISA § 502(a)(3) claim, ERISA § 413, 29 U.S.C. § 1113, sets forth the applicable statute of limitations. *Caputo v. Pfizer, Inc.,* 267 F.3d 181, 188 (2d Cir.2001). ERISA § 413 provides:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after *the earlier of-*

(1) six years after (A) the date of the last action

which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation[.]

29 U.S.C. § 1113 (emphasis added.) A plaintiff has "actual knowledge," and hence the claim accrues, "when [s]he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act ." *Caputo,* 267 F.3d at 193. Second, insofar as Downes brings her benefits claims pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), the statute of limitations is six years, corresponding to "the controlling limitations period ... specified in the most nearly analogous state limitations statute." *Miles v. N.Y.S. Teamsters Conference Pension and Ret. Fund,* 698 F.2d 593, 598 (2d Cir.1983). A claim under § 502(a)(1)(B) accrues "upon a clear repudiation by the plan that is known, or should be known, to the plaintiff-regardless of whether the plaintiff has filed a formal application for benefits." *Carey v. International Brotherhood of Electrical Workers Local 363 Pension Plan,* 201 F.3d 44, 49 (2d Cir.1999); see*also Miles,* 698 F.2d at 598. Under both statutes, the plaintiff's "actual knowledge" of the alleged breach triggers the statute of limitations.

Here, the alleged breach occurred when J.P. Morgan classified Downes as an independent contractor rather than as an employee, thereby rendering her ineligible for benefits. *See Brennan v. Metro. Life Ins. Co.,* 275 F.Supp.2d 406, 409 (S.D.N.Y.2003) ("[A]ll of the district courts that have considered claims made by individuals who were classified or treated as independent contractors have held that the statute of limitations begins to run when the beneficiary first learns that she is considered an independent contractor and is therefore not entitled to benefits, regardless of whether she later files a formal claim for benefits."); *id.* at 409-10

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1277991 (S.D.N.Y.), 33 Employee Benefits Cas. 1273
(Cite as: 2004 WL 1277991 (S.D.N.Y.))

(collecting cases); *seealso Ambris v. Bank of New York,* No. 96 Civ. 61, 1998 WL 702289, at *6 (S.D.N.Y. Oct. 7, 1998). J.P. Morgan's predecessor-in-interest hired Downes in June 1993. (Compl.¶¶ 6, 14.) She filed her complaint on November 14, 2003, more than ten years later. Hence, if Downes had "actual knowledge" of the breach or violation before November 14, 1997 (for her § 502(a)(1)(B) claim) or November 14, 2000 (for her putative § 502(a)(3) claim), then her claims for unpaid benefits are time-barred.[FN4]

> FN4. Under 29 U.S.C. § 1113, the statute of limitations is "the earlier of" three years or six years from the triggering event, depending on the circumstances. Here, as explained in the text, because Downes had actual knowledge of the violation, the statute of limitations for her ERISA § 502(a)(3) claim is three years.

*4 Downes argues that the Court cannot presume her "actual knowledge of the breach or violation."Before discovery, she contends, it would be premature to infer that she knew that J.P. Morgan had not been providing her employee benefits. This is simply implausible. It cannot seriously be maintained that Downes failed to realize that J.P. Morgan had not been providing her employee benefits for ten years. Surely, each time Downes visited a doctor, she did not fail to notice that she did not have health insurance subsidized or provided by J.P. Morgan, and each time she took a leave of absence for illness or vacation, she did not fail to notice that she received no compensation from J.P. Morgan for the days she missed work.[FN5]

> FN5. Of course, had Downes alleged in her complaint that she remained unaware of the fact that J.P. Morgan was not providing her any benefits until some date within the limitations period, the Court would have to accept that allegation as true, however unlikely it might appear, for purposes of a motion to dismiss. Significantly, Downes makes no such allegation. Under these cir-

cumstances, no rule of law requires the Court to indulge the assumption, which cannot fairly be inferred from any of the facts alleged in the complaint, that the plaintiff remained unaware of her own employment status, and had no idea she was not receiving medical, sick leave, or vacation benefits, for years after allegedly commencing full-time work for J.P. Morgan.

Nor is Downes's argument that the Court must await discovery before inferring that she knew J.P. Morgan deemed her an independent contractor from the outset supported by the cases she cites for this proposition. *Bona,* 2003 WL 1395932, held that the plaintiffs' allegations that the "defendants' course of conduct took place over many years and attracted public attention" did not suffice to impute to them "actual knowledge" and thereby to trigger the three-year statutory deadline for breaches of fiduciary duty. *Id.* at *15. *Carollo v. Cement and Concrete Workers District Council Pension Plan,* 964 F.Supp. 677 (E.D.N.Y.1997), simply denied summary judgment on limitations grounds where, far from establishing the plaintiff's actual knowledge of the violation, the defendants sought "further discovery on this issue." *Id.* at 688. Both *Bona* and *Carollo* thus involved claims for breach of fiduciary duty where the breach at issue would not necessarily have been obvious or immediately apparent to the plaintiff.

Here, even assuming that Downes can properly assert a claim for breach of fiduciary duty under ERISA § 502(a)(3)-and it is far from clear that she can, *see Varity,* 516 U.S. at 515-the breach that triggers the statute of limitations occurred when one or more fiduciaries of one or more of J.P. Morgan's employee benefits plans classified Downes as an independent contractor rather than as an employee, rendering her ineligible for benefits. It blinks reality to assert that Downes remained unaware of this alleged breach, for its consequences-that she did not receive employee benefits-would have soon, if not immediately, been apparent. Downes cer-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1277991 (S.D.N.Y.), 33 Employee Benefits Cas. 1273
(Cite as: 2004 WL 1277991 (S.D.N.Y.))

tainly knew that J.P. Morgan did not regard her as an employee entitled to benefits, including health insurance, vacation, and annual bonuses, before November 14, 1997, some four years after she began to work there. See *Brennan,* 27 F.Supp.2d at 409; *Ambris,* 1998 WL 702289, at *6. Her benefits claims based on her alleged misclassification as an independent contractor, whether brought pursuant to ERISA § 502(a)(3), to which a three-year statute of limitations applies, or § 502(a)(1)(B), to which a six-year statute of limitations applies, are therefore time-barred.[FN6]

> FN6. Downes also argues that the continu-ing-violation doctrine tolls the statute of limitations. But the mere allegation that J.P. Morgan continued to treat Downes as an independent contractor until terminating her employment does not suffice to plead a continuing violation, *see Schultz v. Texaco Inc.,* 127 F.Supp.2d 443, 447 (S.D.N.Y.2001), because the relevant breach or violation is Downes's misclas-sification, which occurred in 1993; "that [its] effects ... continue[d] to be felt over a peri-od of time does not render that single, wrongful act a 'continuing violation.' " *Id.* The cases Downes cites to support her con-tinuing-violation theory did not involve misclassification. (P. Br.8-9.) Furthermore, neither the complaint nor Downes's brief contends that J.P. Morgan's treatment of Downes fluctuated or changed materially over time, confusing her as to her formal status or causing her to be repeatedly re-classified, or to become an employee at some subsequent time. It is conceivable, but not pled, that Downes began work for J.P. Morgan as an independent contractor, but that the relationship developed over time such that, by some later date, it be-came employment within the meaning of ERISA. Where a worker's status is am-biguous, common-law agency principles determine whether he or she qualifies as an

"employee" within the meaning of ERISA. *Baraschi v. Silverwear, Inc.,* No. 01 Civ. 11263, 2002 WL 31867730, at *3 (S .D.N.Y. Dec. 23, 2002), citing *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318 (1992). In *Darden,* the Supreme Court reit-erated these principles: "the hiring party's right to control the manner and means by which the product is accomplished," as evinced by a variety of indicia, including the skills required by the job, location of the work, duration of the relationship, method of payment, provision of employee benefits, tax treatment, and the worker's discretion or authority to control when and for how long he or she will work. 503 U.S. at 323-24 (internal quotation marks omit-ted); *see also Eisenberg v. Advance Reloca-tion & Storage, Inc.,* 237 F.3d 111, 114 (2d Cir.2000). In this regard, "[t]he Second Circuit has warned that the parties' own classification of an employee or contract-or's status is not dispositive," and hence that the plaintiff "is entitled to prove that, based on the array of factors listed in *Darden,* she was a common-law employee of [the defendant's]." *Baraschi,* 2002 WL 31867730, at *4, citing *Sharkey v. Ul-tramar,* 70 F.3d 226, 232 (2d Cir.1995). Downes alleges that she was an employee from the outset of her relationship with J.P. Morgan; she does not allege any facts sug-gesting that she became an "employee" at a later time. If discovery has yielded evid-ence suggesting that Downes, while not initially hired by J.P. Morgan as an em-ployee, in time became a *de facto* employ-ee under common-law agency principles, the Court would be inclined to grant her leave to replead her claims for employee benefits insofar as not time-barred.

**B. *Discrimination***

*5 Downes's third ERISA claim (Compl.¶¶ 37-39)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1277991 (S.D.N.Y.), 33 Employee Benefits Cas. 1273
**(Cite as: 2004 WL 1277991 (S.D.N.Y.))**

is likewise time-barred, but in any event fails to state a claim on the merits. ERISA § 510, 29 U.S.C. § 1140, makes it unlawful for an employer to "discriminate against a participant or beneficiary for exercising any right to which [s]he is entitled under" an ERISA plan, "or for the purposes of interfering with the attainment of any right to which such participant may become entitled under the plan."Downes alleges that J.P. Morgan violated § 510 "by misclassifying her as a consultant and/or independent contractor with the specific intent to deny her benefits."(Compl.¶ 38.)

The parties agree that the statute of limitations for ERISA § 510 claims is two years. (D. Br. 9-10; P. Br. 13.) *See Sandberg v. KPMG Peat Marwick, L.L.P.* 111 F.3d 331, 336 (2d Cir.1997). Again, the claim accrues from the date on which Downes knew or should have known about the alleged wrong, that is, her misclassification with intent to deny her benefits. *Tolle v. Carroll Touch, Inc.,* 977 F .2d 1129, 1140-41 (7th Cir.1992) ("Because the purpose of Section 510, like intentional employment discrimination cases, is to prevent actions taken for an unlawful purpose, it is the decision and the participant's discovery of this decision that dictates accrual."). For the reasons set forth above, Downes undoubtedly knew, well before November 14, 2001 (two years before she filed her complaint), that J.P. Morgan deemed her an independent contractor, not an employee. Her ERISA § 510 claim is therefore time-barred.

In any event, this allegation fails to state a claim. ERISA § 510 prohibits employers from disrupting vested or soon-to-be vested employee benefits for several purposes, including, for example, to harass or retaliate against an employee, or to prevent him or her from testifying in an ERISA proceeding. *See Sandberg,* 111 F.3d at 334. But here, as in *Williams v. American International Group, Inc.,* No. 01 Civ. 9673, 2002 WL 31115184 (S.D.N.Y. Sept. 23, 2002), "[Downes] does not allege any disruption of her employment that was designed to preclude her from obtaining benefits; instead, she con-

tends that the act of hiring her as an [independent contractor], instead of as a regular employee, is itself a violation of § 510. This position is untenable in law."*Id.* at *2; *accord, Schwartz v. Independence Blue Cross,* 299 F.Supp.2d 441, 450 (E.D.Pa.2003) (no cause of action lies under § 510 for "misclassification"). Downes therefore fails to state a claim under ERISA § 510.

IV. *The COBRA Claim*

Downes brings her fourth claim pursuant to ERISA §§ 601, 602, and 606, 29 U.S.C. §§ 1161, 1162, and 1166, which give covered employees the rights to the continuation of health insurance in the event of certain qualifying events and to notice of that benefit. Congress enacted these provisions, the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), "to provide employees who had been covered by an employment-related group health care plan with the opportunity to elect group rate continuation of coverage under the plan in the face of some 'qualifying event'-job loss or hour reduction." *Hubicki v. Amtrak Nat'l Passenger R.R. Co.,* 808 F.Supp. 192, 196 (E.D.N.Y.1992). Downes thus seeks post-discharge healthcare benefits under some J.P. Morgan group plan. J.P. Morgan moves to dismiss this claim on three grounds.

*6 First, J.P. Morgan contends that because Downes alleges that it "fraudulently" denied her benefits (Compl.¶ 41), she must plead with particularity pursuant to Fed.R.Civ.P. 9(b), which she did not. This appears to be no more than a trivial pleading error. Read as a whole, the complaint does not allege fraud in connection with J .P. Morgan's refusal to offer Downes COBRA benefits, any more than it does in connection with her other ERISA claims, and Downes does not contend otherwise in her brief. Simply deleting the word "fraudulently" would cure the pleading, and while granting Downes leave to replead to make this change would certainly be appropriate, it would also be a needless formality.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1277991 (S.D.N.Y.), 33 Employee Benefits Cas. 1273
**(Cite as: 2004 WL 1277991 (S.D.N.Y.))**

Second, J.P. Morgan argues that because Downes never enjoyed healthcare coverage in the first place, she cannot logically have "lost" that coverage or be entitled to its "continuation." This argument begs the question. If, but for J.P. Morgan's wrongful misclassification, Downes should have enjoyed certain ERISA benefits, healthcare among them, then she can state a claim for having been denied the continuing coverage (and notice of such coverage) to which COBRA entitles her. In *Baraschi v. Silverwear, Inc.*, No. 01 Civ. 11263, 2002 WL 31867730 (S.D.N.Y. Dec. 23, 2002), the court denied a motion to dismiss under similar circumstances. The plaintiff had annexed a contract to her complaint, which facially appeared to contradict her claim to ERISA benefits, but the complaint nonetheless alleged that the defendants had wrongfully denied her those benefits. *Id.* at *1. While the court noted its doubts based on the contractual language, that language did not unambiguously contradict the plaintiff's claim. Consequently, accepting for purposes of the motion the truth of the plaintiff's allegation that she qualified as a "participant" in the defendants' employee benefits plan, the court held that, as a participant, the plaintiff stated a claim for COBRA benefits. *Id.* at *6. Here, Downes has neither annexed a contract to her complaint nor even alleged the existence of a relevant one (nor identified the plan or plans that allegedly cover her). Nevertheless, because the Court must assume the truth of her allegations that J.P. Morgan misclassified her, and that she should have received healthcare benefits under a relevant ERISA-governed plan, Downes's COBRA claim survives.

Finally, J.P. Morgan argues that Downes's COBRA claim, like her other ERISA claims, must be dismissed because she failed to exhaust her administrative remedies. (D.Br.7, 8, 10.) This argument is at best formalistic where the gravamen of the complaint is that J.P. Morgan misclassified Downes. Because of that misclassification, she had neither the right nor the ability to obtain administrative review. That Downes did not engage in the perfunctory gesture of writing to J.P. Morgan to seek re-

view under an administrative plan that J.P. Morgan denies she had any right to participate in hardly provides a fair ground on which to dismiss her ERISA claims. J.P. Morgan's motion will therefore be denied insofar as it seeks dismissal of Downes's COBRA claim.[FN7]

> FN7. J.P. Morgan did not argue that Downes's COBRA claim is time-barred, and neither party briefed this issue. It would therefore be ill-advised, if not inappropriate, to dismiss on this ground without giving Downes (and J.P. Morgan) notice and an opportunity to be heard. *See McGinty v. New York*, 251 F.3d 84, 90 (2d Cir.2001). Nevertheless, the Court notes that because COBRA does not contain an express statute of limitations, the relevant limitations period must be borrowed from analogous state law, *see Harvey v. Mingo Logal Coal Co.*, 274 F.Supp.2d 791, 793 (S.D.W.Va.2003), and it is an open question, so far as research discloses, whether a COBRA claim brought by a plaintiff who alleges misclassification accrues from the time of the plaintiff's "actual knowledge" of that misclassification, or from the date on which COBRA benefits should first have been received. If, as with Downes's ERISA §§ 502(a)(3) and 502(a)(1)(B) claims, the relevant "breach or violation" for purposes of the statute of limitations is not J.P. Morgan's failure to provide benefits, but its wrongful classification of Downes such that she enjoyed no right to benefits upon the occurrence of a qualifying event, then this claim, too, accrued on the date of the misclassification, which might well fall outside the limitations period.

## IV. *The Equal Pay Act Claim*

*7 Downes also brings a claim pursuant to the Equal Pay Act, 29 U.S.C. § 206(d)(1), which pro-

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1277991 (S.D.N.Y.), 33 Employee Benefits Cas. 1273

**(Cite as: 2004 WL 1277991 (S.D.N.Y.))**

hibits gender-based wage discrimination. She alleges that J.P. Morgan "discriminated against [her] because it compensated male employees, who had jobs that required equal skill, effort and responsibility and were performed under similar working conditions as Downes's job, at a higher rate than Downes."(Compl.¶ 57.) J.P. Morgan argues that this allegation fails adequately to plead an Equal Pay Act claim, even under the liberal standards of Fed.R.Civ.P. 8, and that it is partially time-barred.

With respect to the adequacy of Downes's pleading, J.P. Morgan cites a single decision that dismissed a similarly-skeletal Equal Pay Act complaint. In *Bernstein v. The MONY Group, Inc.,* 228 F.Supp.2d 415 (S.D.N.Y.2002), the court dismissed an Equal Pay Act claim where the plaintiff had alleged that the defendants "pa[id] higher wages to male employees doing equal work with female employees in jobs requiring equal skill, effort and responsibility under similar working conditions."*Id.* at 420 (quoting the complaint). The court reasoned that the plaintiff failed to "specifically detail the time periods [or] the positions at which female employees received lower wages, and consequently fail[ed] to provide 'fair notice' to Defendants."*Id.* Downes responds that in another district court decision, *Brusseau v. Iona College,* No. 02 Civ. 1372, 2002 WL 1933733 (S.D.N.Y. Aug. 21, 2002), the court sustained an Equal Pay Act claim articulated at a similar level of generality, finding it sufficient under Rule 8. *Id.* at *1. But *Brusseau* does not quote the language of the complaint at issue in that case, making it difficult to determine what level of specificity the court found sufficient.

Under the liberal notice-pleading standards of Rule 8, and in view of the Supreme Court's recent admonition to heed this standard in employment discrimination cases, *see Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002), the Court declines to dismiss Downes's Equal Pay Act claim at this juncture, particularly as the parties have already engaged in considerable discovery; should Downes fail to adduce evidence supporting her Equal Pay Act allegation, J.P. Morgan can shortly move for summary judgment on this claim. The complaint gives J.P. Morgan adequate notice of the essence of Downes's claim: that similarly-situated male employees received higher wages than she did. J.P. Morgan presumably knows in what capacity Downes worked for it, and it can ascertain the substance of her claim by comparing her skills, responsibilities, and wages to those of similarly-situated male workers.

With respect to the statute of limitations, a two-year period generally applies to Equal Pay Act claims, although if the employer violated the Act willfully, the period is three years. *Pollis v. New Sch. for Soc. Research,* 132 F.3d 115, 118 (2d Cir.1997). A new claim accrues each time an employee receives a paycheck under a discriminatory wage policy, but the policy's existence does not make the violation a "continuing" one, such that the plaintiff can seek backpay beyond the statutory period of two or three years.*Id.* at 118-19. Accordingly, Downes's Equal Pay Act claim survives, but will permit recovery only for violations that occurred within the applicable limitations period.

## V. *Pendent Claims*

**\*8** Downes also brings two pendent claims under New York law, alleging a violation of the New York Labor Law and a common-law claim for breach of contract. While J.P. Morgan moves to dismiss these claims on a number of grounds, several of which may be meritorious,[FN8] the Court need not address them now. If Downes's federal claims do not survive summary judgment, the Court would in any event decline to exercise supplemental jurisdiction over her state-law claims. *See Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir.2001) (noting that, as a general matter, where all federal claims have been dismissed before trial, pendent state claims should be dismissed without prejudice and left for resolution to the state courts; collecting cases).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1277991 (S.D.N.Y.), 33 Employee Benefits Cas. 1273
**(Cite as: 2004 WL 1277991 (S.D.N.Y.))**

FN8. Under the New York Labor Law, Downes seeks to recover the same benefits she claims under ERISA. J.P. Morgan argues that ERISA preempts these claims, and if, as Downes alleges, an ERISA plan should apply to her, it may well be correct. *See* 29 U.S.C. §§ 1144(a) (express preemption of "all State laws insofar as they may now or hereafter relate to any employee benefit plan"). The question would be whether Downes's claims "relate to" an employee benefit *plan* "whose provision by nature requires an ongoing administrative program to meet the employer's obligation," as opposed "simply to benefits." *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11-12 (1987) (emphasis in original). Downes does not explain why, if not pursuant to some employee benefit plan, J.P. Morgan owes her the benefits she claims, but perhaps some non-preempted state-law basis exists, and the Court need not resolve this issue at this juncture. In her contract claim, Downes alleges that she entered into a one-year employment contract with J.P. Morgan, to run from February 2003 to February 2004, which it breached, entitling her to $163,692. (Compl.¶¶ 52-55.) J.P. Morgan objects to this claim as insufficiently pled under Fed.R.Civ.P. 8 and cites several decisions that arguably support this contention, *see,e.g., See Wolff v. Rare Medium, Inc.* 171 F.Supp.2d 354, 358 (S.D.N.Y.2001); *Zaro Licensing, Inc. v. Cinmar, Inc.,* 779 F.Supp. 276, 286 (S.D.N.Y.1991), but again, given the pendency of discovery, in the interest of judicial economy, the Court will postpone disposition of this claim to the summary judgment stage, at which time, should Downes's federal claims survive, the parties will be able to address the contract claim on a fuller evidentiary record.

## CONCLUSION

For the reasons set forth above, Downes's first, second, and third claims are dismissed, her seventh claim is partially dismissed insofar as it seeks compensation for alleged violations outside the applicable limitations period, and the motion is otherwise denied.

SO ORDERED.

S.D.N.Y.,2004.
Downes v. JP Morgan Chase & Co.
Not Reported in F.Supp.2d, 2004 WL 1277991 (S.D.N.Y.), 33 Employee Benefits Cas. 1273

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Not Reported in A.2d
Not Reported in A.2d, 1998 WL 246493 (Conn.Super.)
**(Cite as: 1998 WL 246493 (Conn.Super.))**

Page 1

**c**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.
Gay Ann WILLIAMS,
v.
CUSHMAN AND WAKEFIELD OF CONNECTI-
CUT, INC.
No. CV 95-0148747 S.

May 5, 1998.

MEMORANDUM OF DECISION RE: MOTION
FOR SUMMARY JUDGMENT

D'ANDREA, J.
*1 The plaintiff, Gay Ann Williams's complaint
against Cushman and Wakefield, Inc. of Connectic-
ut sounds in breach of an oral contract (count one),
breach of the covenant of good faith and fair deal-
ing (count two), violation of General Statutes §
31-71 (count three), and negligent misrepresenta-
tion (count four).

Specifically, the plaintiff alleges that in January of
1991, she entered into an oral employment agree-
ment in which the defendant agreed to pay the
plaintiff an annual salary of $34,000. The plaintiff
worked for the defendant until November of 1994,
but was only paid $27,000 per year "plus annual in-
crease."

The defendant has filed a motion for summary
judgment on all four counts. The defendant asserts
four grounds for its motion: 1) That the plaintiff
waived her breach of contract claim because she
waited four years, after she learned that she would
be paid a salary of $27,000 per year, to institute this
action; 2) that acceptance of weekly paychecks
equivalent to $27,000 per year constituted a modi-

fication of any agreement to a $34,000 per annum
salary; 3) the plaintiff's breach of contract and viol-
ation of General Statutes § 31-71a are barred by the
applicable statute of limitations; and 4) the plaintiff
cannot show detrimental reliance to support her
negligent misrepresentation count.

"Summary judgment shall be rendered forthwith if
the pleadings, affidavits and any other proof sub-
mitted show that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law." *Maffucci v. Royal
Park Limited Partnership,* 243 Conn. 552, 554, 707
A.2d 15 (1998).

The court need not address the defendant's first and
second grounds because the defendant's statute of
limitations argument is dispositive of the plaintiff's
wage claim. The defendant argues that General
Statutes § 52-596 bars the plaintiff's action. And,
"[a]lthough [the plaintiff] alleges in her complaint
separate counts for breach of contract and violation
of [General Statutes § ]31-71a... the gravamen of
her claims is a claim for nonpayment of wages."

The plaintiff does not disagree that General Statutes
§ 52-596 applies to counts one and three. Rather,
the plaintiff argues that the statute did not begin to
run until her employment ended. The plaintiff also
argues that the defendant's "continuing course of
conduct" tolls the limitations period.

General Statutes § 52-596 states that: "No action
for the payment of remuneration for employment
payable periodically shall be brought but within
two years after the right of action accrues ..." The
dispositive issue presented is: When does a right of
action "accrue" for purposes of General Statutes §
52-596?

The plaintiff cites to *Burns v. Koellmer,* 11
Conn.App. 375, 527 A.2d 1210 (1987) as authority
for the proposition that General Statutes § 52-596
does not begin to run until the employee's employ-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 246493 (Conn.Super.)
(Cite as: 1998 WL 246493 (Conn.Super.))

ment ends. This is not the holding of *Burns*.There, "[t]he plaintiff worked for a period of six years as the manager of [a] club, during which time the defendant remunerated her with some payments by cash and check. The plaintiff expected to be remunerated in excess of those payments, the defendant benefited from the plaintiff's service, the defendant had assured the plaintiff that she would receive additional compensation, and the plaintiff's expectation of payment ceased when her employment did." *Id.*, 377, 527 A.2d 1210. The *Burns* court held that "[t]he plaintiff's cause of action did not arise ... until the defendant breached the agreement by refusing to fully compensate the plaintiff for her services." *Id.*, 388-89, 527 A.2d 1210. It just so happened that the defendant refused to compensate the plaintiff for her services at the end of her employment. *Id.*, 389, 527 A.2d 1210.

*2 In the present case, there is no dispute over the fact that the last mention by any party of the allegedly deficient salary occurred sometime in 1991, nearly four years before the plaintiff terminated her employment with the defendant. The defendant provides an affidavit which indicates that, after the first two paychecks, the plaintiff accepted and cashed subsequent paychecks without ever again demanding the higher salary. The plaintiff does not rebut this claim. It may be said, therefore, that the defendant's breach, i.e. the refusal to fully compensate the plaintiff, last occurred sometime in 1991. The limitations period embodied in General Statutes § 52-596 expired, therefore, in 1993.

A contrary conclusion would be logically antithetical. The court can envision an employee who remains employed with a company for thirty years after a similar salary dispute. It would be simply unfair to an employer if the court were to allow that plaintiff, thirty years after her last complaint to the employer about her salary, to bring an action for thirty years of back wages."Whether seen as a sanction imposed on plaintiffs who sleep on their rights or as a benefit conferred upon defendants to reduce the risk and uncertainty of liability, statutes of lim-

itation ... serve the ... public policy of avoiding the litigation of stale claims." *Baxter v. Sturm, Ruger & Co.*, 230 Conn. 335, 344, 644 A.2d 1297 (1994).

The plaintiff's argument that the defendant's actions constitute a "continuing course of conduct" and thereby tolls the limitations period is without merit."The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific *tortious* acts or omissions may be difficult to identify and may yet be remedied ... For example, the doctrine is generally applicable under circumstances where [i]t may be impossible to pinpoint the exact date of a particular negligent act or omission that caused injury or where the negligence consists of a series of acts or omissions and it is appropriate to allow the course of [action] to terminate before allowing the repose section of the statute of limitations to run ..." (Emphasis added; citation omitted; internal quotation marks omitted.)   *Sanborn v. Greenwald*, 39 Conn.App. 289, 295-96, 664 A.2d 803, cert. denied, 666 Conn. 1186 (1995). The court is unable to find, and the plaintiff does not identify, any case which applies this doctrine to contract or employment wage actions.

In the present case, the plaintiff's claim for additional wages became "stale" two years after the defendant first denied her the additional $7,000 per annum to which she claims she is entitled.[FN1] The motion for summary judgment on counts one and three of the complaint, therefore, is granted based on the expiration of the applicable statute of limitations.

> FN1. Additional support for this conclusion exists in dicta found in *Shortt v. New Milford Police Department*, 16 Conn.App. 232, 234-35, 547 A.2d 107 (1988), rev'd on other grounds, 212 Conn. 294, 562 A.2d 7 (1989), where the court stated: "[T]he plaintiff brought suit under General Statutes [§ ]31-72 to collect wages allegedly due him for the period of six months between October 15, 1984, and April 17,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1998 WL 246493 (Conn.Super.)
**(Cite as: 1998 WL 246493 (Conn.Super.))**

1985. This action was commenced on October 10, 1986, just as the two-year statute of limitations; General Statutes [§ ]52-596: was about to expire."This dicta indicates, albeit in passing, that the statute began to run, i.e. the cause of action accrued, at the beginning of the period when wages were wrongfully withheld from the plaintiff.

**\*3** The plaintiff's fourth count sounds in negligent misrepresentation. A cause of action for negligent misrepresentation is explained as follows: "One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 575, 657 A.2d 212 (1995).

In the present case, there exists a highly disputed fact regarding the plaintiff's claim. This fact is whether the plaintiff ever offered the defendant an annual salary of $34,000. The defendant claims that even if this fact is accepted as true, the plaintiff still cannot prove any sort of reliance on the misrepresentation. The court disagrees. The plaintiff states in her affidavit that she did not seek another position elsewhere because she was made an offer of $34,000 per annum by the defendant. This is enough to establish a genuine issue of material fact regarding whether the plaintiff justifiably relied on the defendant's alleged promise. The defendant's motion for summary judgment on count four, therefore, is denied.

The defendant also states, in its motion, that it seeks summary judgment on count two of the complaint. The defendant fails, however, to discuss anywhere in its brief why summary judgment should be granted on count two. An issue that is inadequately briefed is deemed abandoned. *Commission on Human Rights and Opportunities v. Truelove & Maclean, Inc.,* 238 Conn. 337, 344 n.

11, 680 A.2d 1261 (1996); *Cummings v. Twin Tool Manufacturing Co., Inc.,* 40 Conn.App. 36, 45, 668 A.2d 1346 (1995). The defendant's motion for summary judgment on count two, therefore, is denied.

So Ordered.

Conn.Super.,1998.
Williams v. Cushman and Wakefield of Connecticut, Inc.
Not Reported in A.2d, 1998 WL 246493 (Conn.Super.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Slip Copy

Page 1

Slip Copy, 2006 WL 1182275 (D.Conn.)
(Cite as: 2006 WL 1182275 (D.Conn.))

▷

Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.
Ethan BOOK Jr., Plaintiff,
v.
Anthony LUPINACCI, Police Department, City of
Stamford, Martha Villamil, Defendants.
No. 3:04CV1661 (PCD).

April 28, 2006.
Order Granting Reconsideration April 28, 2006.

Ethan Book, Jr., Fairfield, CT, pro se.
James V. Minor, City of Stamford Office of Legal
Affairs, Stamford, CT, James C. Riley, Whitman,
Breed, Abbott & Morgan, Greenwich, CT, for De-
fendants.

*RULING ON PENDING MOTIONS*

DORSEY, J.
*1 Pursuant to Fed.R.Civ.P. 59, Plaintiff moves for
reconsideration of this Court's May 20, 2005 Ruling
granting in part Defendants' Motions to Dismiss.
Plaintiff also moves, pursuant to Fed.R.Civ.P. 15,
for permission to amend his complaint. Defendants
move to dismiss the action for failure to post secur-
ity. For the reasons stated herein, Plaintiff's Motion
for Reconsideration [Doc. No. 66] is granted but
the Court will adhere to its prior ruling, Plaintiff's
Motion for Permission to Supplement his Motion
for Reconsideration [Doc. No. 67] is denied,
Plaintiff's Motion for Permission to Amend Com-
plaint [Doc. No. 68] is denied and Defendants' Mo-
tion to Dismiss [Doc. No. 71] is denied.

I. BACKGROUND [FN1]

> FN1. Many of Plaintiff's factual allegations
> will not be addressed herein. Only those
> facts that are necessary to the resolution of
> the substantive issues raised below are dis-
> cussed.

In January and February 2005, Defendants Anthony
Lupinacci and the Police Department of the City of
Stamford ("Stamford Defendants") and Martha Vil-
lamil moved, pursuant to Fed.R.Civ.P. 12(b)(1) and
12(b)(6), to dismiss the Complaint. Plaintiff's pro se
Complaint alleges twelve separate Counts of viola-
tions of state and federal law.

Count One alleges a violation of the Connecticut
Unfair Practices Act ("CUTPA"), Conn. Gen.Stat. §
42-110b, and 42 U.S.C. §§ 1981, 1985 for Defend-
ant Villamil's failure to pay her business debt, ex-
cluding Plaintiff from their usual business activities
and failing to provide an explanation for ending
their dating relationship. Plaintiff also maintains
that her actions constitute actionable negligence
and conspiracy.

Count Two claims that Defendant Villamil violated
CUTPA and 42 U.S.C. §§ 1981, 1985 and 1986 by
failing to give Plaintiff notice of her concerns or of
questions regarding her debt prior to complaining to
the Stamford Police Department and for failing to
use a more conservative remedy, as suggested to
her by Plaintiff. Plaintiff also claims that these ac-
tions constitute negligence and conspiracy.

Count Three maintains that Defendant Villamil's al-
leged "errors" in her complaints to the Stamford
Police Department constitute actionable violations
of CUTPA, 42 U.S.C. §§ 1981, 1985 and 1986 and
constitute negligence and conspiracy.

Count Four alleges that by advising Plaintiff not to
contact Ms. Villamil during a meeting at the Stam-
ford Police Department, Defendant Sergeant Lupin-
acci acted "without lawful cause" in violation of
Plaintiff's First, Fourth, Ninth and Fourteenth
Amendment rights. Similarly, Plaintiff alleges that
Lupinacci never intended to get back to him as
promised, and as such, he and the Stamford Police
Department violated 42 U.S.C. §§ 1981, 1983, 1985
and 1986. Plaintiff also alleges that these actions
constitute negligence and conspiracy.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Page 2

Slip Copy, 2006 WL 1182275 (D.Conn.)
(Cite as: 2006 WL 1182275 (D.Conn.))

Count Five alleges that the arrest warrant used in Plaintiff's original arrest lacked probable cause and contained factual and procedural errors which violated Plaintiff's First, Fourth, Ninth and Fourteenth Amendment rights pursuant to 42 U.S.C. §§ 1981, 1983, 1985 and 1986. Furthermore, Plaintiff maintains that Defendant Lupinacci's and the Stamford Police Department's actions in overseeing and signing the warrant constitute negligence and conspiracy.

**\*2** Count Six alleges that Defendant Lupinacci's and the Stamford Police Department's actions in seeking to have a protective order issued against Plaintiff "without reasonable cause" violated Plaintiff's First, Fourth, Ninth and Fourteenth Amendment rights pursuant to 42 U.S.C. §§ 1981, 1983, 1985 and 1986 and also constitute negligence and conspiracy.

Count Seven alleges that Defendant Lupinacci's and the Stamford Police Department's failure to take action against Defendant Villamil for her alleged failure to compensate Plaintiff for a business debt was in error and violated the First, Fourth, Ninth and Fourteenth Amendments to the Constitution pursuant to 42 U.S.C. §§ 1981, 1983, 1985 and 1986 and also constitute negligence and conspiracy.

Count Eight maintains that Defendant Villamil's alleged "errors in giving testimony during the trial" constitute actionable violations of CUTPA, 42 U.S.C. §§ 1981, 1983, 1985 and 1986, as well as constituting negligence and conspiracy.

Count Nine alleges that Defendant Lupinacci's allegedly false testimony during Plaintiff's criminal trial violated Plaintiff's First, Fourth, Ninth and Fourteenth Amendment rights pursuant to 42 U.S.C. §§ 1981, 1983, 1985 and 1986 and also constitute negligence and conspiracy.

Count Ten claims that Defendant Lupinacci's actions in (1) contacting an official of the Department of Correction to ask that Plaintiff not contact Defendant Villamil and (2) failing to respond

Plaintiff's letter of the same date constitute actionable violations of Plaintiff's First, Fourth, Ninth and Fourteenth Amendment rights pursuant to 42 U.S.C. §§ 1981, 1983, 1985 and 1986 and also constitute negligence and conspiracy.

Count Eleven contends that Defendant Villamil violated Plaintiff's rights pursuant to CUTPA and 42 U.S.C. §§ 1981, 1985 and 1986 by filing a new complaint against Plaintiff in or about June 2003. Plaintiff claims that this conduct also constitutes negligence and conspiracy.

Count Twelve asserts that Defendant Lupinacci's act of presenting a new charge against Plaintiff on or about July 23, 2003 constitutes a violation of Plaintiff's First, Fourth, Ninth and Fourteenth Amendment rights pursuant to 42 U.S.C. §§ 1981, 1983, 1985 and 1986 and also constitutes negligence and conspiracy.

In a May 20, 2005 Ruling, Defendants' Motions to Dismiss were granted in part, with this Court dismissing Counts One through Nine of Plaintiff's Complaint as outside of the applicable statutes of limitations and time-barred. *See* May 20, 2005 Ruling at 6-8, 11. Counts Ten through Twelve, although not barred on statute of limitations grounds, pertain to a presently pending state court criminal action against Plaintiff and thus this Court declined to rule on them, holding that abstention was appropriate and staying the action pending resolution of the state court criminal matters. *Seeid.* at 11-12.

## II. MOTION FOR RECONSIDERATION

### A. Standard of Review

Reconsideration will generally only be granted when a party can point to "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992) (citations omitted) (cautioning that "where litigants have once battled for the court's decision, they

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

should neither be required, nor without good reason permitted, to battle for it again"). Reconsideration should therefore be granted when a "party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). This Court will not grant a motion to reconsider "where the moving party seeks solely to relitigate an issue already decided," to "plug gaps in an original argument or to argue in the alternative once a decision has been made."*Id., Horsehead Res. Dev. Co., Inc. v. B.U.S. Envtl. Serv., Inc.,* 928 F.Supp. 287, 289 (S.D.N.Y.1996) (citations omitted). Ultimately, however, the question is a discretionary one and the court is not limited in its ability to reconsider its own decisions prior to final judgment. *See Virgin Atl.,* 956 F.2d at 1255.

## B. Discussion

*3 While Plaintiff's arguments suggest disagreement with the Court's ruling, his arguments simply relitigate claims already raised and rejected and do not justify departing from the prior Ruling. *Shrader,* 70 F.3d at 257. Dismissal of Counts One through Nine was and remains appropriate.

## 1. Statute of Limitations

In a May 20, 2005 Ruling, this Court held that Counts One through Nine of Plaintiff's Complaint were filed outside of the applicable statute of limitations and thus were time-barred. *See* May 20, 2005 Ruling at 10-11. Plaintiff takes issue with this holding, arguing that the limitations period should not have started running when the alleged "injury" occurred, but only after the state court jury verdict was rendered. Plaintiff cites a Northern District of Indiana case for the proposition that the limitations period should not begin to run until "plaintiff knew or should have known of the injuries attending the alleged violations of his constitutional rights."*See

Mot. Recons. at 5 (citing *Gaus v. County of Wells,* 620 F.Supp. 1462, 1465 (N.D.Ind.1985).*Gaus* merely held, however, that *"[a]t the very least,* plaintiff knew or should have known of the injuries attending the alleged violations of his constitutional rights with respect to his arrest, prosecution and conviction on January 6, 1982 when the Wells County jury returned the guilty verdict," and regardless of which date was used, the plaintiff's claims were barred by the applicable statute of limitations. *Gaus,* 620, F.Supp. at 1465 (emphasis added). The Court in *Gaus* did not need to and declined to determine the date on which the limitations period actually began to run.*Id.*

Plaintiff also argues that he "was not aware of the likelihood of the primary injury for which he seeks damages until October 1, 2001, the date that the jury rendered its verdicts" because "he believes he is fully innocent and should have been fully acquitted."Mot. Recons. at 5. The Second Circuit has made clear that for statute of limitations purposes, a claim accrues when a plaintiff "knows or has reason to know" that he or she has suffered harm. *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994) (citing *Cullen v. Margiotta,* 811 F.2d 698, 725 (2d Cir.), cert. denied, 483 U.S. 1021, 107 S.C:. 3266, 97 L.Ed.2d 764 (1987)). The court took care to note, however, that "the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act becomes painful."*Id.* (citing *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981)). As in this Court's prior Ruling, Plaintiff's argument that he should not be held responsible for being aware of any potential injury prior to the jury verdict are unconvincing. Even though he believed and continues to believe that he is "fully innocent," the conduct described in his Complaint or its potential consequences would not have been unknown to Plaintiff before the jury verdict.

In a similar case, the Second Circuit held that when the plaintiff was assaulted and falsely arrested by two police officers, the limitations period began to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 1182275 (D.Conn.)
(Cite as: 2006 WL 1182275 (D.Conn.))

Page 4

accrue on the date of the assault and false arrest, not, as the plaintiff argued, the date on which the state court action against the plaintiff was dismissed. *Singleton v. New York,* 632 F.2d 185, 191 (2d Cir.1980). As this Court stated previously, "the verdict itself would have had no impact on Plaintiff's awareness of the conduct or logical connection to it, but would merely have been the point at which the consequences of the acts impacted him, not when he knew or had reason to know of the allegedly unlawful conduct."May 20, 2005 Ruling at 7-8 (citing *Eagleston,* 41 F.3d at 871).

*4 Moreover, running the limitations period from the date of which the actions of which Plaintiff complains occurred does not undermine the federal policies behind the causes of action involved here. Plaintiffs can still enforce their claims and recover compensation simply by filing a federal action within three years of an alleged injury-indeed, as Plaintiff himself did in this case regarding the actions leading to his second state court trial. *See Singleton,* 632 F.2d at 191 (quoting *Board of Regents v. Tomanio,* 446 U.S. 478, 488, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980)); *see* Complaint, Counts Ten-Twelve. "Nothing prevented [Plaintiff] from bringing suit during the period when the criminal prosecution against him was pending."*Singleton* at 192.The fact that Plaintiff believed that he was innocent and believed that he would be acquitted does not alter the determination.

Plaintiff also argues again that some of the acts complained of constitute continuing courses of conduct for which the limitations period should be extended. The acts of which Plaintiff complains are discrete acts. The Supreme Court has held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges" and that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Again, this argument was considered and rejected in the original

Ruling, with this Court holding that "Plaintiff cannot use this theory to extend the statute of limitations for discrete acts."May 20, 2005 Ruling at 8 (citing *Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106).

Plaintiff further makes that argument that where the commission of an overt act is in furtherance of a conspiracy, that act, by its very commission, acts to start the limitations period again for all acts done as a part of that conspiracy. *See* Mot. Recons. at 9. This argument, however, has also been considered and rejected by the Second Circuit:

The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action. To permit him to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable him to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims.

*Singleton,* 632 F.2d at 192. We similarly reject Plaintiff's argument here.

In the original Ruling, this Court held that "even if Plaintiff's argument were accepted, and the verdict date determined to be the point at which the limitations period began to run, he would run afoul on other grounds."May 20, 2005 Ruling at 8. Specifically, we held that Plaintiff's claims would fail, pursuant to the Supreme Court's decision in *Heck v. Humphrey,* since "habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983." 512 U.S. 477, 481, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Essentially, the *Heck* Court held that:

*5 [W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. at 487. Plaintiff challenges the Court's reliance on *Heck* in his Motion for Reconsideration. While the Court affirms its prior holding, reconsideration on this issue is not necessary, as this Court has already found that Counts One through Nine of Plaintiff's Complaint were properly dismissed as untimely under the applicable statutes of limitations.

*2. Abstention*

Arguing against the need for abstention, Plaintiff writes that "the present [action] may be decided simply with consideration of the issue of the constitutionality of the Connecticut statute of harassment ... among other considerations."Mot. Recons. at 18. Considering the issue, the Supreme Court has said that the abstention doctrine is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959). Federal district courts' obligation to adjudicate cases is a weighty one, with abstention justified "only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." *Id.* at 188-89.Similarly, a federal court should not abstain from deciding a case "merely because a State court could entertain it." *Alabama Pub. Serv. Comm'n v. Southern R. Co.,* 341 U.S. 341, 361, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (Frankfurter, J., concurring in result). Federal courts do have the power, however, "to refrain from hearing cases that would interfere with a pending state criminal proceeding." *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 716, 116

S.Ct. 1712, 135 L.Ed.2d 1 (1996). As this case falls into one of the exceptions to federal courts' duty to decide cases, this Court properly considered the issue of whether it should abstain pending resolution of the state court matter.

As this Court previously found, "Counts Ten through Twelve [of Plaintiff's Complaint] all challenge the legitimacy of the proceeding against Plaintiff in one respect or another, with Counts Eleven and Twelve attacking the fact that any action was brought at all."May 20, 2005 Ruling at 12. Thus, a verdict in this Court in Plaintiff's favor could cast doubt on and imply the invalidity of the state criminal charges. *See Jackson v. Suffolk County Homicide Bureau,* 135 F.3d 254, 256-57 (2d Cir.1998) (when adjudicating a civil claim could invalidate or even merely have an impact on a conviction, "the proper course is for the district court to stay further proceedings on that claim pending termination of the state-court criminal proceedings"). For these reasons as well as any additional ones raised in the prior Ruling and not discussed here, the Court will adhere to the prior Ruling and hold that abstention is appropriate pending termination of the state-court criminal proceedings.

III. MOTION FOR PERMISSION TO SUPPLEMENT PLAINTIFF'S MOTION FOR RECONSIDERATION

*6 Local Rule of Civil Procedure 7(c) provides that any Motion for Reconsideration "shall be filed and served within ten (10) days of the filing of the decision or order form which such relief is sought."The Ruling which Plaintiff seeks reconsideration of was filed on May 20, 2005 and thus the original Motion for Reconsideration, filed on June 1, 2005, was properly filed within that ten-day period. The proposed supplement, however, was filed over one month later, on July 9, 2005.

The supplement does not present facts or arguments that would previously have been unknown to the Plaintiff; rather, it merely contains additional argu-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                               Page 6
Slip Copy, 2006 WL 1182275 (D.Conn.)
(Cite as: 2006 WL 1182275 (D.Conn.))

ments that could have been made in the original motion. For example, Plaintiff's entire argument regarding abstention was made in the supplement; only one sentence of Plaintiff's original motion was devoted to the abstention issue. Moreover, Plaintiff does not present any justification for filing a supplement over one month after filing his original motion. Rather, Plaintiff merely states that "[j]ustification for such permissio [sic] is understood from the information and arguments which are contained in the accompanying Supplement."Mot. Perm. Suppl. at 1. The only argument contained in the accompanying Supplement, however, is the conclusory statement that "[t]here is good cause to amplify these arguments."Suppl. at 2. This Court does not believe that Plaintiff needs three bites at the proverbial apple. Therefore, Plaintiff's Motion for Permission to Supplement his Motion for Reconsideration is denied.[FN2]

> FN2. This Court has reviewed Plaintiff's Supplement and finds that even if this Court granted Plaintiff permission to supplement, the arguments contained therein would not alter the instant ruling on Plaintiff's Motion for Reconsideration.

## IV. MOTION FOR LEAVE TO AMEND COMPLAINT

### A. Standard of Review

Leave to file an amended complaint "shall be freely given when justice so requires."FED. R. CIV. P. 15(a). Leave should be "freely given" in the absence of a stated or apparent reason to the contrary, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Forman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

### B. Discussion

Plaintiff filed a Motion for Leave to Amend the Complaint on August 15, 2005. The proposed Amended Complaint repeats Counts One through Nine which the Court dismissed in its May 20, 2005 Ruling. The proposed additions to the Complaint are minor ones relating to charges which this Court has already held are barred on statute of limitations grounds. The only additional Count-proposed Count Three(A)[FN3]-is brought pursuant to 42 U.S.C. §§ 1983 and 1985 and also involves conduct occurring more than three years before October 4, 2004, the date on which the present action was filed. Accordingly, this count would be, like Counts One through Nine, barred by the applicable Statute of Limitations.[FN4] As all of these proposed amendments to the Complaint relate to charges barred by the applicable statutes of limitations, the Court finds that amendment would be futile and therefore Plaintiff's Motion for Leave to Amend the Complaint is denied. *See Forman,* 371 U.S. at 182.

> FN3. Proposed Count Three(A) reads: "The Stamford Police Department erred in not having adequate established procedures for reviewing and responding to a minor complaint such as a harassment claim (42 U.S.Code, Sections 1983 and 1985).

> FN4. As this Court held in its May 20, 2005 Ruling, Connecticut's three-year statute of limitations for all tort actions applies to Plaintiff's claims pursuant to 42 U.S.C. §§ 1983 and 1985. *See Lounsbury v. Jeffries,* 25 F.3d 131, 134 (2d Cir.1994) (applying Connecticut's three-year statute of limitations to a § 1983 claim); *Ford v. New Britain Trans. Co.,* No. 3:03cv150 (MRK), 2004 U.S. Dist. LEXIS 26342, *6 (D.Conn. Dec. 21, 2004) (§ 1985).

## V. MOTION TO DISMISS

*7 On August 31, 2005, Defendants filed a Motion to Dismiss on the grounds that Plaintiff has failed to post security as required by an Order of this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Court. In a separate Ruling [Doc. No. 61], however, this Court granted Plaintiff's Motion to Vacate the Court Order [Doc. No. 10] which originally had required him to pay $500.00 in security for costs in view of his representations regarding his financial status. Accordingly, Defendants' Motion to Dismiss on that basis is denied.

## VI. CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Reconsideration [Doc. No. 66] is granted. Upon reconsideration, however, the Court will adhere to its prior ruling and hold that Counts One through Nine were properly dismissed as time-barred and that as to Counts Ten through Twelve, abstention is appropriate pending resolution of the state-court criminal matter. Moreover, Plaintiff's Motions for Permission to Supplement his Motion for Reconsideration [Doc. No. 67] and for Leave to Amend the Complaint [Doc. No. 68] and Defendants' Motion to Dismiss [Doc. No. 71] are denied.[FN5]

> FN5. No position is taken on any argument raised by the parties but not addressed in this Ruling. Suffice it to say, however, that any such argument has been considered and would not impact the result of this decision.

SO ORDERED.

## *RULING ON MOTION FOR RECONSIDERATION*

Pursuant to D. Conn. L.R. Civ. P. 7(c), Plaintiff moves for reconsideration of the Court's January 12, 2006 Ruling [Doc. No. 82], in which this Court granted Plaintiff's Motion for Reconsideration but adhered to its prior ruling and denied Plaintiff's Motion to Supplement his Motion for Reconsideration, his Motion for Permission to Amend the Complaint and Defendants' Motion to Dismiss. For the reasons stated herein, Plaintiff's Motion for Reconsideration [Doc. No. 83] is granted; however, the prior Ruling is affirmed.

## I. BACKGROUND

The facts of this case and the allegations in the Complaint have been detailed extensively in prior Rulings, including the January 12, 2006 Ruling which is the subject of this Motion for Reconsideration, and will not be repeated here.

## II. STANDARD OF REVIEW

Reconsideration will generally only be granted when a party can point to "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992) (citations omitted) (cautioning that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again"). Reconsideration should therefore be granted when a "party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). This Court will not grant a motion to reconsider "where the moving party seeks solely to relitigate an issue already decided," to "plug gaps in an original argument or to argue in the alternative once a decision has been made."*Id., Horsehead Res. Dev. Co., Inc. v. B.U.S. Envtl. Serv., Inc.,* 928 F.Supp. 287, 289 (S.D.N.Y.1996) (citations omitted). Ultimately, however, the question is a discretionary one and the court is not limited in its ability to reconsider its own decisions prior to final judgment. *See Virgin Atl.,* 956 F.2d at 1255.

## III. DISCUSSION

### A. Ruling on Motion for Reconsideration

#### 1. *Statute of Limitaitons*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 1182275 (D.Conn.)
(Cite as: 2006 WL 1182275 (D.Conn.))

**\*8** In the January 12, 2006 Ruling, this Court, upon Plaintiff's motion, reconsidered and affirmed its prior ruling on Defendants' Motion to Dismiss. In the original May 20, 2005 Ruling [Doc. No. 62], this Court granted in part Defendants' Motion to Dismiss, dismissing Counts One through Nine of Plaintiff's Complaint as outside the applicable statutes of limitations and time-barred. *See* May 20, 2005 Ruling at 6-8, 11. It was also determined that Counts Ten through Twelve, although not barred on statute of limitations grounds, pertain to a presently pending state court criminal action against Plaintiff. Accordingly, this Court declined to rule on those counts, holding that abstention was appropriate and staying the action pending resolution of the state court criminal matter. *Seeid.* at 11-12.

In the January 12, 2006 Ruling on Plaintiff's Motion for Reconsideration, the Court noted that Plaintiff's "arguments simply relitigate claims already raised and rejected and do not justify departing from the prior Ruling."Jan. 12, 2006 Ruling at 5 (citing *Schrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995)). After noting this, the Court proceeded to address Plaintiff's arguments in turn and held that the prior Ruling, dismissing Counts One through Nine on statute of limitations grounds, was correct. *Seeid.* at 5-8.The Court also noted that even if the counts were not dismissed on statute of limitations grounds, the claims would "run afoul on other grounds." *Id.* at 8. Specifically, the Court noted that Plaintiff's claims, challenging the validity of his conviction and the conduct of the prosecution, would fail as "habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983." *Heck v. Humphrey,* 512 U.S. 477, 481, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *see* Jan. 12, 2006 Ruling at 8-9. The Court also held that abstention, although "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it," *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 199,

79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959), was appropriate in light of the pending state criminal action since "a verdict in this Court in Plaintiff's favor could cast doubt on and imply the invalidity of the state criminal charges."Jan. 12, 2006 Ruling at 9-10 (citing *Jackson v. Suffolk Homicide Bureau,* 135 F.3d 254, 256-57 (2d Cir.1998)).

Plaintiff, in the instant motion, seeks reconsideration of a decision which the Court has already reconsidered. Moreover, Plaintiff does not cite "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," *Virgin Atl.,* 956 F.2d at 1255, but simply seeks to "relitigate an issue already decided." *Shrader,* 70 F.3d at 257. Accordingly, on this third attempt to litigate the same issues, the Court will address Plaintiff's arguments only briefly, as noted below.

**\*9** Plaintiff, in the present motion, takes issue with this Court's interpretation of *Gaus v. County of Wells,* 620 F.Supp. 1462, 1465 (N.D.Ind.1985). Although Plaintiff cites language from another portion of that opinion, Plaintiff's argument does not change this Court's previous interpretation of *Gaus:*

*Gaus* merely held ... that *"[a]t the very least,* plaintiff knew or should have known of the injuries attending the alleged violations of his constitutional rights with respect to his arrest, prosecution and conviction on January 6, 1982 when the Wells County jury returned the guilty verdict," and regardless of which date was used, the plaintiff's claims were barred by the applicable statute of limitations. *Gaus,* 620, F.Supp. at 1465 (emphasis added). The Court in *Gaus* did not need to and declined to determine the date on which the limitations period actually began to run. *Id.*

Jan. 12, 2006 Ruling at 6 (emphasis in original).

Plaintiff also argues that *Cullen v. Margiotta,* 811 F.2d 698, 725 (2d Cir.1987), distinguishes "between a plaintiff's awareness of *potential* injury and knowing or having reason to know of the *prob-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*able* injury."Pl's Mot. Recons. at 3 (emphasis in original). The Court does not read *Cullen* to make that distinction. Moreover, *Cullen* supports the Court's holding in this case.*Cullen* involved a group of plaintiffs who had previously been employed by their town or their county and who claimed that "for some years prior to the filing of their federal complaint, the defendants had engaged in a scheme of demanding, in violation of plaintiffs' rights under federal law, that employees or prospective employees of the Town and the County contribute annually one percent of their salaries to the Nassau County Republican Party in order to obtain promotion or employment." *Cullen,* 811 F.2d at 704. The district court ruled that the plaintiffs' claims were governed by a three-year statute of limitations and were time-barred. *Id.* at 705.Specifically, with regard to one plaintiff's claims, the district court held that his claims accrued in October 1973 because he "knew or should have known in October 1973 that his employment would be terminated because of his failure to pass the Civil Service examination." *Id.* at 725.The Second Circuit affirmed this ruling, holding that the plaintiff's "acknowledgment that defendants' coercive and pressure tactics were 'well-known' and that one who failed the exam could remain in the County's employ 'if he paid the one (1%) percent' revealed that he had reason to know in October 1973, in light of his lack of any intent to make that payment, that he would be dismissed."*Id.* Importantly, the Second Circuit held that the plaintiff's claim accrued when he failed the Civil Service examination and *not* subsequently, when his employment was actually terminated.*Id.* Like this Court's Ruling, the Second Circuit focused on the date of injury rather than the date on which the impact of injury was fully realized. *See* Jan. 12, 2006 Ruling at 7.

**\*10** Plaintiff also argues again that the acts complained of constituted continuing courses of conduct for which the limitations period should be tolled. *See* Pl's Mot. Recons. at 5. As previously held in the Ruling on the Motion to Dismiss and Ruling on Motion for Reconsideration, however,

the acts Plaintiff complains of are "discrete acts," not a continuing course of conduct. *See* Jan. 12, 2006 Ruling at 7; May 20, 2005 Ruling at 8. The Supreme Court has made clear that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges" and that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Plaintiff cites *Schuster v. Buckley,* 5 Conn.App. 473, 478, 500 A.2d 240, 243 (1985) and *Doe v. Blake,* 809 F.Supp. 1020, 1025 (D.Conn.1992) for the proposition that a continuing course of conduct may toll the statute of limitations. In such a case, however, "the plaintiff must allege in his complaint or present facts which reasonably support an inference of a continuing breach of duty by the defendant." *Schuster,* 5 Conn.App. at 478, 500 A.2d 240. Regarding the "continuing breach of duty," the *Schuster* court noted that "[t]he negligent performance of a professional duty or the failure to perform it must be distinguished ... from the consequences that result from such act or omission and which are claimed by way of damages;" only the former can constitute a continuing breach. *Id.* Similarly, the *Doe* court explained that "[a] continuing violation is occasioned by continuing unlawful acts, not by continued ill effects from the original violation." *Doe,* 809 F.Supp. at 1025 (quoting *Ward v. Caulk,* 650 F.2d 1144, 1147 (9th Cir.1981)). As found in previous rulings, the acts of which Plaintiff complains are discrete acts, not continuing breaches of duty. Accordingly, the limitations period should not be tolled.

### 2. *Abstention*

With regard to the abstention issue, the Court notes that it has already considered and rejected Plaintiff's arguments against abstention twice. *See* Jan. 12, 2006 Ruling at 9-10; May 20, 2005 Ruling at 11-13. As Plaintiff notes, abstention is a matter of trial court discretion. *See* Pl's Mot. Recons. at 9 (quoting *Ramos v. Lamm,* 485 F.Supp. 122, 128

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                    Page 10
Slip Copy, 2006 WL 1182275 (D.Conn.)
**(Cite as: 2006 WL 1182275 (D.Conn.))**

(D.Colo.1979)). Upon reconsideration, the Court will adhere to its prior rulings on this issue.

**B. Ruling on Plaintiff's Motion for Permission to Supplement**

In its prior Ruling, this Court denied Plaintiff's Motion for Permission to Supplement his Motion for Reconsideration. *See* Jan. 12, 2006 Ruling at 10-11. Specifically, the Court noted that Motions for Reconsideration must, pursuant to Local Rule of Civil Procedure 7(c), "be filed and served within ten (10) days of the filing of the decision or order from which such relief is sought."*Id.* at 10.Although Plaintiff's Motion for Reconsideration was timely, the Motion for Permission to Supplement was filed over one month later. Moreover, the Supplement did not present facts or arguments which would have been previously unknown to Plaintiff, but merely expanded on arguments that were made in the original motion. Plaintiff's Motion for Permission to Supplement also presented no justification for filing a supplement over one month after filing the original motion, stating only that "[j]ustification for such permissio [sic] is understood from the information and arguments which are contained in the accompanying Supplement."Moreover, even if this Court were to grant Plaintiff's Motion for Permission to Supplement his Motion for Reconsideration, such an action would not change the outcome of the Court's Ruling on Plaintiff's Motion for Reconsideration. The Court has read the supplement, however, it does not change the position taken in its rulings. Accordingly, the prior ruling is affirmed. Plaintiff's Motion for Permission to Supplement is denied on the ground that such supplement would be futile.

**C. Ruling on Plaintiff's Motion for Leave to Amend Complaint**

**\*11** Although leave to file an amended complaint "shall be freely given when justice so requires,"Fed.R.Civ.P. 15(a), leave should not be given when such amendment would be futile.

*Forman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The Court previously denied leave to amend on the ground that amendment would be futile, as Plaintiff's proposed additions pertain to conduct occurring more than three years prior to the date on which the action was filed and which therefore would be barred by the applicable statutes of limitations. *See* Jan. 12, 2006 Ruling at 12. Upon reconsideration, the prior ruling is affirmed.

**IV. CONCLUSION**

For the reasons stated herein, Plaintiff's Motion for Reconsideration [Doc. No. 83] is granted. The Court examined the merits of his claims and the prior ruling is affirmed. In light of this decision, Plaintiff Motion for Extension of Time to File Appeal [Doc. No. 87] is granted in part. Plaintiff is granted an additional thirty (30) days from the date of this Ruling to file an appeal.

SO ORDERED.

D.Conn.,2006.
Book v. Lupinacci
Slip Copy, 2006 WL 1182275 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 702289 (S.D.N.Y.)
**(Cite as: 1998 WL 702289 (S.D.N.Y.))**

▷
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Michele D. AMBRIS, on behalf of herself and all
others similarly situated, Plaintiffs,
v.
BANK OF NEW YORK, Bank of New York Re-
tirement Plan and Bank of New York Profit Sharing
Plan, Defendants.
**No. 96 Civ. 0061 LAP.**

Oct. 7, 1998.

*MEMORANDUM and ORDER*

PRESKA, J.
**\*1** Plaintiff Michele D. Ambris ("Ambris") [FN1]
brings this action against defendants the Bank of
New York ("BONY"), Bank of New York Retire-
ment Plan and Bank of New York Profit Sharing
Plan (collectively, the "Plans") [FN2] for violations
of the Employee Retirement Income and Security
Act ("ERISA"). Defendants move for summary
judgment pursuant to Federal Rule of Civil Proced-
ure 56(b). For the reasons that follow, the motion is
granted. [FN3]

> FN1. This instant motion was made prior
> to certification of the class. Thus, this
> Memorandum and Order refers to
> "Plaintiff" not "Plaintiffs."

> FN2. The Plans were incorrectly named in
> the Complaint. They should be named, re-
> spectively, as follows: the Retirement Plan
> of the Bank of New York Company Inc.
> and Employees Profit-Sharing Plan of the
> Bank of New York Company, Inc.

> FN3. The following submissions have been
> considered in resolving this motion: De-
> fendants' Memorandum of Law in Support
> of their Motion for Summary Judgment,
> dated September 5, 1997 ("BONY

Mem."); Defendants' Statement Pursuant
to Local Rule 56.1, dated September 5,
1997 ("BONY 56.1 Statement"); Affidavit
of Michael J. Dell in Support of Defend-
ants' Motion for Summary Judgment,
sworn to on September 5, 1997 ("Dell
Aff."); Affidavit of Frank Pizzimenti in
Support of Defendants' Motion for Sum-
mary Judgment, sworn to on August 28,
1997 ("Pizzimenti Aff."); Plaintiff's
Memorandum in Opposition to Defendants'
Motion for Summary Judgment, dated Oc-
tober 6, 1997 ("Ambris Opp. Mem");
Plaintiffs' Statement of Disputed Facts Pur-
suant to Local Rule 56.1(b), dated October
6, 1997 ("Ambris 56.1 Statement"); Affi-
davit of Ellen M. Doyle, sworn to on Octo-
ber 6, 1997 ("Doyle Aff."); Defendants'
Reply Memorandum in Support of Their
Motion for Summary Judgment, dated Oc-
tober 28, 1997 ("BONY Reply Mem.").

BACKGROUND

Viewed in the light most favorable to Ambris, the
general background facts are discussed herein. The
more detailed and specific facts necessary to a res-
olution of this motion are set forth in the context of
the specific arguments raised by the parties and ad-
dressed in greater detail *infra.*

Ambris commenced this action on or about January
4, 1996. She worked for BONY for more than five
years and each year she worked more than 1,000
hours per year. *See* Complaint ¶ 5. Her employment
was terminated in 1993. [FN4] *See id. According* to the
Complaint, the Plans do not cover part-time em-
ployees who work more than 1,000 hours per year.
*See id.* ¶¶ 7-8. Plaintiff falls into that category,
*see id.* ¶ 16, and the gravamen of Ambris' action is
that this practice violates ERISA, *see id.* ¶¶ 14-15.

> FN4. There seems to be some confusion

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 702289 (S.D.N.Y.)
(Cite as: 1998 WL 702289 (S.D.N.Y.))

concerning when Ambris was terminated. The Complaint alleges that she was terminated in 1993. *See* Complaint ¶ 5. At her deposition, plaintiff testified that this was in error and that she was terminated in 1994. *See* Deposition of Michele D. Ambris, dated May 21 1997, at 10 ("Ambris Depo."); annexed as Ex. 3 to the Appendix to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment and as Ex. A to the Dell Aff. In her 56.1 Statement, Ambris takes the same position. *See* Ambris 56.1 Statement ¶ 1. Defendants' 56.1 Statement continues to refer to the 1993 date. *See* BONY 56.1 Statement ¶ 2. Based upon my resolution of this motion, this factual dispute is neither relevant nor material.

Defendants bring this motion for summary judgment on multiple grounds. First, defendants argue that Ambris' cause of action is barred by the applicable statute of limitations. Second, they argue that plaintiff does not have standing to maintain the cause of action. Third and finally, defendants contend that the Plans are not proper parties to the motion. Because I resolve the motion on the first ground-the statute of limitations defense-I do not address the others.

## DISCUSSION

### I. *Summary Judgment Standard*

Under Fed.R.Civ.P. 56(c), "[a] motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *see* Fed.R.Civ.P. 56(c). *See generally Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the particular litigation if application of the relevant substantive law requires their determination. *Anderson,* 477 U.S. at 248.

"A party who moves for summary judgment has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996); *accord Chambers,* 43 F.3d at 36. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," however, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *accord Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223-24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The moving party, in other words, does not bear the burden of disproving an essential element of the nonmoving party's claim.

*2 If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "affidavits, depositions, or other sworn evidence as permitted by Fed.R.Civ.P. 56, setting forth specific facts showing that there exists a genuine issue of material fact." *Rule,* 85 F.3d at 1011; *accord* Fed.R.Civ.P. 56(e); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. Instead, the nonmovant must " 'come forward with enough evidence to support a jury verdict in its favor, and the motion will not be de-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 702289 (S.D.N.Y.)
(Cite as: 1998 WL 702289 (S.D.N.Y.))

feated merely ... on the basis of conjecture or surmise." ' *Trans Sport, Inc. v. Starter Sportswear,* 964 F.2d 186, 188 (2d Cir.1992) (citation omitted).

"In ruling on a motion for summary judgment, the district court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment."*Id.;accord Chambers,* 43 F.3d at 36. "The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried." *Rule,* 85 F.3d at 1011. Accordingly, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."*Id.* Similarly, "[a]ny weighing of the evidence is the prerogative of the finder of fact."*Id.*"If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a *reasonable* inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers,* 43 F.3d at 37 (emphasis added).

## II. *The Timeliness of Plaintiff's Claims*

In this case, the statute of limitations' puzzle involves two problems. First, what is the applicable statute of limitations? Second, when did plaintiff's cause of action accrue? As set forth in greater detail below, I avoid the first problem by assuming, without deciding, that the longest statute of limitations urged by plaintiff-six years-applies. As to the second problem, I find that the cause of action accrued in December 1988. Because plaintiff commenced suit in January 1996, more than six years after December 1988, the action is time barred.

For ERISA causes of action, the controlling statute of limitations is the most analogous state limitations period. *See Miles v. New York State Teamsters Conf. Pension Plan,* 698 F.2d 593, 598 (2d Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78

L.Ed.2d 108 (1983). Defendants argue that Ambris' claim is most analogous to a claim that alleges a violation of a statute, not a breach of contract. According to defendants, under New York law, such a cause of action is governed by either a three or one year period of time. *See* BONY Mem. at 9-14. Plaintiff disputes this and argues that a six-year statute of limitations based upon a breach of contract applies. *See* Ambris Opp. Mem. at 7-11. Because resolving this dispute is not necessary based upon my finding as to when the cause of action accrued, I shall assume, arguendo, that the six-year statute of limitations applies. *Seegenerally Carollo v. Cement and Concrete Workers Dist. Council Pension Plan,* 964 F.Supp. 677, 686 & 688-89 (E.D.N.Y.1997) (observing that while ERISA establishes a statute of limitations for breach of fiduciary duty claims, it is silent as to those alleging that a given plan violates the Act generally and holding, in an action seeking reformation of a plan and recalculation of benefits, that the six-year statute of limitations should apply).

**\*3** Turning to the second problem, when the cause of action accrued, in *Miles,* the Court of Appeals articulated what is now settled law: "A plaintiff's ERISA cause of action accrues ... when there has been a repudiation by the fiduciary which is clear and made known to the beneficiaries."*Id.* at 598 (internal quotation marks and citation omitted); *seealso Carollo,* 964 F.Supp. at 689 (applying the *Miles* rule to an action challenging the terms of a plan). Though application of this standard should be, under most circumstances, straightforward and clear, this case highlights some of the problems that can arise in applying it. Notwithstanding these obstacles, for the reasons that follow, I find that plaintiff's claim is time barred.

Before addressing the case law and the specific issues raised by this motion, certain critical facts need to be explored; namely, in light of the *Miles* standard, what did plaintiff know and when did she know it. At her deposition, Ambris testified that in December 1988 she understood that she was not eli-

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 702289 (S.D.N.Y.)

**(Cite as: 1998 WL 702289 (S.D.N.Y.))**

gible for pension benefits, that this fact was widely known, and discussed, among her co-workers and that she complained about it to her supervisor:

Q: When did you first complain that you were doing full-time work but not getting benefits?

A: After six months when I noticed the volume of the work increasing.

Q: Six months after you started work?

A: Yes.

Q: When did you start work?

A: I started work in May of '88.

Q: What benefits weren't you getting that you thought you would get if you were full time?

A: Medical coverage, profit sharing, sick days, pension.

Q: How were you aware-well, strike that.

Six months after you started work would be roughly November or December of 1988, is that correct?

A: About December.

Q: So by December of 1988, you were aware that you were not getting medical and you would be getting it if you were considered a full-time worker?

A: Yes.

Q: And that you were not getting profit sharing, sick days and pension and you would get them if you were a full-time worker?

A: Yes.

Q: And how did you learn about that by December of 1988?

A: All co-workers.

Q: Co-workers told you about it?

A: Yes, everybody talked about it, full-time and part timers.

Q: You mean talked about the fact that you couldn't get the pension, sick days, profit sharing and medical because you were part time, not just you but the other people who were part time?

A: That's correct.

Q: So who did you complain to in December of 1988 about that?

A: Well, on many occasions I asked Frank, you know.

Q: Mr. Pesamente?

A: Mr. Pesamente, for a full-time position.

Q: And did you tell him that one of the reasons you wanted a full-time position was so you could get medical, sick days, pension and profit sharing?

A: Yes.

Ambris Depo. at 17-19. Plaintiff also thought, and expressed to her supervisor, that it was a violation of law for BONY to hire her as a part-time employee without benefits but yet require her to work full-time hours:

*4 A: Well, what I'm saying is as co-workers we would talk, we know we're being treated unfairly because we're hired as part time working full-time hours. Who's going to complain when we need our job?

Q: And you thought Bank of New York was violating the law by doing that to you?

A: Yes, I thought so.

Q: And did you tell that to Mr. Pesamente?

A: Yes, I think I did mention it.

Q: Starting in December of 1988?

A: Maybe not in '88 but maybe later on.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 702289 (S.D.N.Y.)
(Cite as: 1998 WL 702289 (S.D.N.Y.))

Q: In '89?

A: Could have been.

Q: And in 1990?

A: Could have been.

Ambris Depo. at 56-57.

Equally important to the resolution of this motion is Ambris' testimony that she never applied for pension benefits because she thought that to do so would have been futile:

Q: Have you ever made any application to the pension plan or the retirement plan for benefits?

A: As far as to my knowledge, these benefits, you only get these benefits if you are a full-time employee.

Q: So you never made an application?

A: You could not. You had to be a full-time employee.

Q: But I just want to clarify for the record that you never made any application for those benefits, is that correct?

A: No.

Q: Maybe my question wasn't clear. Did you ever make any application for benefits to the retirement plan or the profit sharing plan?

A: No, only when I spoke to Mr. Pesamente concerning the full-time position.

Q: Only in your conversation with him starting in December of 1988?

A: Yes.

Ambris Depo. at 38-39.

Thus, to summarize, a number of uncontested facts emerge from this testimony. In December 1988,

Ambris knew that she was not eligible for pension and other benefits. This fact was discussed by Ambris' colleagues, and Ambris complained about it to her supervisor. Ambris thought that she was not eligible for benefits because she was a part-time employee. She also thought that it was a violation of law for her to work full-time hours but yet not receive benefits because she was classified as a part-time employee. Finally, because plaintiff did not believe she was eligible for benefits, she never applied for them. With these undisputed facts in mind, I turn back to the applicable legal standard.

*Miles* held that "[a] plaintiff's ERISA cause of action accrues ... when there has been a repudiation by the fiduciary which is clear and made known to the beneficiaries." 698 F.2d at 598 (internal quotation marks and citation omitted). The Court of Appeals has since reaffirmed this standard, *see Larsen v. NMU Pension Trust,* 902 F.2d 1069, 1073 (2d Cir.1990), and district courts universally apply it without substantial complication. *See,e.g., Lewis v. John Hancock Mutual Life Ins. Co.,* 6 F.Supp.2d 244, 247 (S.D.N.Y.1998); *Barnett v. IBM Corp.,* 885 F.Supp. 581, 591 (S.D.N.Y.1995); *Patterson-Priori v. Unum Life Ins. Co. of Am.,* 846 F.Supp. 1102, 1106 (E.D.N.Y.1994); *Smith v. Rochester Tel. Buss. Marketing Corp.,* 786 F.Supp. 293, 306 (W.D.N.Y.1992), *aff'd,* 40 F.3d 1236 (2d Cir.1994). Here, in light of Ambris' clear testimony that she knew that she was not eligible for benefits in December 1988, one would think that the answer to the question of when her cause of action accrued is quite simple, December 1988. Unfortunately, this case is not as simple as it appears.

*5 The first complication is reflected, but not immediately evident, in the allegations and testimony set forth above. The Plans provide that employees who are paid on an hourly basis are not eligible for benefits. *See* Retirement Plan of the Bank of New York Company, Inc., Art. II, section 2.1(b)(i); annexed as Ex. C to the Dell Aff.; Employees' Profit-Sharing Plan of the Bank of New York Company, Inc., section 2(1)(i); annexed as Ex. D to the Dell

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 702289 (S.D.N.Y.)
(Cite as: 1998 WL 702289 (S.D.N.Y.))

Aff. By negative implication, and assuming that other provisions not relevant here are satisfied, employees are included in the Plans if they are paid on a salaried basis. This otherwise clear distinction has become somewhat muddled by the parties' use of the terms part-time instead of hourly and full-time instead of salaried. An example clarifies the point.

According to Ambris' deposition testimony, Ambris was paid on an hourly basis, worked full-time (in the sense of 40 hours per week), but was designated part-time and did not receive benefits. *See* Ambris Depo. 24; Ambris Opp. Mem. at 5. She further mistakenly understood that she was not eligible for benefits because she was a part-time employee, and that she would be eligible if she was a full-time employee. Ambris does not speak of this matter in terms of salaried and hourly employees. Thus, the substitution of the concepts part-time for hourly and full-time for salaried has generated some confusion, the source of which, according to Ambris, is statements from her supervisor and other employees. *See* Ambris Depo. at 51. Plaintiff also argues that defendants' summary plan descriptions ("SPD") mistakenly refer to part-time, not hourly, employees. *See* Ambris Opp. Mem at Exs. 1 & 2.[FN5]

FN5. I point out that this is not as clear as plaintiff would have it. The first SPD (which addresses BONY's retirement plan), in a footnote underneath the Table of Contents, states that "[t]his Guide applies only to full-time employees...." Ambris Opp. Mem. Ex. 1. That statement falls a bit short of stating that only full-time employees are eligible for retirement benefits, but insofar as the guide "applies" to full-time employees it suggests that its contents are only relevant to full-time employees. Thus, I give plaintiff the benefit of the doubt on that score. Nonetheless, the very next page states the point in clearer terms: "If you are a full-time salaried employee of The Bank of New York Company, Inc ....

you are eligible for Plan membership. If you are employed on an hourly basis, you are not a member of the Plan."*Id.* The use of the phrase "full-time salaried" is perhaps not as clear as it could be, but the second sentence is crystal clear, especially as far as plaintiff is concerned. The second SPD (which addresses the profit sharing plan) is perfectly clear on all points: "In order to become a member of the Plan you must be a salaried employee.... If you are employed on an hourly basis you are not eligible to join the Plan."Ambris Opp. Mem. Ex. 2.

In addition, in the Complaint, although the overall allegations refer to a distinction between full and part-time, plaintiff appears to have understood that part-time was a substitute for hourly. *See* Complaint ¶ 14 ("The exclusion of persons classified as 'part time' or 'hourly'... operates to exclude from participation employees who have met ERISA's minimum participation requirements.") (emphasis added); *seealsoid.* ¶ 33 (referring to "full-time salaried" and "part-time hourly" employees); *id.* ¶ 35 (same). Moreover, annexed to the Complaint, and specifically incorporated by reference, *seeid.* ¶ 17, is a document entitled "Your Guide to Benefits and Policies."The Complaint alleges that this document refers to "exclusions of part-time employees." *Id.* But the document itself, under the heading "Who is a Member," specifically refers to hourly employees: "In order to become a member of the Plan you must be in general a salaried employee.... If you are employed on an hourly basis ..., you are not eligible to join the Plan."

Plaintiff seizes upon this confusion, and the fact that it is apparently generated by defendants, and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 702289 (S.D.N.Y.)
(Cite as: 1998 WL 702289 (S.D.N.Y.))

argues that it creates material issues of fact that preclude granting defendants summary judgment. I disagree. In essence, this is really a debate over nomenclature. Although Ambris may have been confused about the distinction between full and part time, as opposed to salaried and hourly, employees, the fact remains that it was absolutely clear to her, in December 1988, that she was not eligible for benefits. This is the clarity contemplated by *Miles* when it refers to a repudiation which is "clear," *i.e.,* a plaintiff must receive a statement that clearly communicates that she is not entitled to benefits. The fact that she misunderstood the technical term of art that describes the reason for her denial of benefits does not change that result.

I read the Court of Appeals' decision in *Larsen* as supporting this reading of *Miles.*In *Larsen,* the dispute concerned what pension benefits plaintiff, the widow of a merchant mariner, was entitled to receive after her husband's death. The plan at issue provided an option whereby the employee/participant could receive a slightly reduced lifetime benefit, followed by lifetime survivor's benefits for the spouse. *See Larsen,* 902 F.2d at 1070. The issue in the case was whether plaintiff was entitled to these survivor's benefits. Relevant to this motion is the Court of Appeals' rejection of one date as the accrual date for plaintiff's cause of action. On August 27, 1980, plaintiff received a letter from her husband's pension plan indicating that she would receive twenty-six monthly payments of a particular amount. The letter, however, did not explain what the payments represented, that they were being offered in lieu of survivorship benefits and that plaintiff's husband had in fact waived the lifetime survivor's benefits. *See Larsen,* 902 F.2d at 1074. The Court of Appeals held that under these circumstances the letter was not a "clear repudiation" of plaintiff's right to survivor's benefits. *Seeid.*

*6 The repudiation in *Larsen* was not clear because it failed to communicate to plaintiff that she was going to be receiving a monthly payment in lieu of the survivorship benefits that she eventually sought

and believed she was entitled to. In fact, the repudiation did not say anything, one way or the other, about what the payments represented. Here, Ambris was not similarly left in the dark. She knew that she was not receiving benefits and that this was due to her employment status with BONY. She may have been confused about whether that status was properly termed "part-time" or "hourly," but the underlying denial of benefits was clear. The same cannot be said of the repudiation addressed in *Larsen.*In fact, the repudiation that eventually resulted in the accrual of benefits was a letter from the plan which clearly stated that plaintiff had been paid all that she was entitled to receive and that no more payments would be forthcoming. *Seeid.*Ambris had this same understanding in December 1988 and, accordingly, the "repudiation" was clear to her at that time.[FN6]

> FN6. In fact, plaintiff's reading of *Miles* would create the bizarre result of holding that her cause of action has, to this date, still not accrued, even though the Complaint has already been filed, because Ambris, as her deposition testimony reveals, is still confused about the distinction between hourly and part-time.

But I place "repudiation" in quotation marks to emphasize the need to explore another complicating aspect of this motion. In a typical case, the clear repudiation contemplated by *Miles* is a statement, in one form or another, from a plan fiduciary that an application for benefits has been denied. *See,e.g., Larsen,* 902 F.2d at 1074 (cause of action accrued when plaintiff received a letter from the plan supervisor that set forth the plan's denial of benefits); *Miles,* 698 F.2d at 598-99 (cause of action accrued when plaintiff received notification that his application for pension benefits was denied); *Patterson-Priori,* 846 F.Supp. at 1106 ("Uniformly, courts recognize that an ERISA cause of action accrues when an application for benefits is denied.") (internal quotation marks and citation omitted). Here, Ambris never applied for benefits and there-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 702289 (S.D.N.Y.)
(Cite as: 1998 WL 702289 (S.D.N.Y.))

fore no one ever told her that her application had been denied. Under such circumstances, what constitutes clear repudiation? I read the essence of *Miles* and its progeny as seeking to ensure that a plaintiff clearly understands that she is not entitled to benefits. Once a plaintiff is on clear notice that she is not entitled to benefits, the cause of action accrues. Again, in this case, plaintiff never applied for benefits and therefore never received a clear repudiation in response to an application. Nonetheless, the clear repudiation contemplated by *Miles* was present in the sense that the knowledge that Ambris, and others like her, were not eligible for benefits was clear and pervasive: Ambris knew it, her co-workers knew it, Ambris discussed it with her supervisor and, moreover, she thought it was unlawful. I do not believe that *Miles* intended to require anything more before a cause of action accrues. *Cf. Barnett,* 885 F.Supp. at 591 (cause of action accrued when it became "futile" to apply for benefits because the plaintiff alleged that at that time there was a "de facto" denial of her claim).[FN7]

FN7. The lack of typical repudiation due to Ambris' failure to apply for benefits highlights another potential problem with her cause of action. In *Barnett,* the court discussed at some length ERISA's exhaustion requirement, which is a jurisdictional prerequisite to bringing suit. *See* 885 F.Supp. at 586-87;*see also Lewis,* 6 F.Supp.2d at 247-48. Neither side, but particularly defendants, addressed this issue. There is a futility exception to the exhaustion requirement, *see Barnett,* 885 F.Supp. at 587-88, but again neither side has addressed it. In light of this absence of briefing, I am hesitant to conclude that Ambris' claims are barred by an exhaustion requirement. But her failure even to apply for benefits, let alone initiate an internal review process, does suggest that this may be a valid defense. *See Belnomi v. Sonoco Products Co.,* 686 F.Supp. 520, 522 (E.D.Pa.1988)

(discussing *Janowski v. International Brotherhood of Teamsters,* 673 F.2d 931, 935 (7th Cir.1982), *vacated on other grounds,* 463 U.S. 1222, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), and its holding that the exhaustion requirement does not apply to actions seeking to clarify rights to future benefits, but that it does apply to actions seeking current benefits; holding that where plaintiff never applied for pension benefits, and brought suit seeking current benefits, action was properly dismissed as premature because of failure to exhaust remedies).

*7 In addition to the arguments I have already addressed, plaintiff makes a few other arguments in opposing this motion worth commenting upon. First, plaintiff contends that "the *Miles* court rejected the argument that the limitation period began running when the plaintiffs had knowledge that they were excluded from the plan's classifications.... Under the *Miles* analysis, a representation by a supervisory employee who is not involved in the administration of the plan would clearly not be sufficient to start the limitations period running."Ambris Opp. Mem. at 5 (citations omitted). There are two problems with these two somewhat distinct, but nonetheless merged, arguments. First, *Miles* did not "reject the argument that the limitation period began running when the plaintiffs had knowledge that they were excluded from the plan's classifications."In fact, the court specifically held that the limitations period only could begin to run once the plaintiffs had knowledge that they were excluded from the plan.

The *Miles* court was asked to choose between two accrual dates. The first (September or October 1969) was the date when plaintiffs' employer received notice on behalf of its employees (the plaintiffs in *Miles* ) that the employees' pension plan would not give them the benefit they sought. *See* 698 F.2d at 596-97. The Court of Appeals rejected this date as the date the cause of action ac-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 1998 WL 702289 (S.D.N.Y.)
**(Cite as: 1998 WL 702289 (S.D.N.Y.))**

crued, presumably because although plaintiffs' em-
ployer knew that plaintiffs were not eligible for be-
nefits, the plaintiffs themselves did not know.
*See id.* at 598-99.The second date (January 1976)
was the date when one of the plaintiffs applied for
pension benefits and was specifically denied those
benefits. *See id.* at 597.The Court of Appeals held
that the district court's selection of this date as the
accrual date was not clearly erroneous. *See id.* at
599.

Accordingly, *Miles* held that actual knowledge of a
denial of benefits was required, not constructive
knowledge vis-a-vis an employer's attempts to ob-
tain benefits on behalf of its employees. In fact, this
reading of the case fits nicely with the Court of Ap-
peals' broader holding on the governing legal stand-
ard, *i.e.,* that "[a] plaintiff's ERISA cause of action
accrues ... when there has been a repudiation by the
fiduciary which is clear and *made known to the be-
neficiaries." Miles,* 698 F.2d at 598 (internal quota-
tion marks and citation omitted) (emphasis added).
Insofar as the Court of Appeals requires the denial
to be "made known to the beneficiaries" it is diffi-
cult to understand how plaintiff can argue that
*Miles* rejected the argument that the statute of limit-
ations begins to run when a plaintiff obtains know-
ledge of the denial of benefits. The standard that
plaintiff argues was rejected is the very standard
that the Court of Appeals adopted.

Plaintiff's second argument-that under *Miles* a rep-
resentation by a supervisory employee not involved
in the administration of the plan would clearly not
be sufficient to trigger the running of the limita-
tions period-is similarly misleading. True enough,
the *Miles* standard refers to repudiation by a fidu-
ciary, but there is no indication in the decision that
a plaintiff's general understanding that she is not
eligible for benefits is somehow insufficient under
*Miles* because it did not come directly from a fidu-
ciary. This case illustrates the point well. In the
first instance, plaintiff misreads her own deposition
testimony in arguing that her knowledge of the lack
of benefits came from a supervisory, but non-

fiduciary, employee. Ambris testified as follows:

**\*8** Q: And how did you learn about [the lack of be-
nefits] by December of 1988?

A: All co-workers.

Q: Co-workers told you about it?

A: Yes, everybody talked about it, full-time and
part timers.

Q: You mean talked about the fact that you couldn't
get the pension, sick days, profit sharing and med-
ical because you were part time, not just you but
the other people who were part time?

A: That's correct.

Ambris Depo. at 18-19. Thus, Ambris' knowledge
of BONY's rules seems to have been derived not
from a single conversation with a supervisor, but
rather from what appears to have been common
knowledge and a subject of discussion among em-
ployees. The conversation that plaintiff alludes to in
her brief is Ambris' conversation with Pizzimenti,
in which Ambris complained about the denial of be-
nefits and asked for a promotion. *Seeid.* at 19; Am-
bris Opp. Mem. at 5.[FN8] Thus, plaintiff distorts the
deposition testimony in attempting to make it ap-
pear as if Ambris learned of the Plans' rules and
regulations exclusively from Pizzimenti. Rather, the
transcript is clear that plaintiff learned of her in-
eligibility for benefits in the same manner that other
employees at BONY in her position learned of it-it
was simply common knowledge. Nothing in *Miles*
suggests that this is somehow insufficient to trigger
the running of the statute of limitations.

> FN8. The deposition transcript refers to
> Frank Pesamente, but the parties refer to
> Frank Pizzimenti. Frank Pizzimenti sub-
> mitted an affidavit in support of the motion
> which makes clear that he was Ambris' su-
> pervisor, and, therefore, also the individual
> referred to in the deposition transcript as
> Frank Pesamente.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 1998 WL 702289 (S.D.N.Y.)
(Cite as: 1998 WL 702289 (S.D.N.Y.))

Finally, I turn to plaintiff's specific reliance upon my prior decision in *Davis v. NMU Pension & Welfare Plan,* 810 F.Supp. 532, 535 (S.D.N.Y.1992). That case involved a claim by a seaman for increased pension benefits. The central issue was whether plaintiff's plan acted permissibly in denying plaintiff credit for time worked prior to 1972. I found that a six-year statute of limitations applied and that plaintiff's claim accrued when his retirement plan rejected his post-retirement application for benefits. *See id.* at 535.Prior to this accrual date, plaintiff wrote a letter to the plan protesting that he would not receive credit for time worked prior to 1972. The plan responded by letter dated February 8, 1979 ("the February Letter") confirming its calculation of plaintiff's pension benefits. *Seeid.*In rejecting defendant's argument that this letter should control the accrual date, I identified four reasons why this letter did not constitute a clear repudiation: (1) the letter sent by plaintiff requesting this review was not an application for benefits; (2) the procedure utilized by the plan to address plaintiff's letter was "entirely ad hoc and not part of the published procedures[;]" (3) the February Letter specifically stated that its determination was "provided for [plaintiff's] convenience and should not be construed as a complete and final analysis[;]" and (4) at the time the February Letter was issued, plaintiff still had the ability, under the plan's regulations, to cure the cancellation through continued service. *Seeid.* at 535-36.Instead, I found that the plan clearly repudiated plaintiff's right to pension benefits when it denied his application for those benefits some five years later. *Seeid.* at 536.

**\*9** Plaintiff argues that *Davis* compels me to reject the December 1988 accrual date urged by defendants herein because in *Davis* I "found that a participant's action for pension benefits accrued upon denial of the application for benefits and not when [t]he participant first had notice that certain service credits were being cancelled."Ambris Opp. Mem. at 6. The first problem with plaintiff's attempt to draw an analogy to *Davis* is that Ambris, unlike the plaintiff in *Davis,* never applied for benefits. Thus,

she never gave defendants an opportunity to provide her with the type of clear repudiation I found sufficient in *Davis.*Second, the February Letter was, on its face, preliminary, and, most importantly, specifically left room for plaintiff to obtain the benefits he sought. Ambris' understanding of her situation in December 1988 is not at all similar. She understood that she was not eligible for benefits as long as she continued working at her then-current status, and, in fact, she recognized that that predicament was final and binding because she specifically sought to change positions so that she could become eligible for benefits. In addition, plaintiff's understanding that the Plan's classification was final and binding is reflected in the fact that she did not apply for benefits because she thought that do so would be futile. As a result, *Davis* does not compel a different result from the one I reach herein.

In short, I find that notwithstanding plaintiff's arguments to the contrary, plaintiff's cause of action accrued in December 1988. Even assuming that a six-year statute of limitations applies, because the claim was filed in January 1996, the action is time barred.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted. The Clerk of the Court shall mark this matter closed and all pending motions denied as moot.

SO ORDERED:

S.D.N.Y.,1998.
Ambris v. Bank of New York
Not Reported in F.Supp.2d, 1998 WL 702289 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2005 WL 1476453 (S.D.N.Y.), 35 Employee Benefits Cas. 2789
**(Cite as: 2005 WL 1476453 (S.D.N.Y.))**

c

United States District Court, S.D. New York.
Martin NAHOUN, Plaintiff,

v.

EMPLOYEES' PENSION PLAN OF CREDIT
SUISSE FIRST BOSTON and Credit Suisse First
Boston Corporation Employee Benefits Committee,
Defendants.
**No. 04 Civ. 9221(LAK).**

June 22, 2005.

Cem Ozer, Schoeman, Updike & Kaufman, LLP,
for Plaintiff.
Nicholas H. De Baun, Allison E. Maue, Sidley Aus-
tin Brown & Wood LLP, for Defendants.

MEMORANDUM OPINION

KAPLAN, J.
*1 Plaintiff contends he wrongly was denied bene-
fits due under his company's ERISA plan. Defend-
ants move to dismiss on the ground that plaintiff
was not a plan "participant."

I

According to the complaint, Martin Nahoun was
employed by Credit Suisse First Boston ("CSFB")
from April 1982 until April 1995 as a vice president
in the equities department. In January 1997,
Nahoun returned to CSFB to become a vice presid-
ent/project manager in the equities and fixed in-
come divisions. The complaint further alleges that

"[a]lthough Nahoun was given the title
'independent contractor' on or about December 15,
1997, he was never treated like one. Moreover, in
1999, CSFB effectively removed the 'independent
contractor' designation by: (a) exempting Nahoun
from policies then promulgated that were applic-
able to independent contractors but not employees,

including a requirement that independent contract-
ors submit periodic statements of work performed
to obtain future work from CSFB; and (b) requiring
Nahoun to attend meetings for employees relating
to certain regulatory compliance matters that inde-
pendent contractors did not attend."[FN1]

FN1. Cpt. ¶ 2.

Though Nahoun was paid on a Form 1099 rather
than a W-2, "he was paid a set salary (which he was
asked to break down into hourly increments for
submission to CSFB)."[FN2] Furthermore, according
to Nahoun, "the vast majority of CSFB's records"
treated him as an employee rather than a private
contractor.[FN3]

FN2.*Id.* ¶ 12.

FN3.*See id.* ¶ 14.

CSFB terminated Nahoun's employment on March
30, 2004. In the middle of April, Nahoun wrote to
the Credit Suisse First Boston Corporation Employ-
ee Benefits Committee (the "Committee") seeking
confirmation that the Employees' Pension Plan of
Credit Suisse First Boston (the "Plan") covered his
employment with CSFB from December 16, 1997
through March 30, 2004 (the "Relevant Period").
Subsequently, CSFB informed Nahoun that the Plan
did not cover Nahoun during the Relevant Period
and purported to deny his appeal from that decision.
Neither the Plan nor the Committee responded to
Nahoun's request.[FN4]

FN4.*Id.* ¶ 3.

Nahoun subsequently brought two claims against
the Plan and the Committee under the Employee
Retirement Income Security Act of 1974, as
amended ("ERISA").[FN5] First, he requests the
Court to determine *de novo* that he is entitled to be-
nefits for his work during the Relevant Period un-
der Section 502(a)(1)(B) of ERISA.[FN6]Second, he

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2005 WL 1476453 (S.D.N.Y.), 35 Employee Benefits Cas. 2789
**(Cite as: 2005 WL 1476453 (S.D.N.Y.))**

alleges that the Plan and Committee violated Section 503 [FN7] by failing to review his claim.

> FN5. 29 U.S.C. § 1001 et seq.

> FN6. 29 U.S.C. § 1132(a)(1)(B).

> FN7. 29 U.S.C. § 1133.

## II.

In deciding a Rule 12(b)(6) motion, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. [FN8] Where, as here, the complaint refers to a document that is integral to it, the Court considers that document as well. [FN9] Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [FN10]

> FN8. *See e.g., Starr v. Georgeson S'holder, Inc.,* 412 F.3d 103, 2005 WL 1400139 at *4 (2d Cir.2005); *Flores v. South Peru Copper Corp.,* 343 F.3d 140, 143 (2d Cir.2003).

> FN9. *See e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808-809 (2d Cir.1996).

> FN10. *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

**\*2** To state claims under ERISA, Nahoun must allege that he was a "participant" within the meaning of the statute. [FN11] ERISA defines "participant" in relevant part to "mean[ ] any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization." [FN12] Defendants urge that this implies that an individual, to be a "participant," must

be both (1) a common law employee and (2) actually eligible to receive a benefit from the ERISA plan. [FN13] They allege that Nahoun concedes in his complaint that he is not eligible to receive a benefit under CSFB's plan and that his claims therefore fail. [FN14]

> FN11. Section 503 of ERISA does not create a private right of action. 29 U.S.C. § 1133. Rather, Nahoun must sue under Section 502(a)(3) as a "participant" to enforce the rights guaranteed under Section 503. 29 U.S.C. § 1132(a)(3).

> FN12. ERISA § 3(7), 29 U.S.C. § 1002(7).

> FN13. Def. Br. at 6. The Supreme Court explained that "former employees ... who have a 'colorable claim' to vested benefits" fall under the statutory definition of "participant." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 117 (1989) (*quoting Kuntz v.. Reese,* 789 F.2d 1410, 1411 (9th Cir.1986) (per curiam) *cert. denied,* 479 U.S. 916 (1986)).

> FN14. Section 503 of ERISA grants rights only to "participants" and "beneficiaries." 29 U.S.C. § 1133. Nahoun is clearly not a "beneficiary" within the meaning of ERISA. ERISA § 3(8), 29 U.S.C. § 1002(8).

## III.

The complaint alleges that Nahoun is covered. Defendants provide the Court with two versions of the Plan on this motion, that in effect as of January 1, 1998 ("1998 Plan") [FN15] and an amendment and restatement effective January 1, 2004 ("2004 Plan"). [FN16] Both define "participants" as "Employee[s] participating in the Plan." [FN17] The term "Employee" is defined in the 1998 Plan to

> FN15. Aff. of Nicholas H. De Baun, Ex. C ("1998 Plan").

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1476453 (S.D.N.Y.), 35 Employee Benefits Cas. 2789
**(Cite as: 2005 WL 1476453 (S.D.N.Y.))**

FN16. Aff. of Nicholas H. De Baun, Ex. B ("2004 Plan").

FN17. 2004 Plan ¶ 8.2; 1998 Plan ¶ 8.2.

"mean any person employed by the Corporation or a Participating Affiliate and treated as such on the books and records of the Corporation or Participating Affiliate, and shall not include (i) *any person treated by the Corporation or Participating Affiliate as an independent contractor* or (ii) any person serving the Corporation or Participating Affiliate through an agency, consulting firm, payroll service, subcontractor or other third party provider."FN18

FN18. 1998 Plan ¶ 1.14 (emphasis added).

The 2004 definition is identical in all material respects.FN19

FN19. 2004 Plan ¶ 1.16.

Defendants argue that Nahoun was not an "employee" within the meaning of the Plan because CSFB treated Nahoun on its books and records as an independent contractor rather than an employee. Accordingly, they argue Nahoun was not a "participant" within the meaning of ERISA.FN20

FN20. Defendants point also to ¶ 3.2 of the 2004 Plan, which reads in relevant part "[t]he participation of a Participant who ceases to be an Employee *or who ceases to be on the U.S. payroll* of the Company or a Participating Affiliate shall terminate as of the date of such cessation."(Emphasis added). Because Nahoun concedes in the complaint that he was paid on a Form 1099 rather than a W-2, defendants argue that he concededly was not a "participant" within the meaning of the Plan. This argument fails. The analogous provision in the 1998 Plan does not mention "U.S. payroll," a term that in any case is not defined in the Plan. It is not entirely clear that being paid on a Form 1099 suffices to take Nahoun out of the Plan.

Defendants' argument is unpersuasive. The term "books and records" is not defined in Article I of the Plan, and it is not clear that the definition of "employee" requires CSFB to treat an individual as an "employee" on *all* of its books and records for the individual to be covered. Nahoun, moreover, alleges that CSFB treated him as an employee on its books and records. His complaint points to several records specifically, including "records kept for compliance purposes."FN21 Consequently, it cannot be said with certainty that Nahoun cannot prove at trial that he was treated as an employee in CSFB's books and records.

FN21.*See id.* ¶ 14 (Nahoun specifically points to "distribution lists for the groups within which he worked, certain records kept for compliance purposes, records relating to his own brokerage activities, and lists used to track and monitor independent contractors maintained by the human resources department of CSFB.").

Nor is it certain that the Plan's exclusion of those "treated by the Corporation or Participating Affiliate as an independent contractor" applies.FN22 Nahoun alleges that he was treated as an employee rather than an independent contractorFN23 and enumerates more than a dozen reasons in support of this conclusion.FN24

FN22. 1998 Plan ¶ 1.14.

FN23. Nahoun does concede that CSFB designated him an "independent contractor." But he asserts that he "was never treated like [an independent contractor]." Cpt. ¶ 2.

FN24.*See* Cpt. ¶ 12.

In response, defendants contend essentially that the exclusion specifically targets those treated as independent contractors on CSFB's books and records, such as Nahoun.FN25 However, the Plan excludes those "treated" as independent contractors, not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1476453 (S.D.N.Y.), 35 Employee Benefits Cas. 2789
**(Cite as: 2005 WL 1476453 (S.D.N.Y.))**

those "treated on the books and records" of CSFB as independent contractors.[FN26]

> FN25. Def. Br. at 8; *see also* Def. Reply at 3 ("[P]laintiff offers the Court nothing more than the irrelevant argument that he is entitled to benefits because he was allegedly a common law employee of CSFB at the time.").

> FN26.*See* 1998 Plan ¶ 1.14; 2004 Plan ¶ 1.16. By using the word "treated" rather than "treated on its books and records," the Plan does not resolve the question of whether the "employee" and "independent contractor" categories are mutually exclusive (e.g., can someone be simultaneously treated as an employee on CSFB's books and records and treated as an independent contractor, or does CSFB treat individuals on its books and records either as an employee or as an independent contractor?).

**\*3** While it seems unlikely, the Court cannot now say that Nahoun could prove no facts that would permit a finding that he was a Plan "participant." Accordingly, this branch of defendants' motion lacks merit.

### IV.

Defendants argue also that Nahoun's Section 502[FN27] claim is time-barred. They contend the suit was brought over six years after Nahoun had clear notice that he was not a Plan "participant" because, according to them, the Plan itself unambiguously notified Nahoun of his exclusion.[FN28]

> FN27.29 U.S.C. § 1132.

> FN28. Def. Br. at 11.

Defendants rely principally on *Downes v. J.P. Morgan Chase & Co* .[FN29] In *Downes,* plaintiff unsuccessfully brought an action for denied benefits under ERISA alleging she had been "wrongfully clas-

sified ... as an independent contractor rather than as an employee" and that her employer denied her benefits "on that basis ."[FN30] *Downes,* however, is inapposite. Unlike the plaintiff in *Downes,* Nahoun alleges that he always has been a Plan "participant," not that he had been wrongly classified. According to Nahoun, CSFB, the Plan, and the Committee incorrectly denied him benefits due under the plan after he left CSFB.[FN31]

> FN29.*See e.g.,   Downes v. J.P. Morgan Chase & Co.,* No. 03 Civ. 8991, 2004 WL 1277991, at \*5 ("All of the district courts that have considered claims made by individuals who were classified or treated as independent contractors have held that the statute of limitations begins to run when the beneficiary first learns that she is considered an independent contractor and is therefore not entitled to benefits, regardless of whether she later files a formal claim for benefits.") (*citing Brennan v. Metro. Life Ins. Co.,* 275 F.Supp.2d 406, 409-10 (S.D.N.Y.2003)).

> FN30.*Id.* at \*1 ("Downes alleges that J.P. Morgan deliberately 'misclassif[ied] her as a consultant and/or independent contractor with the specific intent to deny her benefits.' ").

> FN31. The other cases defendants cite are similarly inapposite. In *Brennan v. Metropolitan Life Insurance Company,* plaintiffs signed express agreements providing that "[i]t is understood that supplier shall not be entitled to or be eligible to participate in any benefits or privileges given to [MetLife] employees including ... participation in Insurance and Retirement Programs." 275 F.Supp.2d 406, 408 (S.D.N.Y.2003).*Szoke v. Deloitte & Touche LLP* is completely irrelevant. No. 93 Civ. 7097, 1995 WL 92258 (S.D.N.Y.1995). In that case, plaintiff was terminated for poor performance in 1983

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                     Page 5
Not Reported in F.Supp.2d, 2005 WL 1476453 (S.D.N.Y.), 35 Employee Benefits Cas. 2789
**(Cite as: 2005 WL 1476453 (S.D.N.Y.))**

and brought an action in 1993.*Id.* at *1.

In *Carey v. IBEW Local 363 Pension Plan,* the plan trustees sent plaintiff a letter in 1991 "unequivocally repudiat[ing] Carey's entitlement to benefits." 201 F.3d 44, 49 (2d Cir.1999). In January 1997, the plan denied plaintiff's formal application for benefits and in March 1998 plaintiff brought an action under ERISA. *Id.* at 46.The Court held that the statute of limitations began to run in 1991 because "a cause of action under ERISA accrues upon a clear repudiation by the plan that is known, or should be known, to the plaintiff regardless of whether the plaintiff has filed a formal application for benefits." *Id.* at 49.Significantly, plaintiff had received a personalized letter from the plan secretary in March 1989 notifying him that he was not covered and pointing to the relevant provisions in the plan. *Id.* at 45–46.If a personalized letter from the plan secretary pointing to relevant sections of the plan is insufficient to constitute "clear repudiation by the plan," then an ambiguous definition within the plan itself will not be sufficient either. Under the facts as alleged by Nahoun, the "cause of action ... accrue[d]" when CSFB advised Nahoun he was not covered, after April 20, 2004. Cpt. ¶ 3.

Ultimately, defendants' statute of limitations argument is without merit. If Nahoun's employment during the Relevant Period was covered by the Plan, then the claim would not be time-barred. In that event, the denial would have occurred no earlier than 2004, when CSFB told Nahoun that the Plan did not cover him. If, on the other hand, Nahoun is not a "participant," he cannot recover in any event. The statute of limitations is therefore immaterial.

*Conclusion*

Defendants' motion to dismiss the complaint for failure to state a claim is denied.

SO ORDERED.

S.D.N.Y.,2005.
Nahoun v. Employees' Pension Plan of Credit Suisse First Boston
Not Reported in F.Supp.2d, 2005 WL 1476453 (S.D.N.Y.), 35 Employee Benefits Cas. 2789

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.